IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:22-CV-00289-M

| | | |
|---|---|---|
| SEAN B. MAYO, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF LAW** |
| | ) | **IN SUPPORT OF DEFENDANTS' MOTION FOR** |
| v. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| ROCKY MOUNT POLICE DEPARTMENT, *et al.*, | ) | Local Rule 7.2 |
| | ) | |
| Defendants. | ) | |

## NATURE OF THE MATTER BEFORE THE COURT

"Rocky Mount Community Corrections Judicial Center Probation Department," (hereinafter "Defendant Community Corrections"), Kiwana Johnson, and Dennis Parris, (collectively "Defendants" "the defendants" or "Community Corrections Defendants") through undersigned counsel, file this memorandum of law in support of their motion for summary judgment.

## STATEMENT OF THE CASE

Plaintiff, a *pro se* litigant, commenced this action by filing a Complaint on August 1, 2022, which this Court deemed amended on March 30, 2023, alleging what appear to be constitutional violations of the Fourth Amendment, due to an unlawful search and an unlawful detention and/or arrest, that allegedly occurred on August 12, 2019; against the "Rocky Mount Police Department" and "Rocky Mount Community Corrections Judicial Center Probation Department," as well as Defendant Craft, a police officer with "Rocky Mount Police Department," and Defendants Johnson and Parris, probation/parole officers ["probation officers"] with the North Carolina Department of Public Safety ["NCDPS"]. [D.E. 1; D.E. 52; D.E. 56]

On May 17, 2023, Defendants filed a motion to dismiss which currently is pending; and following a motion to dismiss by "Rocky Mount Police Department," on May 22, 2023 Magistrate Judge Numbers recommended dismissal of the

matter against "Rocky Mount Police Department." *See* D.E. 78; D.E. 82. This Memorandum of Law supports the summary judgment motion of Defendants filed herewith.

## FACTS

At the time of the incidents that took place on August 12, 2019, Defendants Parris and Johnson were sworn law enforcement officers and employees of the Community Corrections Section ["Community Corrections"] of the Division of Adult Corrections ["DAC"] of NCDPS. Woolard Declaration ¶¶2-3.

On May 6, 2019, an Edgecombe County Superior Court judge sentenced Patrina Lynch to two suspended and concurrent terms of 6 to 17 months and one active term of 30 days, in exchange for 18 months of supervised probation, during which the court ordered that she must "submit at reasonable times to warrantless searches by a probation officer of [her] person and of [her] premises and vehicle while the defendant is present, for purposes directly related to the probation supervision." Exhibit 1, D.E.22-2 at 4-5.[1] Ms. Lynch began her supervised probation in Edgecombe County, and on or about June 24, 2019, advised her probation officer that she intended to move to Nash County in a residence located at 1109 Nashville Road in Rocky Mount, North Carolina. Johnson Declaration ¶¶6,9. Her probation officer approved the residence for Ms. Lynch on July 2, 2019, meaning she would have conducted an "initial home contact" at the residence to verify that the new residence would be suitable for Ms. Lynch to comply with the terms of her probation. Johnson Declaration ¶10; Woolard Declaration ¶¶6-7, Attachment A at 5 (defining "home contact" and "initial home contact"). The process of verifying a probationer's residence includes speaking with others who reside at the residence, observing the probationer's personal belongings, verifying where the probationer sleeps, and conducting a "walk-through" of the residence. Johnson Declaration ¶8; Woolard Declaration, Attachment A at 6.

---

[1] *See Direct Benefits, LLC v. TAC Fin., Inc.*, 2020 U.S. Dist. LEXIS 22621, at *8 n.1 (D. Md. Feb. 10, 2020)("Perhaps part of the issue Plaintiffs' counsel have is a mistaken belief that each document provided in support of, or in opposition to, a summary judgment motion must be properly authenticated. That requirement was eliminated ten years ago by amendment, however. *See* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment. Now, parties need only show that the evidence they provide can be produced in some admissible form at trial. *See* R. 56(c)(2).").

2

Due to the change in Ms. Lynch's residence from Edgecombe to Nash County, Defendant Johnson, who supervised probationers in Nash County, became Ms. Lynch's probation officer. Johnson Declaration ¶11. On July 5, 2019 Defendant Johnson visited Ms. Lynch's new residence and conducted a home contact to verify her residency and its suitability for her probation compliance. Johnson Declaration ¶12. On July 16, 2019 Defendant Johnson approved the residence. Johnson Declaration ¶13. Defendant Johnson visited Ms. Lynch's residence on August 11, 2019, confirmed that Ms. Lynch resided at 1109 Nashville Road, and spoke with Plaintiff who informed her that Ms. Lynch had been staying out all night. Johnson Declaration ¶14.

The following day, August 12, 2019, at around 3:59 PM, Rocky Mount Police records indicate that a "Katrina" Lynch called 911 about an incident at 1109 Nashville Road. Exhibit 4, propounded in discovery by "Rocky Mount Police Department" on February 2, 2023. The responding officer noted, a "[m]ale party that lives at the residence was outside when I arrived on scene. He advised that Katrina could stay at the residence as long as she went inside and did not cause any more issues. Katrina advised she was going inside and would stay in a spare bedroom until she can get her belongings together to leave the residence for good." Exhibit 4 at 1. The officer noted at 4:32 PM, "[S]ame has boyfriend/exboyfriend that changed locks on the door. [S]ame stated he probation officer told her that he can't kick her out without an eviction notice. I informed her info was accurate. I also informed her that I can't force open the doors or force the bf to let her in." Exhibit 4 at 1.

On August 12, 2019, at around 8:25 PM, Defendants Parris and Johnson arrived at Plaintiff's residence for the purpose of verifying Ms. Lynch's compliance with the terms of her probation. Johnson Declaration ¶15. *See* D.E. 22-1 ¶¶6-7,14. *See also* Exhibit 2 propounded in discovery to Plaintiff by Defendant "Rocky Mount Police Department" on February 2, 2023, as AXON_Body_2_Video_2019-08-12_2018.mp4, 2019-08-13 T00:17:32Z[2] (revealing that at 8:32 PM EDT there

---

[2] *See* https://www.calculatehours.com/zulu-time.html, last visited June 14, 2023 ("Zulu Time is used to refer to the current time in Greenwich, England. To avoid confusion about time zones and daylight saving time, a Global Time was created. This Global time has many names. It used to be called GMT. Now it's called UTC, Zulu Time or Z Time!. . . Greenwich Mean Time (GMT) is now called Universal Time Coordinated (UTC) and is also commonly known as Zulu

still was daylight).

As a safety precaution, Defendant Johnson asked Defendant Parris to accompany her. Johnson Declaration ¶16. *See* D.E. 22-1 ¶8.

During their visit, Defendant Johnson became more concerned for their safety, as Ms. Lynch met them at their vehicle upon their arrival, was crying, and appeared fearful; and Plaintiff began yelling and cursing at them, and refused to allow them entry to the residence. Johnson Declaration ¶¶18, 20-22.

Defendant Parris called dispatch to request back-up assistance. Johnson Declaration ¶23. *See* D.E. 22-1 ¶9.

Upon arrival of police, the following events transpired:

As Ms. Lynch, Defendants Parris and Johnson, and officers from the Rocky Mount Police Department (Officer Whitaker and Defendant Craft) were standing outside the residence, Plaintiff was inside the residence, when Officer Whitaker, who was wearing a body camera or "body cam," asked Ms. Lynch, "You do have residence at this, lease, where you lease or rent to?" Ms. Lynch responded, "The — the office said I could stay here 30 days." Exhibit 2 00:19:01-19:04Z. *See* Exhibit 8 at 6; https://my.axon.com/sfc/servlet.shepherd/document/download/069f3000006Ko6BAAS, last visited June 22, 2023 (Once the body camera is turned on, it will enter "buffering mode;"[w]hen buffering begins . . . the camera will be capturing video, but no audio . . . .[;] [b]uffered duration is 30 seconds by default (00:00:30)[;] [w]hen you activate the event mode, the buffered video (not audio) captured directly before the event, up to 30 seconds, will be saved and attached to the event in permanent memory."); Exhibit 8 at 7 ("With default settings, the system does not capture audio

Time."); https://savvytime.com/converter/z-to-est, last visited June 14, 2023 ("**Z** - is the zone designator for the zero UTC/GMT offset, also known as 'Zulu' time.. . . Daylight Saving: This is a standard time zone, however during summer some places switch clocks for one hour forward when daylight saving comes into effect and observe **Eastern Daylight Time (EDT)**.. . . Standard time ends annually the . . . second Sunday of March.. . . Zulu Time Zone is **4 hours ahead** of Eastern Daylight Time.")(emphasis added). This Court can take judicial notice that "2019-08-13 T00:17:32Z" converts to August 12, 2019 at 8:32 PM EDT. *See Carpenter v. Norfolk & W. Ry.*, 1998 U.S. App. LEXIS 7694, at *10 (6th Cir. Apr. 16, 1998) ("Pursuant to Federal Rule of Evidence 201, the trial court has the power to take judicial notice of general time . . . calculations."), reported at *Carpenter v. Norfolk & W. Ry.*, 145 F.3d 1330 (6th Cir. 1998).

