IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CV-00289-M-RN

| | |
|---|---|
| **Sean B. Mayo**, | |
| Plaintiff, | |
| v. | **Memorandum & Recommendation** |
| **Rocky Mount Police Department**, et al., | |
| Defendants. | |

Plaintiff Sean B. Mayo alleges that a local probation office; two probation officers, Kiwanna Johnson and Dennis Parris; and a Rocky Mount Police Officer, C.S. Craft, violated his Fourth Amendment rights by unlawfully detaining him, illegally searching his property and his truck, and wrongfully arresting him. The Defendants have all moved for summary judgment on Mayo's claims.

Craft is entitled to summary judgment on all of Mayo's claims. The evidence does not establish a basis for an official capacity claim against him. And the undisputed facts establish that he was not personally involved in the detention or the search, so he cannot be held individually liable for those acts. And when Craft arrested Mayo, the information he had would have led a reasonable officer to conclude that there was probable cause to believe Mayo committed a crime. Thus Craft is entitled to a judgment in his favor on the wrongful arrest claim.

But the Probation Defendants are only entitled to summary judgment on some of Mayo's claims. The Eleventh Amendment precludes Mayo's claims against the Probation Department and the Probation Officers in their official capacities. And the Probation Officers are entitled to a judgment as a matter of law on the wrongful arrest claim because they were not the ones that

arrested Mayo. Similarly, they should prevail on his search-related claims. The Probation Officers did not violate Mayo's clearly established rights by searching his property since a woman who reportedly lived with him was subject to a warrantless condition as part of her probation. The record also establishes that Mayo consented to the search of his truck by turning over the keys to that vehicle to Parris. Finally, while Johnson is entitled to summary judgment on Mayo's illegal detention claim because of her lack of personal involvement, there is a genuine issue of material fact about Parris's actions that precludes summary judgment.

## I.  Background

In May 2019, a North Carolina Superior Court Judge placed Patrina Lynch on probation for 18 months in connection with her conviction for heroin possession. Judgment at 1, *State* v. *Lynch*, No. 18-CRS-050346 (N.C. Sup. Ct. May 6, 2019), D.E. 86–7. As required by North Carolina law, the court imposed several conditions on Lynch's conduct while she was on probation. *Id.* at 2. Among those conditions were the requirement that she "[s]ubmit at reasonable times to warrantless searches by a probation officer of [her] person, and of [her] vehicle and premises while [she] is present[.]" *Id.* Any searches under that provision must be "for purposes directly related to the probation supervision[.]" *Id.* Lynch was also prohibited from possessing a firearm, explosive device, or other dangerous weapon as defined by state law; using or possessing illegal drugs; and "knowingly assocat[ing]" with anyone who used, possessed, or sold illegal drugs or had been convicted of that conduct. *Id.*

The next month, Lynch notified her supervising officer that she would be living at 1109 Nashville Road in Rocky Mount, North Carolina. Johnson Dec. ¶ 9, D.E. 86–5. Lynch's supervising officer approved her to live at that address a few days later. *Id.* ¶ 10. As that address

was in a different county from the one in which Lynch was convicted, a new probation officer would supervise Lynch. *Id.* ¶ 11. That duty fell to Johnson. *Id.*

In early July 2019, Johnson visited the Nashville Road residence to determine whether it was a suitable place for Lynch to live given the conditions of her probation. *Id.* ¶ 12. Conducting these types of home visits are part of the regular duties of North Carolina's probation officers. *Id.* ¶ 7. As part of a home visit, a probation officer will conduct a walk-through of the home, speak with anyone else living in the home, verify where the probationer will sleep, and check to see if the probationer has possessions stored at the home. *Id.* ¶ 8.

During her home visit, Johnson conducted a walk through that confirmed that Lynch lived at the Nashville Road residence, kept her belongings there, and had a place to sleep there. *Id.* ¶ 12. Several days after conducting this home visit, Johnson approved Lynch to live at 1109 Nashville Road. *Id.* ¶ 13.

Then, on the evening of August 11, 2019, Johnson returned to that address to verify that Lynch was complying with her probationary conditions. *Id.* ¶ 14. Upon her arrival, Johnson spoke with Mayo who told her that "Lynch was staying out all night." *Id.* Mayo claims that during this visit he told Johnson that Lynch "don't stay here, she don't live here." Mayo Depo. Tr. at 50:7–9, D.E. 86–13.