4

in buffering mode, so anything recorded in that mode will be video-only. Buffering mode starts only after the Axon Body 2 camera is turned on.").

Defendant Craft asked Plaintiff, "What——does she stay here?" Defendant Johnson responded, "Um hum." Exhibit 2 00:19:33-19:36Z. Defendant Craft asked, "Why won't you let her come back inside?" Plaintiff responded through the blinds of a window in a closed door, "I ain't never locked her out. What are you talking about?" Exhibit 2 00:19:47-19:53Z. Ms. Lynch explained, "No, he never locked me out, but . . . he talked shit to them when they got here." Exhibit 2 00:19:53-19:57Z.

Plaintiff explained, "He said somebody's got a gun, get your racist ass out my yard, dude. Nobody want to shoot you." Exhibit 2 00:19:57-20:04Z. Defendant Parris responded, "I told him to get his hands out of his pocket." Exhibit 2 00:20:08-20:10Z. Plaintiff responded, "Get your ass up out my goddam yard, dude. You're trespassing." Exhibit 2 00:20:10-20:13Z.

Officer Whitaker asked Defendants Johnson and Parris, "Y'all have to search the home?" Exhibit 2 00:20:30-20:32Z. Ms. Lynch responded, "She got to search my home." Exhibit 2 00:20:34-20:36Z.

Officer Whitaker asked Ms. Lynch, "And now, he, does he stay here with you?" Exhibit 2 00:20:37-20:39Z. Ms. Lynch responded, "Uh-huh." Exhibit 2 00:20:39Z. Defendant Johnson stated, "No, she, when we got here, she was saying he won't let her in the house." Exhibit 2 00:20:43-20:47Z. Officer Whitaker asked, "Okay. So y'all just want him to step out while y'all search, basically?" Exhibit 2 00:20:39-20:41Z Ms. Lynch responded, "They got to search. They got to search where I'm staying at... . Sean, they want to search the house." Exhibit 2 00:20:41-20:49Z. Plaintiff responded, "And why the fuck didn't she say that, or you say that?" Exhibit 2 00:20:55-20:58Z. Defendant Johnson stated, "She saying her medicine in the house. She can't get her medicine. That's what she told us when we got here." Exhibit 2 00:21:03-21:07Z.

Defendant Craft asked, "Why is he so mad?" Exhibit 2 00:21:07-21:08Z. Defendant Parris responded, "He got mad saying I [said he] had a gun in his pocket. I was like, 'Man, I just told you keep your hands out of your pocket. I don't know what's in your pocket.'" Exhibit 2 00:21:16-21:23Z. Plaintiff opened the door and stated, "First of all, I ain't

5

did shit to that dude right there. Okay? Nothing to him. Dude I don't want to touch you, let alone look at you. Talking about some, 'Shoot you,' please, you ain't worth it." Exhibit 2 00:21:36-21:48Z. Ms. Lynch went inside. Exhibit 2 00:21:40Z.

Officer Whitaker asked, "Y'all want to search while he's in the house or y'all want to wait until he comes out?" Exhibit 2 00:21:51-21:54Z. Plaintiff stated, "Come on in, hold, let me, let me put my dinner back in the oven, for y'all, to do what y'all need to do. Is that fine?" Exhibit 2 00:21:59- 22:07Z. Plaintiff stated, "Come on in." Exhibit 2 00:22:17Z. Defendant Johnson entered the residence and Defendant Parris responded, "Yeah, if we're going to search the residence, he can step outside here or he can be placed in handcuffs;" and entered the residence. Exhibit 2 00:22:16-22:20Z.

Plaintiff came outside and stated, "The door was wide fucking open the whole--." Exhibit 2 00:22:39-22:41Z. Officer Whitaker stated, "What basically we got is that you said that you won't let us in the house, but she has residency here." Plaintiff responded, "What the hell?" Exhibit 2 00:22:46-22:51Z. Defendant Craft stated, "All we do know is she's on probation, and they have to- they have to do her whole probation stuff." Plaintiff responded, "I already told her she could do that. She didn't come here and say that." Exhibit 2 00:22:55-23:04Z. Plaintiff explained:

> The issue is not her. The issue is the guy that wants somebody to touch him, okay? The one that's fucking shivering over here. For what? Go fucking get a desk job. Don't come up to me. I got on a fucking work uniform. "Oh, you got a gun.' You see this big ass phone on my goddam hip? 'Oh, it might've been a gun.' Man, get the fuck out. You hear me? Get another job, okay? If you're fucking scared, get your ass up out of here.. . . Don't come up to me, 'Oh, you got a gun.' Motherfucker, you got a gun, pull your gun out and shoot.

Exhibit 2 00:23:11-23:55Z. Plaintiff stated, "He asked me, he said, 'Can you get out the truck?' I'm like, "For what, you here to see her. There she go.' Hold up, hold up. This damn kicker of the whole story, I'm 'bout to leave, and the door was still open (laughter), and they told me to stay. I'm about to get some, go get some- some garlic bread, from fucking (laughter). " Exhibit 2 00:24:02-24:24Z.

Officer Whitaker stated, "It sounds like a big under- a big misunderstanding. That's what it sound like." Exhibit 2 00:24:36-24:40Z. Defendant Craft stated, "Either way, I appreciate you letting them go in. Plaintiff stated, "No, no, no, but did you just hear the kicker? The door was open (laughter). I was leaving." Defendant Craft responded, "We don't

6

know that.  I can't come and barge in your house."  Exhibit 2 00:25:20-25-39Z.

Defendant Parris came outside and asked the officers, "To make things a little easy, do you guys have a K-9 working tonight?" Defendant Craft responded, "Yeah, maybe so."  Defendant Parris stated, "Could y'all check on that? Maybe run a K-9 through the house." Exhibit 2 00:25:39-25:50Z.

Ms. Lynch and Defendant Johnson came outside.  Ms. Lynch appeared to be crying, stated, "Sean, I love you to death, but you making it hard.  I don't want to go nowhere."   Plaintiff responded, "I'm making it hard?"  Ms. Lynch responded, "You still talking trash to them." Plaintiff responded, "She said you told her a lie, said I wouldn't let you in the house." Exhibit 2 00:25:53-26:05Z. Officer Whitaker stepped away and walked toward the front of the house.  Exhibit 2 00:26:06Z.

After Officer Whitaker returned to the back of the house, Defendant Parris stated to Plaintiff, "I don't know you. You don't know me.  I don't know what you're capable of.  You don't know what I'm capable of."  Exhibit 2 00:26:50-26:53Z.   Plaintiff responded, "Okay, so therefore, when you come, make sure, that everybody is treated fairly.  Don't come talking to me like I'm some goddam nigger.... You're the nigger.  You're the nigger, because you acting ignorant." Exhibit 2 00:26:53-27:08Z.

Defendant Craft responded, "I think all of that's irrelevant." Exhibit 2 00:27:28-27:29Z.  Plaintiff responded, "No. It's not.  It's very relevant, because he's scared, of me (laughter)." Exhibit 2 00:27:30-27:33Z.  Defendant Craft stated, "I'ma tell you, if I, if I came over, and you had your hands in your pocket, I'd ask you too."   Exhibit 2 00:27:34-27:37Z. Defendant Johnson stated to Plaintiff's sister, "What she need to do is find somewhere to stay (indecipherable)."  Plaintiff's sister, Keia, who had arrived and sat on the porch at time stamp 00:27:00Z, responded, "What we doing right now?  She need to do it right now?"  Defendant Johnson responded, "Um.  No.  Soon." Exhibit 2 00:28:57-29:05Z.

Defendant Parris stated to Officer Whitaker, "Cocaine in the truck... . (indecipherable) it's in the bedroom, but we can do it  with the truck with a K-9 (indecipherable) the common areas, that's why I got that K-9 out here."    Officer Whitaker interjected, "Gun," and then asked, "Do you know if he's convicted or anything?" Defendant Parris responded,

"No." Exhibit 2 00:30:42-30:59Z.