The next day, Johnson returned to Lynch's residence for a home visit. *Id.* ¶ 15. She asked Parris to go with her because of concerns for her safety, a common practice among probation officers. *Id.* ¶¶ 16, 17.

At this point, the Mayo and the Probation Defendants tell different stories about what occurred leading up to the arrival of officers with the Rocky Mount Police Department.

3

## A.    Probation Defendants' Version of Events

When Johnson and Parris arrived at 1109 Nashville Road, they went to the back of the house where the entrance was located. *Id.* ¶ 19. Lynch ran towards their vehicle. *Id.* ¶ 18. She was crying and looked afraid. *Id.*

Mayo was inside the home and refused to come outside. *Id.* ¶ 21. And he refused to let Johnson or Parris into the house . *Id.* But he did yell and curse at the Probation Officers from inside his house. *Id.* ¶ 22.

In response to Mayo's actions, Parris contacted "dispatch" to ask for assistance from local law enforcement. *Id.* ¶¶ 23, 24, 30. Between the time Parris called for assistance and the time that the Rocky Mount Police Department arrived, Mayo neither left the house nor allowed the Probation Officers inside. *Id.* ¶ 30.

## B.    Mayo's Version of Events

Mayo contends that when Johnson and Parris arrived at his home, he was inside cooking lasagna. Mayo Dep. Tr. at 46:24–47:1, D.E. 86–13. While his entrée was in the oven, Mayo wanted to go to the store to get some garlic bread. *Id.* at 47:2–4.

So he went outside and got into his truck. *Id.* at 47:5–6. Once he was in his truck, Parris "jump[ed] out" and told him, "Get out of the truck." *Id.* at 46:21–24; 47:5–8. Parris had drawn his gun and had it pointed at Mayo. *Id.* at 48:11. Mayo asked Parris, "What's your problem?" *Id.* at 47:7–9. To which Parris told him, "You're not going nowhere [sic]. Get out of the truck[.]" *Id.* at 48:10–11.

Mayo then got out of the truck and put his keys in his pocket. *Id.* at 48:15–16. This action caused Parris to order him to get his hands out of his pocket. *Id.* at 48:16. After some more back and forth, Mayo went back into his house. *Id.* at 48:17–18.

4

### C. Arrival of the Rocky Mount Police Department, the Searches, and Mayo's Arrest

Eventually, Craft and his partner, Officer Damian Whitaker, arrived at 1109 Nashville Road. Craft Dec. ¶ 3. When Craft arrived, Johnson, Parris, and Lynch were all outside. *Id.* ¶ 4. The Probation Officers told Craft and Whitaker that Lynch lived at that address and that they were searching it in connection with her probation. Reporting Officer Narrative, D.E. 90–3 at 6. The Probation Officers also shared that Mayo was not on probation. *Id.*

Craft saw Mayo inside the house an approached him. Craft Dec. ¶ 4. He motioned for Mayo to come outside so that they could talk. *Id.* ¶ 5. Mayo responded by shouting at Craft and the Probation Officers through the window. Body Camera Footage at 2:20.[1] He directed most of his invective at Parris who Mayo believed accused him of having a gun. *Id.* Mayo wanted Parris to get out of his yard. *Id.* at 2:40. Parris can be heard responding that all he did was ask Mayo to take his hands out of his pocket. *Id.* at 3:45. While this exchange is going on, Lynch suggests that someone get a warrant to search Mayo's truck. *Id.* at 2:44; 3:20–3:22.

Mayo eventually allowed Lynch and the Probation Officers to go inside the home to search it. Craft. Dec. ¶ 5. He came outside and spoke with Craft and Mayo. Body Camera Video at 5:00–8:00. When Craft explains that the Probation Officers were there to search the house in connection with Lynch's probation, Mayo says, "I already told her she could do that." *Id.* at 5:25–5:30.

Mayo also relays that Parris had previously told him to get out of his truck. *Id.* at 6:30. He does not, however, mention Parris pointing a gun at him.

Parris eventually came back outside and asked Craft to call for a canine that could assist in the search. Craft. Dec. ¶ 7; Body Camera Footage at 8:05–8:10. Parris can be overheard saying

---

[1] Citations for the body camera footage will refer to the time that has elapsed in the recording.

that he wanted to "run a canine through the house." Body Camera Footage at 8:10–8:15. Craft did so. Craft. Dec. ¶ 7.