Defendant Johnson and Plaintiff conversed and Defendant Johnson stated, "I mean um, I don't know what help is. Because I mean, I saw the way you acted earlier, and I don't feel comfortable." Plaintiff stated, "She stayed out. She stayed out all night. She don't have a curfew? Y'all didn't give a--?" Officer Whitaker interrupted their conversation with questions. Exhibit 2 00:32:57-33:10Z.

Officer Whitaker asked Plaintiff, "You stay here with her, sir?" Plaintiff responded, "Well, she stays with me." Officer Whitaker responded, "Okay. I got you." Exhibit 2 00:33:20-33:26Z.

Ms. Lynch stated to Plaintiff, "They making me leave because of the way you act." Plaintiff responded, "Because of the way I act?" Ms. Lynch responded, "Yeah." Exhibit 2 00:33:34-33:42Z. *See* Johnson Declaration ¶35 (Before and after the police arrived, Ms. Lynch informed Defendant Johnson that Plaintiff had been locking her out, and Plaintiff informed Defendant Johnson that if Ms. Lynch continued to come in at all hours of the night, she would have to leave.).

At time stamp 00:47:00Z, a K-9 officer is seen. Exhibit 2 00:47:00Z. Defendant Parris asked, "Who's the Tahoe registered to?" Ms. Lynch responded, "It ain't mine. I don't got no car." Defendant Parris again asked, "Who's the Tahoe registered to, sir? Is it unlocked, because if she has access to the Tahoe on the property, kind of like a common area—um, is it locked?" Plaintiff responded, "Yeah. It doesn't work. It doesn't work at all." Defendant Parris asked, "Okay, so it's a dead vehicle too, so we still have to search it, if it's like uh-" Plaintiff explained, "No, it's not a dead vehicle. I'm just saying it's not, it's not a driven, vehicle." Defendant Parris explained, "Okay, yeah, so we got, we're gonna search that, um because the dog hit on it... . Do you know where the keys are for the Tahoe? Is it unlocked or is it locked?" Plaintiff responded, "Locked." Defendant Parris asked, "It's locked? Do you know where the keys are?" Plaintiff responded, "No." Defendant Parris asked, "You don't know where the keys are, but you know that it runs?" Plaintiff responded, "Yeah, I can get the key for you, but you won't let me go in the house." Defendant Craft asked, "Where, where's the keys to it?" Plaintiff responded, "It's in the house." Exhibit 2 00:51:20-52:27Z.

Officer Whitaker asked, "You say you know where the keys are? She probably going to escort you in so you can

show where the keys at, alright?" Officer Whitaker then stated, "Come on in buddy, let's get that, get that key for me, alright?" Plaintiff entered the house. Exhibit 2 00:53:44-54:08Z.

Plaintiff looked through various areas of the residence, and stated, "Somebody moved it.. . . Somebody done moved it out of here.. . . The key was right in the kitchen." Exhibit 2 00:54:54-55:46Z. Defendant Parris asked Plaintiff, "Do you have any keys in your pocket?" Plaintiff responded, "No." Exhibit 2 00:56:00-56:03Z. Defendant Parris asked Plaintiff, "Now what about the keys that are in your pocket?" Ms. Lynch responded, "They go to that." Mr. Mayo stated, "There go the keys on um- there go the truck right here." Defendant Parris stated, "You mind if I see 'em real quick?" Exhibit 2 00:56:41-56:49Z. Plaintiff retrieved the keys from his pants pocket and handed them to Defendant Parris. Exhibit 2 00:57:08-57:14Z. Defendant Parris walked toward a vehicle with the keys. Exhibit 2 00:57:20-57:27Z.

Defendant Craft placed Plaintiff under arrest and Plaintiff responded, "What are you arresting me for?" Defendant Craft responded, "Possession of a firearm by a convicted felon." Plaintiff responded, "I don't have no firearm, what are you talking about?" Exhibit 2 01:05:35-05:48Z.

Officer Whitaker asked Plaintiff, "Is it registered to you, man?" Plaintiff responded, "I don't . . . that's not my gun. I don't have a gun." Officer Whitaker asked, "That is your vehicle? . . . Is that your vehicle registered to you? Is it?" Plaintiff responded, "Yeah, it's registered to me." Ms. Lynch responded, "Ain't no tag on it." Officer Whitaker asked, "Were you the only real driver of it?" Plaintiff responded, "No. No. I just bought it from over at my sister's house." Officer Whitaker asked Plaintiff if he searched it beforehand and he responded, "Everything's in there is, that's what's been in it." Exhibit 2 01:08:29-09:03Z.

Defendant Parris later stated, "Ms. Lynch, you can come inside with us. We're going to do a quick uh, search of the residence, okay? Common areas and such." Defendant Craft stated to Plaintiff, "The reason why you in handcuffs is because you're going to be charged with possession of a firearm by a convicted felon." Plaintiff stated, "This wasn't my gun. I didn't have no gun." Defendant Craft responded, "That's your truck. You said it was your truck. You got the key." Plaintiff responded, "I said it's registered to me." Defendant Craft explained, "If it's registered, it's your truck. You had

9

the keys in your pocket, okay? You gave him the keys. They did a probation search. They found a firearm inside the vehicle." Exhibit 2 01:20:00-20:46Z. *See* Johnson Declaration ¶¶ 34,40-43 (Defendant Johnson searched the residence, recalled seeing Ms. Lynch's clothes and prescribed medication, did not search Plaintiff's vehicle, and remained outside while Rocky Mount Police and their K-9 searched the residence.).

Defendant Parris later asked Ms. Lynch, "You can't stay here?" Ms. Lynch responded, "So, I'm gonna have to get a whole fucking apartment. She give me 30 days to get an apartment. Why Sean? Why?" Exhibit 2 01:27:55-28:13Z.

Ms. Lynch later asked, "I can't stay at my house?" Exhibit 2 01:30:32-30:34Z. A Rocky Mount Police corporal[3] responded, "No ma'am." Plaintiff's sister, asked, "Why she can't stay here?" 01:30:39-30:41Z. Ms. Lynch stated, "He gone be locked up." Defendant Craft asked, "Do you care if she stays here?" Defendant Johnson responded, "I mean, I'm still giving her a time frame anyway to get out." Officer Whitaker asked, "What you want to do, boss man?" Ms. Lynch responded, "I'm staying here . . . (indecipherable) locked up." Exhibit 2 01:30:43-31:21Z. *See* Johnson Declaration ¶¶36-38 (Defendant Johnson did not believe it was safe for Ms. Lynch to remain at the residence or for Defendant Johnson to conduct home contacts at the residence; and informed Ms. Lynch that she would give her 30 days to find another place to live.). *See also* Johnson Declaration ¶27 (Defendant Johnson denied that either she or Defendant Parris displayed their service weapons prior to the police arriving and had they done so, it would have been considered a "use of force" about which they would had to report to their superiors.); Woolard Declaration ¶¶4,11,12, Attachment C § .1711(a)(2), (e)(1), (f)(2),(h)(1),(i)(1), (j)(5).

Christopher McPhatter was the magistrate working that night when Officer Whitaker and Defendant Craft brought Plaintiff in, seeking an order finding probable cause to arrest Plaintiff. McPhatter Declaration ¶¶2-5. He obtained information from Plaintiff and both officers, and understood that Ms. Lynch was on probation; Plaintiff was not on

---

[3] *See* https://www.wnct.com/local-news/partners-in-crime-rocky-mount-police-celebrate-twins-serving-together/amp/ last visited June 14, 2023 (revealing that the chevron for a corporal with the Rocky Mount Police Department has two stripes.).

probation; probation officers had called the police seeking assistance with a probation matter involving Ms. Lynch; it was not clear why the probation offices were at Plaintiff's residence; no one indicated Ms. Lynch lived at Plaintiff's residence; the police used a K-9 to search Plaintiff's residence and vehicle without a warrant and found a gun in his vehicle; and police arrested Plaintiff for possession of a firearm by a convicted felon. McPhatter Declaration ¶¶6-11. Mr. McPhatter did not find probable cause for the search or the arrest, as Plaintiff was not on probation. McPhatter Declaration ¶12.