Mayo remained on his porch with the officers. Mayo's sister also arrived at the house. Body Camera Footage at 8:10–8:44. For several minutes, Mayo talked directly to Parris and express his displeasure about how he had been treated. *Id.* at 9:19–11:30. Mayo eventually left the porch and walked around his property. *Id.* at 12:20.

Parris and Whittaker also walked away from the porch. *Id.* Parris tells Whittaker that there is cocaine and a gun in one of the trucks on the property. *Id.* at 13:07–13:20.

Then, after Parris walks away, Whitaker relayed this information to Craft. Craft. Dec. ¶ 7; Body Camera Footage at 14:30–14:48.

Whittaker then begins collecting information. Johnson tells him Lynch's name. Body Camera Footage at 15:40–15:47. Whittaker then asks Mayo if he "stays [at the residence] with her." *Id.* at 15:48–15:50. He responds, "She stays with me." *Id.* at 15:50–15:52.

Craft eventually returned to his car to conduct a criminal record check on Mayo. Craft Dec. ¶ 7. Through that search Craft learned that Mayo was a felon. *Id.*

Rocky Mount Police Department Officer Jerry Judd, a canine handler, then arrived with his dog. *Id.* ¶ 8. Whittaker tells the canine handler that Probation Officers had found some cocaine and a firearm in the residence and that there may be some in one of the vehicles. Body Camera Footage at 23:20–24:00. The officers then return to the back of the house. *Id.* at 24:00–24:37.

Parris eventually spoke to Mayo about the vehicles on his property. He asked Mayo, "Who's the Tahoe registered to, sir? Is it unlocked? Because if she has access to the Tahoe on the property it's kind of like a common area. Is it locked?" *Id.* at 33:59–34:10. Mayo responded,

"Yeah it doesn't work. It doesn't work at all." *Id.* at 34:11–34:14. Parris followed up by asking, "So we still have to search it just like a[,]" *id.* at 34:16, at which point Mayo interrupted him and said, "No, it's not a dead vehicle. I'm just saying it's not, it's not driven[,]" *id.* at 34:16–20.

Parris then tells Mayo, "OK. So we're going to search that because the dog hit on it, and then we're going to search the building out there, and then we'll move our way into the house." *Id.* at 34:23–34:30. Parris asked Plaintiff, "Do you know where the keys are for the Tahoe? Is it unlocked or is it locked?" *Id.* at 34:31–32. Plaintiff responded, "Locked." *Id.* at 34:33.

After a few minutes of standing around, Whittaker asks Mayo to go inside and get the keys for him. *Id.* at 36:19–36:26. Mayo goes inside the house and Whittaker follows him. *Id.* at 36:30. Mayo rummages around some drawers inside the house and cannot find the keys. *Id.* at 36:59–37:20. Whittaker says that if Mayo cannot find the keys, they can use a device to unlock the Tahoe. *Id.* at 37:20. They then go back outside. *Id.* at 37:36.

Parris then says, "What about the keys that are in your pocket." *Id.* at 39:10. And then follows up with, "You mind if I seem 'em real quick?" *Id.* at 39:15. Mayo can be seen taking a bunch of keys out of his pocket and handing them to Parris. *Id.* at 39:30–39:40.

Parris told Craft that he found a handgun under the Tahoe's front passenger seat. *Id.* ¶ 10. Given that Craft knew that Mayo was a felon and that a handgun was found under the driver's seat of a locked vehicle that Mayo had the keys to, Craft concluded that there was probable cause to believe Mayo had violated North Carolina's prohibition on felons possessing firearms. *Id.* ¶ 11. So he arrested Mayo on that charge. *Id.* ¶ 11; Body Camera Footage at 48:00.

A state magistrate later found that there was no probable cause for Mayo's arrest. McPhatter Dec. ¶ 12. The magistrate based this decision on the fact that Mayo was not on probation. *Id.* ¶ 12. But no one told the magistrate that Lynch lived with Mayo. *Id.* ¶ 8.

Nearly three years later, Mayo sued over the events of August 12, 2019. He named the Rocky Mount Police Department and the Rocky Mount Community Corrections Judicial Center Probation Department as defendants. Compl. at 1. He alleged that the Defendants illegally searched his property and his truck, illegally detained him, and falsely arrested him. *Id.* at 2.

Mayo then filed several motions with the court. One sought an order requiring the defendants to disclose the names of the officers that allegedly violated his constitutional rights. D.E. 17. The court granted that request and allowed Mayo to supplement his complaint to add factual allegations against the new defendants. D.E. 42, 44. He eventually added Craft, Johnson, and Parris as parties.