The following day, Tuesday, August 13, 2019, Rocky Mount Police Department records indicate that Ms. Lynch called 911 at 8:30 PM regarding a "domestic disturbance" at 1109 Nashville Road. Exhibit 5, propounded in discovery by "Rocky Mount Police Department" on February 2, 2023. The responding officer, Brandon Thomas Sherrod, noted, "[C]aller advised officers came out last[]night and subj is now threatening to have someone come beat her up.. . . [C]aller would like to speak with officers in ref to Shawn Mayo." Exhibit 5 at 1.

On Wednesday, August 14, 2019, Ms. Lynch appeared before Mr. McPhatter after which Mr. McPhatter found probable cause to believe that Plaintiff committed the crimes of assault by strangulation and assault inflicting serious bodily injury. Exhibit 6[4] at 1. Mr. McPhatter understood that Plaintiff choked Ms. Lynch, "leaving red marks around her neck, causing her to lose consciousness by strangulation with his hands around her throat;" and that he inflicted an injury to her "right arm, requiring 12 stitches after pushing [her] through a storm door." Exhibit 6 at 1. Both Plaintiff and Ms. Lynch are listed as having an address at 1109 Nashville Road. Exhibit 6 at 1,3,5. On June 19, 2020, the prosecutor voluntarily dismissed the charges in that "After numerous attempts, State unable to contact the victim." Exhibit 6 at 7.

On October 25, 2019, another magistrate issued a warrant for arrest and executed Conditions of Release and Release Order, and an "Appearance Bond for Pretrial Release," in Nash County, indicating that that Ms. Lynch was arrested and posted bond the same day, and that her address was 1109 Nashville Road in Rocky Mount. Exhibit 3.

---

[4] *See Reed v. Reed (In re Reed)*, 2013 Bankr. LEXIS 5180, *25 (D. Md. Sept. 30, 2014), n. 2 (On summary judgment "[p]roperly certified, or 'true', copies of records from another court are deemed self-authenticating and admissible.").

<u>**ARGUMENT**</u>

Plaintiff cannot forecast that Community Corrections Defendants have violated his constitutional right to be free from an unreasonable search, an unlawful arrest or false imprisonment. *See Hardt v. Reliance Std. Life Ins. Co.*, 540 F. Supp. 2d 656, 660 (E.D. Va. 2008)("The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without **forecasting** evidence sufficient to sustain his or her burden of proof on that point.") (emphasis added), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Likewise, Plaintiff is not entitled to compensatory or punitive damages from any of Community Corrections Defendants in either their official or individual capacities. As such, this Court should grant summary judgment in their favor.

I.      SUMMARY JUDGMENT PRINCIPLES

"[S]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), *citing* Fed. R. Civ. P. 56(c). The movant has "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, [*etc.*] . . . , which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Further, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, *citing* Fed. R. Civ. P. 56(e).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*, 477 U.S. at 249. In opposing summary judgment, nonmovants must do more than present "a mere scintilla of evidence" in their favor. *See Matherly v. Andrews*, 859 F.3d 264, 280 (4th Cir. 2017). They must present sufficient evidence that reasonable jurors could find for them by a preponderance of the evidence. Only "material factual discrepancies make summary judgment improper." *Jones v. Westside-Urban Health Ctr., Inc.*, 760 F. Supp. 1575, 1578 (S.D. Ga. 1991). *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). "Factual disputes that are irrelevant or

unnecessary will not be counted." *Id.*, 477 U.S. at 248. Even if relevant, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). *See Hodges v. Fed.-Mogul Corp.*, 621 F. App'x 735, 741 (4th Cir. 2015)(holding that where facts presented are "blatantly contradicted by the record, so that no reasonable jury could believe it, an alleged factual dispute created by the [evidence] need not be credited and will not defeat an otherwise properly supported motion for summary judgment.")(citations and quotations omitted). "As to materiality, the substantive law will identify which facts are material." *Id.*

In addition, a nonmoving party who relies on "mere belief or conjecture, or the allegations and denials contained in his pleadings," cannot avoid summary judgment. *Celotex,* 477 U.S. at 324; *Pronin v. Johnson*, 628 F. App'x 160, 161 (4th Cir. 2015)("Mere conclusory allegations and bare denials are insufficient to support the nonmoving party's case.")(*per curiam*); *Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP*, 213 F. 3d 175, 180 (4th Cir. 2000)(holding that Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). As such, declarations submitted by a party which contain only hearsay, speculation about the motivation of others or other inadmissible assertions properly cannot be considered and are insufficient to defeat summary judgment. *Celotex*, 477 U.S. at 322. *See United States v. Norman*, 2020 U.S. Dist. LEXIS 125765, *5 (D.S.C. July 17, 2020)("A litigant cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."), *citing Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). A trial judge has an affirmative duty to prevent factually unsupported claims from proceeding to trial. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

Likewise, where a party simply misunderstands facts relevant to an issue, such a misunderstanding is not a ground upon which to grant summary judgment in favor of the party with the mistaken belief. *See Kelly v. SunTrust Bank*, 2016 U.S. Dist. LEXIS 23451, at *2 (E.D. Va. Feb. 25, 2016)(granting summary judgment for a defendant bank where the

13

plaintiff alleged inaccuracies in the bank's reports to credit bureaus, by reasoning "Kelly simply misunderstands the way these entities report payment delinquencies on consumer reports.").

Plaintiff has not and cannot forecast a presentation of evidence that would allow a reasonable juror to return a verdict in his favor. As set forth below, there is no evidence that either of the defendants violated his due process rights, and summary judgment should be "rendered forthwith."

## II.    CONSTITUTIONAL ARGUMENTS

Without alerting this Court to the statutory basis for its jurisdiction, Plaintiff has alleged that the defendants violated his rights by performing an illegal search, falsely arresting him, and holding him against his will. *See* D.E. 1 at 2.  Assuming *arguendo* as to jurisdiction under Section 1983 and a claim under the Fourth and Fourteenth Amendments, Plaintiff cannot avoid summary judgment.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. CONST. amend. IV.  *See Marcus v. Search Warrant of Property*, 367 U.S. 717, 738 (1961)(Black, J., concurring)("[T]he Fourteenth Amendment makes the Fourth Amendment applicable to the States to the full extent of its terms, just  as it applies to the Federal Government.").

"A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement."  *United States v. Avent*, 984 F. Supp. 961, 964 (E.D. Va. 1997), *citing Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).  "[W]hen a private citizen voluntarily consents to . . . search by police officers . . . he cannot later claim, when criminal conduct is uncovered, that his Fourth Amendment rights were violated. While consent generally has its limits, a consensual search or seizure within those limits **does not implicate** constitutional rights."  *Avent*, 984 F. Supp. at 964 (emphasis added), *citing United States v. McFarley*, 991 F.2d 1188, 1191 (4th Cir. 1993).

As such, in North Carolina, "a law-enforcement officer may conduct a search and make seizures, without a search warrant or other authorization, if consent to the search is given."  N.C.G.S. § 15A-221(a).   Likewise, NCDAC's policy lists among the reasons a probation/parole officer may search is when "[t]he probation/parole officer is authorized to conduct

warrantless searches of persons, vehicles, and/or premises in the following situations ONLY: (a) When the offender consents." *See* Woolard Declaration, Attachment B, Ch. C §0802.

However, "[c]onstitutionally permissible searches and seizures which are **not regulated** by the General Statutes of North Carolina are **not prohibited**[;]" and NCDAC recognizes that the courts ultimately determine what is or is not reasonable under the Constitution(s). *See* N.C.G.S. § 15A-231 (emphasis added); Woolard Declaration, Attachment B, Ch. C §.0801 ("The courts have determined what is necessary for probable cause, and when searches conducted without warrants are reasonable.").

Moreover, "[w]hile North Carolina's probation law authorizes only probation officers to conduct warrantless searches, that authorization does not preclude the probation officer from obtaining help from the police department for the purpose of physically conducting the search." *United States v. Midgette*, 478 F.3d 616, 625-626 (4th Cir. 2007).

Premises

Ordinarily, "[w]arrantless searches of a probationer's person, vehicle, and residence require reasonable suspicion, not probable cause." *Osborne v. Long*, 2012 U.S. Dist. LEXIS 33373, at *24 (S.D. W. Va. Mar. 13, 2012). However, "[a]n examination of North Carolina [G.S.] 15A-1343(b)(13) shows that the statute does not require a probation officer to have reasonable suspicion or any other basis in order to conduct a warrantless search of a probationer's person, vehicle or premises if that condition is placed in the judgment placing the probationer on probation." *United States v. Plemmons*, 2017 U.S. Dist. LEXIS 214704, at *23 (W.D.N.C. Dec. 11, 2017). *See* N.C.G.S. § 15A-1343(b)(13) (A probationer must "[s]ubmit at reasonable times to warrantless searches by a probation officer of the probationer's person and of the probationer's vehicle and premises while the probationer is present, for purposes directly related to the probation supervision."). *See also* Woolard Declaration, Attachment B, CH. C §.0804.