## II.    Discussion

Summary judgment is appropriate when an examination of the pleadings, affidavits, and other discovery materials before the court shows that "there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making this determination, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *News & Observer Publ'g Co.* v. *Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (quoting *Hunt* v. *Cromartie*, 526 U.S. 541, 552 (1999)).

### A.    Qualified Immunity Standard

All Defendants invoke qualified immunity as a defense to Mayo's claims. The Supreme Court has explained that when sued in their individual capacity government officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia* v. *Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle* v. *Howards*, 566 U.S. 658, 664

(2012)). Courts are free to consider whether a right was clearly established before determining whether the official violated the right at issue. *Pearson* v. *Callahan*, 555 U.S. 223, 236–42 (2009).

A right is clearly established if "at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *Wesby*, 583 U.S. at 63 (quoting *Ashcroft* v. *al–Kidd*, 563 U.S. 731, 741–42 (2011)). To meet this standard, "[t]he rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority[.]'" *Id.* (citation and quotations omitted).

Courts must be cautious when defining the right at issue. In determining whether a right is clearly established the court must consider whether "the legal principle clearly prohibit[s] the officer's conduct in the particular circumstances before him." *Id.* The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* at 63–64 (quoting *Plumhoff* v. *Rickard*, 134 S. Ct. 2012, 2023 (2014)).

With this standard in mind, the court turns to its analysis of Mayo's claims.

### B.      Claims Against Officer Craft

Mayo claims that he was falsely arrested and that Craft illegally searched his property. But the undisputed facts do not support this claim. To begin with, the record establishes that Craft did not search Mayo's truck or his property. His lack of personal involvement in the allegedly unconstitutional search entitles him to summary judgment in his favor on that claim. And Craft is also entitled to summary judgment on the wrongful arrest claim because at the time

9

he arrested Mayo, the facts Craft knew established probable cause to believe Mayo had committed a crime. Given that Craft did not violate Mayo's rights, there is also no basis for an official capacity claim against him. Thus the District Court should grant Craft's Motion for Summary Judgment.[2]

### 1. Craft Was Not Involved in the Search of Mayo's Property

Mayo alleges that Craft violated his Fourth Amendment rights by searching his property without a warrant. To hold a defendant liable in their individual capacity for a constitutional violation, a plaintiff must show that the defendant was personally involved in that violation. *Iqbal*, 556 U.S. at 675–77; *Vinnedge* v. *Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

But the record conclusively establishes that Craft was not involved in the search of Mayo's property. Craft has submitted a declaration disclaiming any involvement in the search. Craft Dec. ¶ 10. Instead, he says that he was standing with Mayo and Lynch when the search occurred. *Id.* Mayo has not provided a sworn statement or other evidence to create an issue of fact on this point. And the body camera footage confirms Craft's version of events. Body Camera Footage at 39:42–47:50. Thus Craft is entitled to a judgment as a matter of law on Mayo's illegal search claims. The District Court should grant his motion on that issue.

### 2. Craft Had Probable Cause to Arrest Mayo

The Fourth Amendment protects members of the public from unreasonable seizures by government officials.[3] U.S. Const. amend IV. When a plaintiff alleges that a law enforcement officer violated their Fourth Amendment rights by unlawfully arresting them, that plaintiff must

---

[2] Craft also argues that Mayo's claims are barred by the statute of limitations. Given the recommended outcome of the merits of his motion, this opinion need not address that argument.

[3] The Fourth Amendment applies to state actors like Craft through the Fourteenth Amendment. *Mapp* v. *Ohio*, 367 U.S. 643, 655 (1961).

establish that their arrest was not supported by probable cause. *See Miller* v. *Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007).

In considering whether probable cause supported a particular arrest, a court must "examine the events leading up to the arrest and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 583 U.S. at 56–57 (quotations omitted). Meeting the probable cause standard "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 57 (quotation omitted). This "is not a high bar." *Id.* (quotation omitted).

Craft arrested Mayo for being a felon in possession of a firearm. As suggested by the offense's name, there are two elements to that offense under North Carolina law: that the defendant had been convicted of a felony and that the defendant possessed a firearm. *See State* v. *Hussey*, 194 N.C. App. 516, 521, 669 S.E.2d 864, 867 (2008). North Carolina law prohibits both actual and constructive possession of firearms by felons. *State* v. *Billinger*, 21 N.C. App. 249, 253, 714 S.E.2d 201, 205 (2011) (citing *State* v. *Alston*, 131 N.C. App. 514, 519, 508 S.E.2d 315, 318 (1998)). "A person has actual possession of a firearm if it is on his person, he is aware of its presence, and either by himself or together with others he has the power and intent to control its disposition or use." *Id.* Constructive possession occurs "when, although not having actual possession, the person has the intent and capability to maintain control and dominion over the firearm." *Id.* at 253–54; 714 S.E.2d at 205.