Furthermore, "[t]he restrictions that North Carolina's probation statute place on probationer searches undoubtedly assure that the searches conducted pursuant to it are justified by the State's **special needs**. We readily conclude, therefore, that searches conducted in conformity with the statute are reasonable under the Fourth Amendment."

*Midgette*, 478 F.3d at 624 (emphasis added). *See Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)(holding that a warrantless search is reasonable under the Fourth and Fourteenth Amendments when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.").

In an almost identical scenario, the North Carolina Court of Appeals recently found no violation of a boyfriend's constitutional rights following a probation search of the residence shared with his girlfriend, a probationer. *See State v. Lucas*, 880 S.E.2d 418, 425 P32 (N.C. Ct. App. 2022)(holding that where a criminal defendant challenged the constitutionality of a search of his residence by arguing that his girlfriend, the probationer, did not live with him, a search of a residence was not unreasonable where the defendant did not "challenge the constitutionality of N.C. Gen. Stat. § 15A-1343, . . . contest that the warrantless search was made at a reasonable time or [contest] that Ms. Green [the probationer] was present for the search").

The search of Plaintiff's premises complied with the terms of G.S. 15A-1343(b)(13) and therefore North Carolina's special needs, as: the search was conducted at a reasonable time since the body cam footage revealed that there still daylight when Officer Whitaker arrived, and the body cam time stamp converts to 8:32 PM EDST; Ms. Lynch was on probation; the only indication that Ms. Lynch did not reside at the residence is Plaintiff's belated allegation more than three years later; the body cam footage contains numerous statements by Defendant Johnson, Mr. Lynch, **and Plaintiff** that Ms. Lynch resided at Plaintiff's residence; as required by NCDPS/NCDAC policy, Defendant Johnson averred she previously had visited the residence and confirmed Ms. Lynch's residency; both Defendants Johnson and Parris were probation officers and both conducted the search of the premises; Ms. Lynch was present for the search of the premises on August 12, 2019; and Defendant Johnson and Ms. Lynch explained to the police that Defendants needed to search the premises as part of Ms. Lynch's probation requirements, to which Plaintiff did not object, but instead responded, "Why she didn't say that?" and "I already told her she could do that." *See United States v. Plemmons*, 2017 U.S. Dist. LEXIS 214704, at *16 (W.D.N.C. Dec. 11, 2017)("The Federal Rules of Criminal Procedure define 'daytime' for purposes of search warrant execution as falling between '6:00 o'clock a.m. and 10:00 o'clock p.m.'"), *quoting* Fed. R. Crim. P. 41(a)(2)(B);

Exhibit 2 00:17:32Z; Exhibit 1 at 1; Woolard Declaration ¶2, Attachment A; Johnson Declaration ¶¶12-14; Exhibit 2 00:20:39-20:49, 00:20:55-20:58, 00:21:40, 00:22:16-22:20, 00:22:55-23:04, 01:20:00-20:46Z.

Thus, Defendants' search of the premises comported with the Fourth Amendment, regardless of whether Plaintiff was on probation. For the reasons noted below, the fact Magistrate McPhatter did not find probable cause does not change the constitutionality of the search of the premises. While Plaintiff now alleges that Ms. Lynch did not live with him, as also discussed below, there is no genuine issue of material fact as to that issue. As such, Plaintiff's allegation that Defendants' search of his premises violated his constitutional rights, cannot withstand summary judgment.

Vehicle

While neither North Carolina's statutes nor NCDPS/NCDAC's policies **specifically enumerate** the right of a probation/parole officer to search the vehicle of a non-"offender," both NCDAC's policy and the General Statutes recognize that the consent of the registered owner allows probation/parole officer, e.g. law enforcement officer, to search a vehicle. *See* Woolard Declaration, Attachment B, Ch. C §.0803 ("Permission to make a search can be given by . . . [t]he registered owner of a vehicle to be searched, or the person in apparent control of its operation and contents at the time the consent is given."); N.C.G.S. § 15A-222 (2) ("The consent needed to justify a search and seizure under G.S. 15A-221 must be given . . . [b]y the registered owner of a vehicle to be searched."). As such, probation officers, like all law enforcement, may search a person's vehicle with his/her consent. *See Avent.*

The body cam footage reveals that Plaintiff not only offered to look for the keys inside the premises, but that he went inside and appeared to search for them, and later admitted they were in his pocket. It also reveals that after Defendant Parris asked, "You mind if I see 'em real quick?" Plaintiff removed them from his pants pocket and handed them to Defendant Parris. *See* Exhibit 2 00:51:20-52:27, 00:54:54-55:46, 00:56:41-57:14Z. Under those circumstances, Plaintiff consented to the search of the truck. *See United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003)("Consent may be inferred from actions as well as words."). *See also United States v. Neely*, 564 F.3d 346, 350 (4th Cir. 2009)(holding that non-verbal actions did not reveal consent where the defendant "**did not offer** his keys in response to a law

17

enforcement officer's request to search his car, an action which might reasonably be viewed as non-verbal consent.")(emphasis added); *United States v. Townsend*, 2020 U.S. Dist. LEXIS 156768, at \*6-7 (S.D.W.Va. Aug. 28, 2020)("by handing his keys over to Deputy Miller without any evidence that she demanded or coerced him to do so, defendant was consenting to her using his keys to unlock the truck and search in the tool bag he had said his gun was stored in. Thus, this is precisely the kind of non-verbal conduct that demonstrates consent."), *citing United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999)(holding that when the defendant "voluntarily and without objection handed [a DEA agent] the key in response to her asking him, 'Can you open that?' [The agent] reasonably construed Gordon's response as consent to search the locked bag."); *United States v. Jones*, 356 F.3d 529, 534 (4th Cir. 2004) (holding that the "suspect's failure to object . . . . is a strong indicator that the search was within the proper bounds of the consent search."), *citing Gordon*. As such, Plaintiff's actions of looking for the keys, admitting they were in his pants pocket and then handing them to Defendant Parris upon his request to "see them real quick," do not implicate his Fourth Amendment rights. Thus, he cannot claim that because the search revealed a gun, Defendant Parris violated his Fourth Amendment rights.

Arrest

It is indisputed that Defendants did not arrest Plaintiff. However, *Midgette* makes clear that they were within their right to seek assistance from the police, who in turn later arrested Plaintiff.

Regardless, as is the case with the ability to arrest, as sworn law enforcement officers, probation officers have the ability **to detain** members of the public under certain circumstances. *See* D.E. 22, Attachment A ¶10; *United States v. McDaniel*, 2016 U.S. Dist. LEXIS 151782, \*17 (N.D.W.V. Oct. 10, 2016)("Exigent circumstances can permit a warrantless . . . . seizure, even without probable cause to believe a crime has occurred; exigent circumstances include the officer safety exception. *Figg v. Schroeder*, 312 F.3d 625.); *Figg v. Schroeder*, 312 F.3d 625, 639 (4th Cir. 2002)("For police officers successfully to assert the exigent circumstances doctrine, they need only possess a 'reasonable suspicion' that such circumstances exist at the time of the . . . seizure in question. And, as usual, courts should not engage in 'unreasonable second-guessing' of the officers' assessment of the circumstances that they faced.")(citations omitted), *citing United States*

18

*v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985). Those circumstances include the fact that as a "safety precaution, it is not uncommon for probation officers conducting home contacts, to ask any residents other than the probationer at the premises, not to leave until the search is complete or to leave prior to conducting the search. *See* D.E. 22, Attachment A ¶8. Thus, Plaintiff has not forecast evidence that Defendants violated his rights by acting in a manner other than that which was necessary to ensure their safety during the home contact. As such, if Defendants asked Plaintiff not to leave, there remains nothing to suggest Plaintiff's alleged detention was outside the parameters of the Fourth Amendment.