The facts Craft knew when he arrested Mayo would have led an objectively reasonable police officer to believe Mayo had committed a crime. Craft learned through his database search that Mayo had a felony conviction. And the fact that the probation officers found a gun in a locked truck that Mayo owned and had the keys to makes it reasonable to believe that he had the

11

intent and capability maintain control and dominion over that gun. Thus Craft's arrest of Mayo on the charge of being a felon in possession of a firearm was supported by probable cause.

Mayo has not provided any argument about why the court should reach a contrary conclusion. By not contesting this argument, he has conceded it. *See Kinetic Concepts, Inc.* v. *Convatec Inc.*, No. 1:08-CV-00918, 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010) (collecting cases). Thus, the District Court should grant Craft's motion on this claim.

### 3. Lack of Constitutional Violation by Craft Requires Dismissal of any Official Capacity Claim Against Him

It is unclear whether Mayo is pursuing an official capacity claim against Craft. But even if he were, that claim would need to be dismissed. In order to maintain such a claim, Mayo would need to establish that his alleged constitutional injury is attributable to an official policy, procedure, or custom of Craft's employer. *See Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). As discussed above, Craft did not violate Mayo's constitutional rights and, in any event, there is nothing in the record establishing that the alleged constitutional violation resulted from a policy or custom of the Rocky Mount Police Department or the City of Rocky Mount. Thus, the District Court should dismiss any official capacity claims against Craft.

### C. Claims Against the Probation Defendants

Resolving the Probation Defendants' Motion for Summary Judgment follows a similar path as Craft's motion. Mayo's official capacity claims against the Probation Office and the Probation Defendants in their official capacity fail because those Defendants are entitled to Eleventh Amendment immunity. Johnson and Parris are also entitled to summary judgment on Mayo's wrongful arrest claim because they did not arrest him. And they are entitled to a judgment as a matter of law on Mayo's illegal search claims because of the warrantless search provision in Lynch's probation conditions and because Mayo consented to a search of his truck.

12

And while Johnson is entitled to summary judgment on Mayo's wrongful detention claim, Parris is not because there is a genuine issue of material fact about what occurred.

### 1. Effect of Mayo's Failure to Respond to the Probation Defendants' Summary Judgment Motion

Both Craft and the Probation Defendants filed motions for summary judgment, Mayo only responded to Craft's motion. Mayo's failure to respond, however, does not automatically entitle the Probation Defendants to summary judgment. Instead, the court "must review the motion . . . and determine" based on the uncontroverted facts "before it whether the moving party is entitled to summary judgment as a matter of law." *Custer* v. *Pan Am. Life Ins.*, 12 F.3d 410, 416 (4th Cir. 1993). So the court will assess the merits of each of the Probation Officers' arguments to see if they have established that there are no genuine issues of material facts and that they are entitled to a judgment as a matter of law.

### 2. Eleventh Amendment Immunity Bars Mayo's Claims Against the Probation Department and Johnson and Parris in their Official Capacities

The Probation Defendants argue that the Probation Department and the Probation Officers, in their official capacities, are entitled to summary judgment under the Eleventh Amendment. The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign States." U.S. Const. amend. XI. The Amendment guarantees that "nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 363 (2001). State agencies and officials sued in their official capacities are also entitled to immunity under the Eleventh Amendment because they are merely alter egos of the state itself. *Regents of the Univ. of Cal.* v. *Doe*, 519 U.S. 425, 429 (1997); *Will* v. *Mich. Dep't of State*

*Police*, 491 U.S. 58, 71 (1989). The immunity applies to suits brought by a state's own citizens or the citizens of another state. *Edelman* v. *Jordan*, 415 U.S. 651, 666– 68 (1974).