As discussed below, there is no genuine issue of material fact as to whether Defendant Parris "pulled a gun" on Plaintiff. Even if true, "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful [detention] into a custodial arrest." *Capps v. Long*, 2020 U.S. Dist. LEXIS 84835, *13 (D.S.C. March 11, 2020), *citing United States v. Leshuk*, 65 F.3d 1105, 1109-1110 (4th Cir. 1995), *States v. Vaughan*, 700 F.3d 705, 709 (4th Cir. 2012) (rejecting the "free to leave" analysis when determining whether an investigative detention has turned into an arrest). Thus, if and when Defendants detained Plaintiff, or if in doing so Defendant Parris "pulled a gun" on Plaintiff, their actions were in accordance with Fourth Amendment exception allowing them to temporarily detain Plaintiff for the purpose of ensuring their safety.

Furthermore, any issue regarding the elements of North Carolina's torts of false imprisonment or false arrest, is not enough for this Court to deny Defendants' summary judgment as to Plaintiff's Fourth and Fourteenth Amendment rights, and in particular, his rights under Section 1983. While the Fourth and Fourteenth Amendments protect citizen against unreasonable searches, Section 1983 provides in pertinent part that "[every] person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983 (1974).

In so doing, "Section 1983 imposes liability for violations of rights protected by the Constitution, **not for violations of duties of care arising out of tort law**. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles." *Baker v. McCollan*, 443 U.S. 137, 146 (1979) (emphasis added). "Just as medical

19

malpractice does not become a constitutional violation merely because the victim is a prisoner, false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official." *Id.*, citing *Estelle* v. *Gamble*, 429 U.S. 97, 106 (1976) (quotations omitted).

Thus, "the sole question before this Court is whether Plaintiff has submitted sufficient evidence to maintain a *constitutional* claim, **not** whether he may have a claim under some state law or administrative procedure." *James v. Cartledge*, 2016 U.S. Dist. LEXIS 49578, *22-23 (S.C. March 2, 2016)(emphasis in original and emphasis added). *See McCollan*, 443 U.S. at 142; *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992); *Street v. Surdyka*, 492 F.2d 368, 372 (4th Cir. 1974); *York v. City of Burlington*, 225 F. Supp. 3d 341, 347 (M.D. N.C. Dec. 22, 2016); *Parratt v. Taylor*, 451 U.S. 527, 537 (1981). *See also McCollan*, 443 U.S. at 145 ("The Fourteenth Amendment does **not** protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished '**without due process of law**.'")(emphasis added).

### Materiality of Issues

While Plaintiff **appears** to have alleged that Defendants unlawfully searched his residence and vehicle, and falsely arrested and imprisoned him, there is no genuine issue of material fact as to a whether either of the defendants actually violated Plaintiff's rights guaranteed by the United States Constitution. The facts he has raised are either undisputed, mere conjecture or speculation, simply immaterial or immaterial for the issue Plaintiff has raised, so blatantly contradictory as to not be believed by a reasonable jury, or based upon Plaintiff's mistaken beliefs. Thus, Defendants contend that there are only issues of law for this Court to decide, such that summary judgment in their favor is appropriate.

A. Undisputed Facts

While Plaintiff has alleged that the defendants violated his rights by searching his truck, it is undisputed that Plaintiff offered to look for the keys inside the house, removed the keys from his pants pocket, and handed them to Defendant Parris. *See* Exhibit 2 00:51:20-52:27Z (Plaintiff offered to look for keys.); 00:54:54-55:46Z (Plaintiff looked for the keys inside the premises.); 00:56:00-56:03, 00:56:41-56:49Z (After Defendant Parris asked if the keys were in Plaintiff's pocket and Ms. Lynch stated, "They go to that," Plaintiff stated, "[T]here go the key to the truck there.");

00:56:48-57:14Z (Defendant Parris asked, "You mind if I see 'em real quick?" and Plaintiff removed the keys from his pocket and handed them to Defendant Parris.").   Additional undisputed facts are delineated in Paragraphs 3-33 of the Statement of Facts by Defendants filed contemporaneously with this Memorandum.

      B.   Mere Conjecture

<u>Collusion</u>

Plaintiff has made a number of allegations that the defendants colluded with each other, with the police, and with Ms. Lynch to violate his rights.  However, his allegations are steeped in speculation.  *See Celotex* (holding that speculation about the motivation of others is insufficient to withstand summary judgment); D.E. 52 at 2 (Defendant Craft was "not willing to go against what probation officers had in progress."); D.E. 52-1 at 2 ("Probation officers Johnson and Parris in collusion with probationer Lynch to preform a illegal search on plaintiff property[,] knowing they had a gun and drugs planted in plaintiff's vehicle.");   D.E. 52-2 at 2 ("Definitely officers would have arrested Ms. Lynch if they haven't conspired to planting evidence against plaintiff.");  Exhibit 7 at 50 ("So I guess . . . the probation officer she wanted to say she stayed with me[;]  'Oh, it's him, he's the one.'").

<u>Damages</u>

Plaintiff's basis for pain and suffering in that he "fear for his life" also is mired in speculation.  *See* Exhibit 7 at 34-35

> ([M]eaning someone is out to get you.  They will hunt you down, shoot you like a dog, poison you.. . . Get someone to come around you, plant things.. . .  You have officers here and there selling drugs.. . . You have Roanoke Rapids officers that was let go, you don't hear it publicly in the news, but in connection with the boy that came up missing, sent his parents his head, skeleton.  Straight cannibals, not human-like people.. . .   The rabbit hole goes very deep and that's the reason why I fear for my life.);

Exhibit 7 at 36 ("Someone is out to get me, okay.  Specifically, someone came to get me on 8/12/2019.  So I'm not throwing out in the air; I'm specifically telling you that they came that day to get me.").  *See also Pronin.*

      C.    Immaterial Facts

Much of what Plaintiff has alleged is not outcome determinative to this matter, and therefore is immaterial to summary judgment for his **purported** 1983 claim(s). *See Anderson,* 477 U.S. at 248.

<u>Detention</u>

The body cam footage is silent on any discussion between Defendants and Plaintiff that he could not leave while the police were present. Rather, it indicates that Officer Whitaker asked Defendants their preference for Plaintiff's location during the search of the premises, and Defendant Parris replied, "Yeah, if we're going to search the residence, he can step outside here or he can be placed in handcuffs." Exhibit 2 00:22:16-22:20Z. From there, the footage reveals that other than being allowed to enter the premises to look for the keys to the truck, Plaintiff remained outside, without handcuffs, apparently free to walk around, and arguably to leave if he had chosen to do so. His only limitation came when he was placed under arrest. Thus, Plaintiff cannot forecast that Defendants detained him while the police were present, and even if he can, because Defendants were allowed to temporarily detain him for their safety, it would not change the outcome of this matter.

For the same reason, whether as Plaintiff suggests, Defendants detained Plaintiff prior to the police arriving, also does not create a genuine issue of material fact. Plaintiff's behavior of yelling, insulting and cursing, even **after** the police arrived, combined with Defendants' need to call for back-up, speak to the reasonableness of a decision to detain Plaintiff. Moreover, the fact Defendants Johnson and Parris traveled in a pair, and Defendant Johnson advised Ms. Lynch she needed to move out, also speaks to reasonableness of any decision to detain Plaintiff. *See* Johnson Declaration ¶¶17,18,20-23. Thus, regardless of any contradiction in the facts as to whether Defendants detained Plaintiff, a detention would not affect the outcome of the case.

<u>Whether Plaintiff Locked the Doors</u>

The body cam footage revealed that Plaintiff denied locking out Ms. Lynch. *See* Exhibit 2 00:19:47-19:53Z ("I ain't never locked her out. What are you talking about?"). However, the police records from earlier on August 12, 2019 reveal that the locks had been changed, but that a male at the residence indicated Ms. "Katrina" Lynch could stay as long as she

22

did not cause any more issues. Exhibit 4 at 1. The body cam footage also revealed that Plaintiff told Defendant Johnson that Ms. Lynch had been staying out at night. Exhibit 2 32:57-33:10Z. Plaintiff told the officers, "No, no, no, but did you just hear the kicker? The door was open (laughter)." Exhibit 2 00:25:22-25:24Z. Plaintiff stated to Ms. Lynch, "She said you told her a lie, said I wouldn't let you in the house." Exhibit 2 00:25:53-26:05Z. Meanwhile, Defendant Johnson has averred that Plaintiff told her on both the day prior and on August 12,2019 that if Ms. Lynch continued to come in all hours of the night she would have to leave. Johnson Declaration ¶35. Plaintiff even testified at his deposition that Ms. Lynch kept leaving his door unlocked at night while he was asleep. *See* Exhibit 7 at 50.