At the time of the events here, the Community Corrections section of North Carolina's Division of Adult Corrections, which was then part of the state's Department of Public Safety, was responsible for overseeing probationers. N.C. Gen. Stat. § 15A-1343.2(b) (2002). Since it appears that the Rocky Mount Community Corrections Judicial Center Probation Department was a state agency, it is entitled to Eleventh Amendment immunity and should be dismissed from this case. *See Myers* v. *North Carolina*, No. 5:12–CV–714–D, 2013 WL 4456848, at *3 (E.D.N.C. Aug. 16, 2013) ("State agencies and state officials acting in their official capacities also are protected against a claim for damages because a suit against a state office is no different from a suit against the state itself.").

Similarly, any claims against Johnson and Parris in their official capacities would be barred by the Eleventh Amendment. *Id.* Thus they are entitled to dismissal of those claims.

Although a state can waive Eleventh Amendment immunity or Congress can abrogate it, *see Will*, 491 U.S. at 66, there is no sign that either exception applies here. Therefore, the District Court should dismiss Mayo's claims against the Rocky Mount Community Corrections Judicial Center Probation Department[4] as well as his claims against Johnson and Parris in their official capacities.

### 3.      Lack of Personal Involvement in Mayo's Arrest

The Probation Defendants allegedly violated Mayo's Fourth Amendment rights by illegally arresting him. As previously noted, to hold a defendant liable in their individual capacity for a constitutional violation, a plaintiff must show that the defendant was personally

---

[4] The Probation Department also argues that it is not an entity that can be sued. Mem. in Supp. at 26. In light of the ruling on the Eleventh Amendment issue, the undersigned need not address that argument.

involved in that violation. *Iqbal*, 556 U.S. at 675–77; *Vinnedge*, 550 F.2d at 928. But the record conclusively establishes that it was Craft, not Johnson or Parris who arrested Mayo. Thus the probation officers are entitled to a judgment as a matter of law on Mayo's wrongful arrest claim. The District Court should grant their motion on that issue.

> ### 4. Lynch's Conditions of Probation Allowed Officers to Search the Premises where She Claimed to Live

Mayo alleges in his pleading that the Probation Officers unconstitutionally searched a storage unit on his property. In their summary judgment motion, those officers claim that they searched Mayo's property because Lynch lived there and she had agreed to a warrantless searches of her premises as a condition of her probation. Given that the Fourth Circuit has approved North Carolina's use of the warrantless search provision as a condition of probation, the Probation Officers are entitled to summary judgment on this claim.

Lynch was subject to several conditions of probation in connection with her conviction on state drug charges. Among those conditions was the requirement that she "[s]ubmit at reasonable times to warrantless searches by a probation officer of the defendant's person and of the defendant's vehicle and premises while the defendant is present[.]" D.E. 86–7 at 2.

The Probation Defendant argue that each element is met here. Probation Defs' Mem. in Supp. at 16–17. They point out that the search occurred at a reasonable time—around 8:30 p.m.—and that Lynch was present for the search. And they assert that home visits are a regular part of probation to ensure compliance with supervision and residency requirements. Mayo has never contested any of these issues.

The only point over which there is any dispute is whether Lynch lived at 1109 Nashville Road. The Probation Defendants have provided overwhelming evidence that, at least as far as the Probation Office was aware, that address was Lynch's approved residence. Johnson Dec. ¶¶ 10,

15

13. More than a month before the events here, Johnson visited the property and verified that Lynch lived at that address. *Id.* ¶ 12. What's more, just a few hours before the events at issue in this lawsuit, Lynch visited the probation office and confirmed she lived with Lynch. First Wollard Dec. ¶ 14. These facts are undisputed and establish that it was reasonable for Parris and Johnson to believe that Lynch lived at 1109 Nashville Road. Thus the warrantless search of Mayo's property was permissible under Lynch's probation conditions since she lived with him.

Mayo claims that the day before the events that led to this suit, he told Johnson that Lynch no longer lived with him. Compl. at 2; Supplemental Johnson Compl. at 1; Mayo Dep. Tr. at 50:7–17. But even if he did, that would not defeat the Probation Officers' summary judgment motion. Since Mayo has not responded to the Probation Defendants' motion, he has not shown that it was clearly established when they searched his property that Mayo's statement—which Lynch contradicted the next day—made it unreasonable for the Probation Officers to believe Lynch lived with him. As a result, they are entitled to qualified immunity, and thus summary judgment, on this claim.

### 5. Mayo Consented to the Search of his Truck

The Probation Defendants acknowledge that Lynch's probation conditions do not explicitly authorize them to search Mayo's truck, since he was not on probation. Instead, they claim that the search was constitutionally permissible because Mayo consented to it.