Thus, the relevant issue is not whether it was true that the doors were locked or unlocked. Rather, the issue, although of minimal relevance, is why the statements about the status of the door locks, were made. Plaintiff has alleged that the statements were made because Ms. Lynch did not live with him and had no keys, a position for which as shown below, the forecast of evidence is overwhelmingly contrary, such that it is not a genuine issue of material fact. *See* D.E. 1 at 2; D.E. 52-1at 2; Exhibit 7 at 50. On the contrary, the relevance is that Ms. Lynch had been staying out all night, leading to discourse in their relationship. Thus, whether or not the content of the statements about the locks is contradictory, such contradictions do not change the outcome of the case.

### Magistrate's Finding of No Probable Cause

The fact the magistrate determined that there was no probable cause for the search or the arrest, while relevant for other purposes as will be discussed below, is not relevant for purposes of forecasting that the search was constitutionally unreasonable for purposes of this civil action, or that the arrest was unlawful. Furthermore, the magistrate's declaration makes clear that he simply did not have all of the facts, including whether Ms. Lynch lived there or why the probation officers were at Plaintiff's residence. *See* McPhatter Declaration ¶¶8-9.

### D. Contradictory Statements

### Ms. Lynch's residency

Although three years after the incidents in question, Plaintiff has alleged that Ms. Lynch did not live with him,

that allegation is contradicted, not simply by Defendants' position, but by numerous statements captured by the body cam, including Plaintiff's own statements, court filings, and police records. Indeed, the allegation is so blatantly contradicted by the record, that no reasonable jury would believe it.

Both Ms. Lynch's probation officers conducted home contacts to verify her address was 1109 Nashville Road; Defendant Johnson verified Ms. Lynch's address on two subsequent occasions, e.g. August 11, 2019 and August 12, 2019; Ms. Lynch called the police repeatedly on August 12, 2019 about issues with Plaintiff locking her out of the residence; Officer Whitaker asked Ms. Lynch, "You do have residence at this, lease, where do you lease or rent to?"; Defendant Craft asked, "[D]oes she stay here?"; Ms. Lynch stated, "She got to search my home;" Officer Whitaker asked Ms. Lynch, "And now, he, does he stay here with you?"; Ms. Lynch stated, "They got to search where I'm staying;" Defendant Craft told Plaintiff, "What we basically got is that you said you won't let us in the house, but she has residency here;" Plaintiff stated he told Defendant Parris, "You here to see her[,] [t]here she go;" Ms. Lynch stated, "Sean . . . you making it hard[,] I don't want to go nowhere;" Officer Whitaker asked Plaintiff, "You stay here with her, sir?"; Plaintiff responded, "Well, she stays with me;" Ms. Lynch stated to Plaintiff, "They making me leave because of the way you act;" Defendant Johnson observed Ms. Lynch's clothing and medication inside the residence when she searched it; Ms. Lynch stated, "So, I'm gonna have to get a whole fucking apartment;" Ms. Lynch asked the officers, "I can't stay at my house?"; Defendant Johnson stated, "I'm still giving her a timeframe anyway to get out;" Ms. Lynch called police the following day about a domestic disturbance at the residence; on August 14, 2019 the magistrate found probable cause to believe Plaintiff had assaulted Ms. Lynch and indicated her address at 1109 Nashville Road; and by October 25, 2019 court documents indicated that Ms. Lynch's address was 1109 Nashville Road. *See* Johnson Declaration ¶¶10, 12,33,40-43; Exhibit 2 00:19:01-19.04, 19:33-19:36, 20:34-20:49, 20:55-20:58, 22:46-22:51, 24:02-24:04, 25:53-26:05, 33:20-33:26, 33:34-33:42, 01:27:55-28:13, 01:30:32-30:34, 01:30:43-31:21Z; Exhibit 3; Exhibit 4 at 1; Exhibit 5 at 1; Exhibit 6 at 1.

<u>Whether Defendant Parris "Pulled a Gun" on Plaintiff</u>

It was not until "Community Corrections" filed its initial motion to dismiss, alleging that Plaintiff gave no

24

indication in his complaint that he was not free to leave and therefore was not under arrest, that **more than three years** after the incidents in question, Plaintiff began alleging that he was not free to leave because Defendant Parris ordered Plaintiff out of his truck with "his gun drawn." *See* D.E. 52-1 at 1; Exhibit 7 at 48 ("He was standing behind the truck like 'You're not going anywhere. Get out of the truck,' with his gun drawn."); D.E. 52 at 1 (Defendant Parris "pulled a gun hold plaintiff from leaving address."). Just as "[i]t is well recognized that a plaintiff may not avoid summary judgment by submitting an affidavit that conflicts with earlier deposition testimony," likewise it is inappropriate for Plaintiff to attempt to avoid summary judgment or otherwise bolster his case, by submitting court filings and giving deposition testimony that contradict both his statements at the time of the incident and those in his original complaint. *See Alba v. Merrill Lynch & Co.*, 198 Fed. App'x. 288, 300 (4th Cir. 2006); *Id.* ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). **Never mind, whether Plaintiff felt free to leave or Defendant Parris "pulled a gun" is not dispositive of whether an investigative detention became an arrest**. *See Capps*, 2020 U.S. Dist. LEXIS 84835, *13.

Regardless, body cam footage reveals that Plaintiff made statements *ad nauseum* to the police that quite **the opposite occurred**, e.g. Defendant Parris **felt threatened by Plaintiff** and accused **Plaintiff of having a gun**. Plaintiff taunted Defendant Parris, "If you're fucking scared, get your ass up out of here.. . . Don't come up to me, 'Oh, you got a gun.' Motherfucker, you got a gun, pull your gun out and shoot." Exhibit 2 00:22:55-23:04Z. Plaintiff cursed, going so far as to use a racial epithet toward Defendant Parris, for a large portion of the 1-hour-and-36-minute long footage, due to Defendant Parris simply having told Plaintiff to take his hands out of his pocket. Never mind, it is undisputed that NCDAC/NCDPS policy is that displaying a service weapon is considered a "use of force" which mandates multiple levels of checks and balances. *See* Woolard Declaration, Attachment C. Thus, Plaintiff cannot forecast that he can prove his latest version of the facts to a reasonable jury.

E. Misunderstood Facts

The allegation that Defendants colluded with police to mute the first 30 seconds of the body cam footage, is not

only speculative, but a product of Plaintiff's misunderstanding about the camera. As earlier referenced, the footage was propounded to Defendants and Plaintiff as AXON_Body_2_Video_2019-08-12_2018.mp4. As illustrated in Exhibit 8, Axon is the manufacturer and Body 2 is the type of camera. When the camera is turned on, by default, it begins recording in "buffering mode" for 30 seconds, during which time, audio is not available. *See* Exhibit 8 at 6-7.

Plaintiff also misunderstands the time stamp of the body cam footage. As explained above, the "Z" on the time stamp reveals that it is in Zulu time, which is 4 hours ahead of day light savings time in the Eastern Standard time zone; and the time is in military hours, followed by minutes, and seconds. Therefore, Plaintiff's allegations about what transpired or could have transpired at 3 minutes and 20 seconds, 20 minutes and 52 seconds, and 17 minutes and 33 seconds are misplaced, and do not create a genuine issue of material fact. *See* D.E. 52 at 1; D.E. 52-1 at 2.

III.     NO EXCLUSIONARY RULE

Although Plaintiff relies heavily upon the magistrate's finding of no probable cause, such that **presumably,** the gun was "fruit of the poisonous tree," his reliance is misplaced. The "fruit of the poisonous tree" doctrine is irrelevant for purposes of 1983. *See Sweet v. Reese*, 2021 U.S. Dist. LEXIS 166990, at *11 (D.S.C. Sep. 2, 2021)(holding "there is no fruit of the poisonous tree doctrine in a § 1983 civil case."), *citing Pa. Bd. of Probation & Parole v. Scott*, 524 U.S. 357 (1998); *Ware v. James City Cnty., Va.*, 652 F. Supp. 2d 693, 705 (E.D. Va. 2009) ("[T]he fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant.")(citation omitted); *White v. City of Greensboro*, 608 F. Supp. 3d 248, 264-265 (M.D.N.C. 2022)("White fails to identify, and the court is unaware of, any Fourth Circuit decision that has held that the fruit of the poisonous tree doctrine applies in a § 1983 claim.. . . Thus, as this court has already held, 'it is clear that the exclusionary rule and the fruit of the poisonous tree doctrine simply do not apply in civil cases.'")(citations omitted).