An exception to the Fourth Amendment arises when an officer receives consent to search. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 222 (1973). To rely on this exception, the government must establish by a preponderance of the evidence that, after considering the totality of the circumstances, the person giving consent did so freely and voluntarily. *Id.* at 227; *United States* v. *Drayton*, 536 U.S. 194, 207 (2002). In viewing the totality of the circumstances, the court

considers factors such as "the characteristics of the [person giving consent] (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *United States* v. *Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). Whether the defendant knew he had a right to refuse to consent to a search is relevant to the court's determination, but "the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary." *Id.*

In some cases, consent is expressly given, but consent "may be inferred from actions as well as words." *United States* v. *Hylton*, 349 F.3d 781, 786 (4th Cir. 2003). When the government relies on an implied consent argument, its "'burden is heavier . . . since consent is not lightly to be inferred.'" *United States* v. *Moreland*, 437 F.3d 424, 429 (4th Cir. 2006) (quoting *United States* v. *Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984)), *overruled on other grounds*, *see United States* v. *Diosdado-Star*, 630 F.3d 359, 364 (4th Cir. 2011).

The Probation Defendants claim that Mayo's consent to search the vehicle is established by the fact that he willingly gave Parris the keys to his truck. To support this claim, they point the court to several cases, including *United States* v. *Townsend*, No. 2:20–00088, 2020 WL 5097840, at *3 (S.D.W. Va. Aug 28, 2020).

In that case, the court concluded that, it would be reasonable to believe that "by handing his keys over to [a deputy] without any evidence that she demanded or coerced him to do so, defendant was consenting to her using his keys to unlock the truck and search in the tool bag he had said his gun was stored in." *Id.* In at least one case, this court has reached a similar conclusion. *United States* v. *Hernandez*, No. 5:12-CR-00147-BO, 2012 WL 3958028, at *2

(E.D.N.C. Sept. 10, 2012) ("Finally, Hernandez also provided agents with keys to his outbuilding—again indicating his implied consent to a search.").

So Mayo handing over his truck's keys to Parris, when it was obvious that Parris wished to search his car, is a strong indicator of Mayo's implied consent for him to do so. Mayo has provided the court with no reason to believe that, given the totality of the circumstances, this consent was not voluntarily given. Thus, there is no sign that Parris's actions in searching the car violated Mayo's clearly established constitutional rights. So the District Court should grant his motion to dismiss on this point.

### 6.    Detention Claim

Mayo's remaining claim alleges that Parris unlawfully detained him when he prevented Mayo from leaving his property to go to the grocery store. Although the parties disagree over whether and how Mayo was detained, the Probation Defendants argue that any detention was constitutionally permissible because of the need to ensure officer safety during the search.

Mayo contends that after Parris and Johnson arrived he wanted to leave his house to buy some more supplies for his dinner. But, according to Mayo, when he got into his truck, Parris got behind the truck, drew his gun, and instructed Mayo to get out of the vehicle. Parris then told Mayo, in so many words, that he was not free to leave.

At the outset, it is important to note that this claim is only directed at Parris. There is no allegation—and, more importantly at this stage, no evidence—that Johnson played any role in the detention. So given that there is no evidence that she violated Mayo's clearly established connotational rights, she is entitled to summary judgment on this claim.

The Probation Defendants direct two arguments at Mayo's claim against Parris. First, they argue that Mayo has made up this incident after they moved to dismiss. Probation Defs'

Mem. in Supp. at 24–25. And second, they argue that regardless of whether Parris pointed his gun at Mayo, the Probation Officers could temporarily detain Mayo to ensure officer safety. *Id.* at 18–19. Neither of these arguments meets the standard for granting a motion for summary judgment.

As for the argument that Mayo fabricated this incident, the standard for summary judgment motions does not allow the court to discard Mayo's allegations as easily as the Probation Defendants suggest. As noted above, since Mayo is the non-moving party, the court must accept his version of events and draw any inferences in his favor. *News & Observer Publ'g Co.*, 597 F.3d at 576.

And although Mayo has not responded to their motion, the Probation Officers have put evidence supporting this claim before the court. In connection with their motion, the Probation Defendants have included the entirety of Mayo's deposition transcript. In that transcript, Mayo provides sworn testimony about what he claims occurred on August 12th. And that account include Parris drawing his weapon and ordering Mayo out of his truck. Mayo Dep. Tr. at 48:6–14. Nothing in the record conclusively rebuts Mayo's statement.