Thus, summary judgment in Community Corrections Defendants' favor is appropriate not only as to the reasonableness of the search of Plaintiff's truck, but also the lawfulness of his subsequent arrest, notwithstanding the actions of the magistrate, or the fact Defendants did not arrest Plaintiff. *See White v. City of Greensboro*, 608 F. Supp. 3d at 265 ("[E]vidence arguably seized in violation of the Fourth Amendment is not subject to the exclusionary rule in civil

26

proceedings and **amply provides probable cause to justify plaintiff's arrest**.") (emphasis added), *citing United States v. Calandra*, 414 U.S. 338, 348 (1974)(citations and quotations omitted).

V.      DAMAGES

        A.    No Injury or Damages

Plaintiff has not suffered any injuries, and as such is not entitled to any damages in this matter. "The basic purpose of § 1983 damages is to *compensate persons for **injuries*** that are caused by the deprivation of constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)(emphasis in original and added)(citations and quotations omitted). *See  Garza v. Henderson*, 779 F.2d 390, 396 (7th Cir. 1985) (holding "that general damages (i.e. damages not based on proof of actual injury) cannot be awarded in a suit alleging denial of due process in its primary sense."), *citing Carey v. Piphus*, 435 U.S. 247 (1978); *White v. City of Greensboro*, 608 F. Supp. 3d at  266 (holding that damages were not available for part of a civil rights lawsuit stemming from a warrantless search as "the evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all.").

Plaintiff was neither imprisoned nor convicted of a crime as a result of the allegedly unlawful search or arrest. For purposes of summary judgment, the relevance of the magistrate's finding is that neither a conviction nor a sentence resulted from the search of arrest.  As such, Plaintiff cannot forecast that he suffered any injury.

Furthermore, Plaintiff's conclusory allegations show that he made up a number for the dollar amount of compensation, simply to get attention. *See* Exhibit 7 at 44 ("If you look at the price I put . . . I could have just put $666.00. I could have put that, but it wouldn't have got your attention.. . . So we have to give something that will make him look at it."); Exhibit 7 at 56 ("So the price of the pain and suffering is well under what anybody was looking for a payout would ask for.  It's a price to let you know what I see that I'm up against."). Without **injury**, e.g. a conviction or sentence, **and proof of actual damages**, there is no basis for a constitutional claim under Section 1983.

        B.    Eleventh Amendment

This lawsuit is against not only an alleged State agency, but also the probation officers in their official capacities.

27

However, "an action by a private party to recover money damages from state officials in their official capacities is barred by the Eleventh Amendment." *Huang v. Board of Governors of University of North Carolina*, 902 F.2d 1134, 1138 (4th Cir. 1990).

> The Eleventh Amendment prohibits actions in federal court by individuals against a state unless the state has consented to suit or unless Congress has lawfully abrogated the states' Eleventh Amendment immunity... Additionally, in North Carolina, actions against officers of the State in their official capacities are actions against the State for the purposes of applying the doctrine of sovereign immunity... Additionally, compensatory damages are unavailable in official capacity suits under § 1983.

*Seelig v. Perry*, 2017 U.S. Dist. LEXIS 180349, at *27 (M.D.N.C. Oct. 30, 2017), *citing Ballenger v. Owens*, 352 F.3d 842 (4th Cir. 2003).

Therefore, this matter is a suit against the State of North Carolina, which has not consented to this lawsuit or waived immunity. Plaintiff is barred from recovering monetary damages for his official capacity claims.

C. Defendants Johnson and Parris' Liability in Their Individual Capacities

"[L]iability under Section 1983 is personal, not vicarious or derivative." *Branchcomb v. Brewer*, 683 F.2d 251, 254 (8th Cir. 1982). Thus, a Section 1983 plaintiff must plausibly allege the personal involvement of a defendant. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2019). Indeed, "State officials are not subject to suit under § 1983 unless they play an affirmative part in the alleged deprivation." *Hymes v. Gomez,* 1994 U.S. Dist. LEXIS 15132 *7-8 (N.D. Cal. Oct. 19, 1994) (citations omitted). Moreover, "[q]ualified immunity is a defense from suit, not simply liability." *Carter v. Copfer*, 2017 U.S. Dist. LEXIS 171536, *6 (D.Md. Oct. 16, 2017), *citing Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002).

Government officials such as Community Corrections Defendants "generally are shielded from liability for civil damages insofar as their conduct does not violate **clearly established** statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)(emphasis added). Qualified immunity protects government officials in the performance of their duties unless they "knowingly violate the law." *Doe v. Broaderick*, 225 F.33d 440, 446 (4th Cir. 2000).

28

1. No Personal Wrongdoing

Most if not all Plaintiff's allegations are mired in speculation about collusion, which again, will not survive summary judgment. As such, he has not alleged how Defendants Johnson and Parris are responsible for his arrest, given that the facts are undisputed that Rocky Mount Police arrested him. Even his new-found allegation that he did not feel free to leave because Defendant Parris "pulled a gun" on him, will not save his claims, as such actions do not necessarily convert a permissible detention into an arrest. Moreover, he has completely ignored that the body cam footage reveals that he admitted more than once that Ms. Lynch lived with him; gave Defendant Parris the keys to his truck; and was irate, yelling and cursing such that the safety of the officers was an apparent concern. Thus, Plaintiff cannot forecast evidence of any wrongdoing by Defendant Johnson or Parris for the search of his residence or his truck, or any detention.

2. Clearly Established Law/Knowing Violation

Plaintiff also cannot forecast that Defendants Johnson and Parris **knowingly** acted in violation of **clearly established law.**

a. *State v. Lucas*

The circumstances in *State v. Lucas* are **indistinguishable** from those in this matter. In that case, the Court of Appeals found that the belated allegations that the probationer did not reside at the premises, were without merit when: the probation officer had verified the address on prior occasions; the probationer never denied living at the residence; the probation officer had previously made at least one other warrantless search of the premises while the couple was present and the significant other, Lucas, did not object; and the significant other indicated that he understood the probation officer was at the residence on the date in question for the purpose of conducting a warrantless search. *See Lucas*, 880 S.E.2d at 426, P38.

b. Exceptions to Warrant Requirement

*Midgette* makes clear that searches of probationers' residences are supported by the special needs exception when the search complies with G.S. 15A-1343(b)(13); *Avent* makes clear that given Plaintiff's consent to search the truck,

29

the search of the truck did not implicate the Fourth Amendment; and the exigent circumstances exception allowed Defendants Johnson and Parris to temporarily detain Plaintiff for purposes of ensuring their safety. Under these circumstances, Defendants Johnson and Parris are entitled to qualified immunity.

VI.    COMMUNITY CORRECTIONS DEFENDANTS ARE ENTITLED TO PREVAIL AS A MATTER OF LAW FOR PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES.

Punitive damages are allowed in Section 1983 claims, only when the conduct "involves reckless or callous indifference to the federally protected rights of others, as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987). Thus, punitive damages may never be recovered from a governmental agency or its officials in Section 1983 claims. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). No evidence exists of aggravated conduct sufficient to create an issue of fact as to punitive damages in this case. As such, as to Defendants, Plaintiff's claim for punitive damages fails as a matter of law.

## CONCLUSION

For the reasons set forth herein, Defendants respectfully submit that there are no genuine issues of material fact, only questions of law. This Court should grant summary judgment to Defendants, and dismiss Plaintiff's action.

Respectfully submitted this the 28th day of June 2023.

**JOSHUA H. STEIN**
**Attorney General of North Carolina**

/s/ Sonya Calloway-Durham
Sonya Calloway-Durham
Special Deputy Attorney General
N.C. State Bar No. 21960
P.O. Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 716-6576
Fax: (919) 716-6761
E-mail:  scalloway@ncdoj.gov
Attorney for Community Corrections Defendants

30

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I have electronically filed the **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS** with the Clerk of the Court utilizing the CM/ECF system, which provides electronic notification to counsel for "Rocky Mount Police Department" as follows:

> J. Nicholas Ellis
> Dylan Castellino
> POYNER & SPRUILL, LLP
> P. O. Box 353
> Rocky Mount, NC  27802-0353

I further hereby certify that I have on this day, I served a copy of said document upon the Plaintiff, a non-CM/ECF participant *via* regular United States Mail, first-class, postage prepaid addressed as follows:

> Sean B. Mayo
> P. O. Box 2922
> Rocky Mount, NC  27802

.

Respectfully submitted this the 28th day of June 2023.

> /s/ Sonya Calloway-Durham
> Sonya Calloway-Durham
> Special Deputy Attorney General