Instead, the record proves that there is a genuine issue of material fact about Parris's actions. While Mayo claims he left his house and got into his truck, Johnson's claims that Mayo "was at home, inside the residence and refused to come outside[.]" Johnson Dec. ¶ 21. And while Mayo claims that Parris pointed a gun at him, Johnson claims that neither she nor Parris "display[ed their] service weapon(s) or use the 'low-ready' position with [their] firearm(s)." *Id.* ¶ 27. The dispute over whether the events that led to Mayo's alleged detention ever occurred constitutes a genuine issue of material fact that precludes summary judgment on this claim.

Even if the court were to accept Mayo's version of events, the Probation Defendants would fare no better. They argue that they could detain Mayo to ensure officer safety during the search. Probation Defs.' Mem. in Supp. at 18–19, 30 In support of this argument, they cite two cases *United States* v. *McDaniel*, No. 1:16-CR-00052, 2016 WL 1143089 (N.D.W. Va. Oct. 20, 2016), and *Figg* v. *Schroeder*, 312 F.3d 625 (4th Cir. 2002).[5]

Both cases do address the propriety of detaining an individual to ensure officer safety. But both cases also explain that before an officer may do so, the officer must have reasonable suspicion to believe that the person they wish to detain poses a danger. *McDaniel*, 2016 WL 1143089, at *6–8 (discussing why officer had reasonable suspicion to detain a subject); *Figg*, 312 F.3d at 639 ("For police officers successfully to assert the exigent circumstances doctrine, they need only possess a 'reasonable suspicion' that such circumstances exist at the time of the search or seizure in question.").

The Probation Defendants have never argued that reasonable suspicion existed for Parris to believe that Mayo posed a danger to him or anyone else. And the court's independent review of the record turns up nothing to support such a claim. So the Probation Defendants have not established that the officer safety exception to the Fourth Amendment allowed Parris to detain Mayo. Since the need for an officer to have reasonable suspicion before relying on the officer-safety exception was clearly established at the time of the events here, they are not entitled to qualified immunity on this claim.

Thus, with respect to Mayo's illegal seizure claim, the District Court should grant summary judgment for Johnson, but deny it for Parris.

---

[5] This opinion only addresses the arguments raised by the Probation Defendants in their supporting memorandum. There may, potentially, be more compelling officer-safety-based arguments that Parris may have made. But it is not the court's job to raise arguments not presented by the parties. *See Short* v. *Hartman*, 87 F.4th 593, 603–04 (4th Cir. 2023) (explaining that "under the party presentation principle, [courts] generally address only the issues raised by the parties.").

### D. Damages-Related Issues

The Probation Defendants make two arguments about the damages Mayo wishes to recover for his alleged injuries. They argue that since Mayo has not established from recovering punitive damages for his § 1983 claim. Probation Defs' Mem. in Supp. at 27. And they also claim that he "has not suffered any injuries, and as such is not entitled to any damages[.]" *Id.* at 27. They are correct on the first argument, but wrong on the second.

Punitive damages are available in § 1983 claims in limited circumstances. A plaintiff seeking to recover those enhanced damages must show that "the defendant's conduct is . . . motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Johnson* v. *City of Fayetteville*, 91 F. Supp. 3d 775, 817 (E.D.N.C. 2015) (citing *Smith* v. *Wade*, 461 U.S. 30, 56 (1983)). Nothing in the record provides a factual basis to conclude that Parris's actions meet this standard. So the Probation Defendants are entitled to summary judgment on this claim.

But the record does reflect a basis to believe that Mayo has suffered compensable injuries. In his Complaint, Mayo seeks damages of $666,137 due to "pain and suffering" as well as for fearing for his life. Compl. at 3. And the deposition transcript the Probation Defendants submitted includes a discussion of the basis for Mayo's damages. *See* Mayo Dep. Tr. at 51:11–57:15. Whether that argument is compelling is an issue that the jury must decide. So the Probation Defendants' argument about damages does not provide a basis for summary judgment.

## III. Conclusion

For all these reasons, the undersigned recommends that the District Court grant Craft's Motion for Summary Judgment (D.E. 89) in its entirety. The Probation Defendants' (D.E. 84) motion should be granted in part and denied in part. All of Mayo's claims should be dismissed

except for his illegal detention against Parris in his individual capacity. That claim should be resolved through a trial.

        The Clerk of Court must serve a copy of this Memorandum and Recommendation ("M&R") on each party who has appeared here. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: January 3, 2024

Robert T. Numbers, II
United States Magistrate Judge