1    **UNITED STATES DISTRICT COURT**

2    **EASTERN DISTRICT OF NORTH CAROLINA**

3                                    )
     SEAN B. MAYO,                   )
4                                    )    DOCKET NO. 5:22-CV-289-M
                        Plaintiff,   )
5                                    )
     vs.                             )
6                                    )
     ROCKY MOUNT POLICE              )
7    DEPARTMENT, ET AL.,             )
                                     )
8                        Defendants. )

9    _____

10                   **TRANSCRIPT OF SHOW CAUSE HEARING**
     **BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II**
                **TUESDAY, APRIL 15, 2025; 3:04 PM**
11                    **RALEIGH, NORTH CAROLINA**

12   **FOR THE DEFENDANTS DENNIS PARRIS AND NCDOJ:**
             North Carolina Department of Justice
13           By:  Sonya M. Calloway-Durham, Esq.
                  Alex Williams, Esq.
14           114 West Edenton Street
             9001 Mail Service Center, Post Office Box 629
15           Raleigh, NC 27602

16   **FOR THE DEFENDANT NCDOJ**
             North Carolina Department of Justice
17           By:  Olga E. Vysotskaya de Brito, Esq.
                  Kelly Chambers, Esq.
18           114 West Edenton Street
             Raleigh, NC 27603
19

20   Audio Operator:              CLERK'S OFFICE PERSONNEL

21                          eScribers, LLC
                        7227 N. 16th Street
22                          Suite 207
                       Phoenix, AZ 85020
23                        800-257-0885
                       www.escribers.net
24

25   Proceedings recorded by electronic sound recording; transcript
                produced by transcription service.

Colloquy

1      P R O C E E D I N G S

2           THE CLERK:  All rise.  This United States District

3   Court for the Eastern District of North Carolina now in

4   session.  The Honorable Judge Robert T. Numbers, II presiding.

5           Please be seated and come to order.

6           THE COURT:  Good afternoon, everyone.

7           MS. CALLOWAY-DURHAM:  Good afternoon.

8           THE COURT:  We are here in the United States District

9   Court for the Eastern District of North Carolina sitting in

10  Raleigh for a hearing on a show-cause order in the case of

11  Mayo v. Rocky Mount Police Department, case number 5:22-CV-

12  289.  The Court excused Mr. Mayo the plaintiff from attending

13  today.

14          Would counsel please identify themselves for the

15  defense?

16          MS. CALLOWAY-DURHAM:  Good afternoon, Your Honor.

17  Sonya Calloway-Durham.

18          MR. WILLIAMS:  Good afternoon, Your Honor.  Alex

19  Williams on behalf of Mr. Parris and also DOJ.

20          MS. VYSOTSKAYA DE BRITO:  Your Honor, I'm Olga

21  Vysotskaya de Brito and NC DOJ was ordered to show cause.  I

22  am appearing on behalf of DOJ.  I am head of litigation

23  division at the Department of Justice.  And my colleague,

24  Kelly Chambers, she is a civil bureau chief.  I'm sure she'll

25  introduce herself.  She's appearing for DOJ, too.

Colloquy

1        MS. CHAMBERS:  Yes, Your Honor.  May it please the

2   Court.  I'm Kelly Chambers.  Thank you, Your Honor.

3        THE COURT:  Thank you.

4        I want to begin by noting this is the second time the

5   Court is holding a show-cause hearing to address Ms. Callaway-

6   Durham's conduct in this case.  In February 2023, the Court

7   entered an order that, among other things, prohibited the

8   parties from filing discovery materials on the docket unless

9   that filing was authorized by the Court or its local civil

10  rules.

11       Yet, the day after the Court filed that order, Ms.

12  Calloway-Durham filed discovery materials on the docket.  The

13  Court ordered her to appear and show cause why she or the

14  North Carolina Department of Justice should not be sanctioned

15  for her conduct.  The order also required the head of the

16  criminal division of NCDOJ to appear.

17       At the show-cause hearing, Ms. Calloway-Durham

18  acknowledged that her conduct violated the Court's order.  She

19  claimed, however, that the violation was unintentional because

20  she did not realize she had not read the entirety of the

21  Court's order.

22       At that hearing, NCDOJ was represented by Leslie

23  Dismukes, who at the time was the criminal bureau chief for

24  NCDOJ.  The Court addressed with Ms. Dismukes both Ms.

25  Calloway-Durham's conduct and global concerns it has over the

Colloquy

1    performance of attorneys in NCDOJ's public safety section.

2          In an attempt to assuage the Court's concerns, Ms.

3    Dismukes reviewed some procedural changes that have been

4    implemented to try to address the public safety section's

5    ongoing issues with North Carolina's federal courts.  These

6    procedural changes involved weekly staff meetings to discuss

7    cases and having the section head receive all notices of

8    electronic filing issued by this State's federal courts.

9          Ms. Dismukes noted, however, that in light of the

10   protections afforded to State employees, there were

11   limitations on how NCDOJ can impose corrections on individuals

12   who have repeated issues.  And she indicated it will likely

13   take NCDOJ a longer period of time to address some of those

14   issues than it would at an at-will employment setting.

15         In response, the Court noted that it was not so

16   limited in how it could deal with attorney misconduct.  The

17   Court went on to explain that in dealing with these issues, it

18   was trying to avoid imposing sanctions on individual attorneys

19   because doing so impacts the attorney's reputation and has the

20   potential to impact the attorney financially.  But while the

21   Court hoped to avoid sanctioning NCDOJ or its attorneys, the

22   Court noted it was losing patience with the repeated errors

23   and was running out of other options.

24         The Court ultimately did not sanction Ms. Calloway-

25   Durham or NCDOJ, but it noted that it considered various other

Colloquy

1     options, including a formal reprimand of the Department for

2     its failure to meet its obligations to the Court; invoking the

3     Court's formal disciplinary process against NCDOJ; and

4     appointing someone to determine if it had violated the Rules

5     of Professional Conduct; referring NCDOJ to the North Carolina

6     State Bar for potential disciplinary action; and requiring

7     NCDOJ to prepare a written plan to address the public safety

8     section's issues and appointing a monitor to ensure compliance

9     with that plan.

10          The Court concluded the hearing by expressing its

11    hope that we wouldn't be in this position again and pointing

12    out that the Court had made its views clear on how it would

13    deal with any future issues that might arise.  Yet, we find

14    ourselves here today with that hope unfulfilled because we're

15    once again addressing issues of Calloway-Durham's conduct.

16          I want to hear from Ms. Calloway-Durham in a moment,

17    and certainly want to hear from NCDOJ as well, but I want to

18    begin by asking the clerk to please place Ms. Calloway-Durham

19    under oath because I've noticed that some of her pleadings

20    have difficulty accurately representing what is going on in

21    this case.

22          THE CLERK:  Please raise your right hand and place

23    your left hand on the Bible.

24          THE COURT'S WITNESS, SONYA CALLOWAY-DURHAM, SWORN

25          THE COURT:  Ms. Calloway-Durham, do you understand

Colloquy

1    that you are now under oath, and if you answer any of my

2    questions falsely, you may be prosecuted for perjury for

3    making a false statement?

4            THE WITNESS:  Yes, Your Honor.

5            THE COURT:  We're here today for a hearing on the

6    Court's order requiring you to show cause why you should not

7    be sanctioned for violating Rule 11(b) of the Federal Rules of

8    Civil Procedure.  As outlined in its March 31st, 2025 show-

9    cause order, the Court noted two potential Rule 11 violations

10   related to defendant Dennis Parris' motion to dismiss that's

11   at docket entry 121.

12           First, the Court -- and I believe that you may have

13   violated Rule 11 because the legal contentions about the

14   nature of Mayo's remaining claim and the Court's lack of

15   subject matter jurisdiction over that claim did not appear to

16   be warranted by existing law or based on a nonfrivolous

17   argument for changing existing law.

18           And second, the apparent lack of a legal basis for

19   those arguments suggested that they were presented to the

20   Court to harass Mr. Mayo and to unnecessarily delay the trial

21   of this matter.

22           At the outset, Ms. Calloway-Durham, can you tell me

23   the standard the Court must apply in determining if you have

24   violated Rule 11?

25           THE WITNESS:  Do you want me to stand, Your Honor?  I

Colloquy

1    don't want to be disrespect --

2            THE COURT:  Yes, in this court we stand when we

3    address the -- in this court we stand when we address the

4    Court.

5            THE WITNESS:  I understand, Your Honor.  Excusable

6    neglect.

7            THE COURT:  And what do you base that on?

8            THE WITNESS:  If my memory's off, let me make sure

9    I'm not recalling something incorrectly, which I would like to

10   explain that issue to the Court if I may speak at some point

11   later.  I want to make sure that I'm not speaking incorrectly

12   about Rule 11 versus show cause and excusable neglect as

13   opposed to good cause.  Your Honor, if I may explain my

14   inability to recall and how that relates to the show cause.

15           THE COURT:  Well, I mean, my point here is we are

16   here on a hearing that the Court is deciding whether to impose

17   sanctions that impact your professional reputation and have a

18   potential to have consequences on you and NCDOJ because the

19   rule requires me with limited exceptions to sanction them too

20   if I sanction you under Rule 11.  And it doesn't seem that

21   you're familiar with the standard I'll apply.

22           THE WITNESS:  It's -- Your Honor, if I may.  It's not

23   that I'm not familiar.  I'm having trouble recalling, if I can

24   explain.

25           THE COURT:  I mean, briefly.

Colloquy

1        THE WITNESS:  Your Honor, I was going to -- when

2    given the opportunity to explain, sort of give a timeline on

3    how we got here including the last order.

4        THE COURT:  I'm not really -- I'll hear from you

5    eventually on that, but I have a list of questions that I need

6    to have answered before we get there.  If there's something

7    you think is pertinent to this particular question, I'm happy

8    to hear from you on it but at this point --

9        THE WITNESS:  It is.

10       THE COURT:  -- I don't want to get into a lengthy

11   discussion.

12       THE WITNESS:  Part of that timeline, Your Honor,

13   includes the fact that I have been on medical leave for a six-

14   month period at one point after the first show cause and

15   another five or six-week period after the last motion that's

16   now at issue here.  Both of which were related to issues that

17   I've had medically speaking, which affect my cognitive

18   processing.

19       THE COURT:  Well, and I don't mean this in a rude

20   way.  Are you saying that you are impaired such that you

21   cannot adequately practice law?

22       THE WITNESS:  No, Your Honor, I am not.  I'm saying

23   that under certain circumstances and now, being one of them

24   with the stress associated with this, it's difficult for me to

25   recall things in a timely manner.  And that has affected my

Colloquy

1    ability to work, which is why I have been on medical leave

2    twice.  It's not that I'm incapable of working.  There are

3    times that I need extra time.  And unbeknownst to me, I may or

4    may not have processed something properly.

5         THE COURT:  Be that as it may, again, I'm surprised

6    you don't have somewhere the standard the Court will apply in

7    resolving this matter, given the importance of it, I would

8    hope, to your professional reputation and to that of your

9    employer.

10        This motion involves -- or this show-cause order

11   involves a motion to dismiss that you filed on behalf of Mr.

12   Dennis Parris, one of the -- the remaining defendant here.  I

13   may refer to that as a third motion to dismiss because it's

14   the third one filed on behalf of one of your clients in this

15   case.

16        In that motion, you argued that after the Court's

17   ruling on the defendant's motion for summary judgment the

18   Court lacked subject-matter jurisdiction over the remaining

19   claim.  Your principal argument was that Mayo's remaining

20   claim is a false imprisonment claim under North Carolina law,

21   and that since the Court had dismissed all of Mayo's federal

22   claims, it no longer had subject-matter jurisdiction to hear

23   the remaining state law claim.

24        In an earlier motion to dismiss, Mr. Parris made

25   another subject-matter-jurisdiction-based argument, but that

1   motion was not mentioned at all in the third motion.  Instead,

2   in your supporting memorandum for the third motion you said

3   that defendant Parris recognizes that Community Corrections

4   previously filed a motion to dismiss on the basis of subject-

5   matter jurisdiction in this matter.  However, he was not a

6   party when that motion was filed.

7          And so one of my questions that I've had throughout

8   this is that at the time you file the third motion to dismiss

9   were you aware that Dennis Parris had filed a subject-matter

10  jurisdiction-based motion to dismiss earlier in this case?

11         THE WITNESS:  Yes, Your Honor.  I had, and the reason

12  for the Court's denial of that motion, and that's part of what

13  I wanted to explain, Your Honor denied that motion on a basis

14  other than what's presently before the Court.  And also there

15  was a line in that order -- part of what I wanted to explain

16  also is that order as well as the subject matter -- excuse me,

17  the motion for summary judgment order both came out during my

18  absence.

19         And although when I returned to the office, I looked

20  over both of them, months later when I filed the third motion,

21  I did not recall the line in which Your Honor had indicated

22  that there was -- that the claim was federal.  Which is why in

23  the second motion -- excuse me, the third motion I made the

24  incorrect statement that even if the Court finds that it's

25  federal, clearly indicating that I did not recall that the

Colloquy

1     Court had already found that it was federal.

2            THE COURT:  I guess what I'm struggling with is the

3     third motion to dismiss makes no mention of Parris' earlier

4     motion to dismiss, what I will call the second motion to

5     dismiss.  And it does not acknowledge that that was filed at

6     all.  And I'm curios why that is.  There's no mention of it at

7     all.

8            THE WITNESS:  It wasn't to be disrespectful to the

9     Court or dishonest with the Court.  It was simply because I

10    believed there was a different issue at hand at that point.

11    It had nothing to do with -- I mean, I don't -- I don't have a

12    history of trying to be disingenuous or trying to say anything

13    that's not accurate.  I've practiced law a number of years.  I

14    take that very seriously, which is part of the reason I tried

15    to get medical attention and have been on medical leave.  I

16    don't take that lightly.

17           And honestly, it took me a while to figure out what I

18    had said incorrectly because I did not recall from the order

19    that you ruled on while I was on medical leave that -- I mean,

20    I read the order.  But I didn't recall that particular portion

21    of it.

22           THE COURT:  So here's why I'm confused and why your

23    answer isn't making sense.  I'm reading the memorandum of

24    support of the third motion to dismiss.  You say defendant

25    Parris also recognizes that Community Corrections previously

Colloquy

1    filed a motion to dismiss on the basis of subject-matter

2    jurisdiction in this matter. However, he was not a party when

3    the motion was filed.

4         You go on to say Community Corrections could not have

5    waived subject-matter jurisdiction on behalf of an individual

6    not yet a party to the action by having previously raised such

7    jurisdiction on the basis outside of an order not yet

8    rendered.

9         And so I guess I'm just confused again as to why this

10   seems -- this doesn't seem to acknowledge that Parris brought

11   his own motion to dismiss.

12        THE WITNESS: That was never my intent, Your Honor.

13   And I think part of the problem is that when I raised the --

14   his first, which is the second motion to dismission, DE-79.

15   Let me see. I raised them on the basis of sovereign immunity

16   and also the fact that I thought there was a state claim. But

17   the purpose of the second -- the third motion was to say that,

18   without realizing that Your Honor had already ruled that the

19   remaining claim was federal -- was that in light of that

20   factual mis -- in light of that factual inaccuracy, I then

21   found another case. And I understand Your Honor does not

22   believe this is persuasive.

23        THE COURT: I just want to stop here for a moment

24   because you're saying that you were unaware that I had ruled

25   on this issue and that I had said all the claims were federal.

1    More or less the --

2            THE WITNESS:  I said I did not recall that, yes.

3            THE COURT:  More or less the day after you filed this

4    third motion to dismiss I entered a text order because I

5    thought there was incredible overlap between the two motions.

6    And -- or actually, it was referred to me perhaps.

7            I said in a text order entered October 25th, 2024 --

8    I said no later than Monday, October 28th, 2024 defendant

9    Dennis Parris must submit a memorandum of no more than ten

10   pages explaining how his recent motion to dismiss for lack of

11   subject-matter jurisdiction is not duplicative of the subject-

12   matter jurisdiction argument Parris and the other defendants

13   raised in the motion to dismiss filed in May 2023.

14           The Court notes that United States Magistrate Judge

15   Numbers found the subject-matter jurisdiction argument in the

16   May 2023 motion to be frivolous.  Then I cite the memorandum

17   in recommendation and recommended denying that portion of the

18   motion.  No objections were filed to that recommendation, and

19   the district court adopted it.

20           So when I filed that text order, did you not go back

21   and reread the order?

22           THE WITNESS:  I went back and reread the DE-79 and

23   the motion that I filed, which I can't recall the file number

24   for in September because, as I read it, I was to explain how

25   my prior motion was different from my current motion.  That

Colloquy

1    was my focus.

2        THE COURT:  When I noted that I'd already ruled on a

3    similar issue, did you go back and read the M&R that dealt

4    with that issue or not?

5        THE WITNESS:  My focus was on what you ordered me to

6    do, which was to explain how the two motions aren't

7    duplicative.

8        THE COURT:  Is the answer to my question yes or no?

9    Did you go back and read my December 11th, 2023 order before

10   you filed your supplemental response?

11       THE WITNESS:  And I'm trying to explain that I did

12   not because I was trying to do as you ordered me to explain

13   the difference between the two motions.

14       THE COURT:  So again, you've touched on this a bit,

15   but in my December 2023 recommendation, I noted that if Mayo's

16   allegations were true, then the defendants violated his Fourth

17   Amendment right to be free from unlawful searches and

18   seizures.  And as a result, Mayo could sue under 42 U.S.C.

19   Section 1983, and the Court could hear that claim through its

20   federal question jurisdiction.

21       The opinion also noted that since the Court had

22   subject-matter jurisdiction over Mayo's federal claim, it

23   could exercise supplemental jurisdiction over any state law

24   claims included in Mayo's complaint, but there was no need to

25   invoke supplemental jurisdiction because "May has brought no

www.escribers.net | 800-257-0885

1    state law tort claims.  Instead, his claims are all based on a

2    violation of his federal constitutional rights."

3         So that's very explicit.  There's no state law claims

4    here.  They're all federal claims.  That was the principal

5    basis for denying that motion.  So again, explain to me why

6    you then filed another subject-matter-jurisdiction-based

7    motion claiming that there are state law claims?

8         THE WITNESS:  Again, Your Honor, I filed a motion

9    based on what I thought was a change in circumstances, having

10   not recollected that the order in which you denied the prior

11   motion included language that dissolved the issue of whether

12   or not there was a state claim, and because I believed there

13   was case law that if it could be either might be something for

14   Your Honor to consider in its discretion.  It was not with the

15   intent to file something that was inaccurate or unethical or

16   dishonest.

17        THE COURT:  You mention discretion here, and under

18   the supplemental-jurisdiction statute, the Court can in the

19   exercise of its discretion dismiss any remaining state law

20   claims.  But that was not your argument in the third motion to

21   dismiss and in your memorandum of support.  The word

22   discretion does not appear in that in that context at all.

23   You unequivocally say the Court lacks subject-matter

24   jurisdiction and must dismiss the case.

25        THE WITNESS:  Your Honor, the point of Pate (ph.) was

Colloquy

1    that where there can be, and I did not articulate that

2    properly, I recognize that.  Where there can be either

3    jurisdiction in a state court or in a federal court, but Your

4    Honor, again, that goes back to my not recalling that the

5    basis for the prior denial of the second motion to dismiss was

6    related to the very thing I was asking for in the third

7    motion.

8         And I did not articulate the point of Pate being

9    where it can be not whether it is or isn't.  If my word -- and

10   also I did not bring up 1367 because I had previously

11   mentioned 1367.  I thought it was kind of understood.

12        THE COURT:  Where did you previously mention 1367?

13        THE WITNESS:  Okay.  I can't remember if it was in

14   the prior motion to dismiss or if it was in the motion for

15   summary judgment.  I'm trying to remember.  Yes, it's on page

16   98 of DE -- excuse me, page 14 of DE-79.

17        THE COURT:  What appears in a block quote, that's not

18   a -- you're not making a serious argument based on 1367.  It

19   happens to show up in a block quote that you cut and pasted

20   from something else.

21        But I want to go back to this Pate point.  In your

22   supporting memorandum, when you're talking about Pate, you

23   say, "As such, once this Court dismissed plaintiff's Section

24   1983 claim, e.g. the purported unlawful search, it was without

25   jurisdiction to hear the remaining tort claim, e.g. false

Colloquy

1   imprisonment against defendant Parris.  As in Pate, plaintiff

2   cannot rely on the alternative theory of a state claim to

3   support jurisdiction in this action."

4       At the end of the paragraph you say, "Section 1983

5   simply cannot stand as the basis for the false-imprisonment

6   claim and, as such, this Court is without jurisdiction to hear

7   the matter."

8       So you're not arguing discretion.  You're arguing a

9   lack of jurisdiction.

10      THE WITNESS:  Your Honor, again, that goes back to my

11  thinking that I still had an argument that not only can -- if

12  it can be either, but where it actually is a remaining state

13  claim as well.  But that goes back to not recalling that Your

14  Honor had already resolved that issue.

15      THE COURT:  I am so frustrated and aghast at the fact

16  that you're claiming you don't recall the key portion of an

17  earlier order dealing with largely the same issue.  It's

18  really -- it's incredible.  I mean, it's genuinely incredible.

19  It is impossible to believe.

20      The other thing that -- one of the other things

21  that's incredibly confusing here is in both my recommendation

22  on subject-matter jurisdiction -- I'm sorry, on summary

23  judgment and on the district court's order on summary

24  judgment, they both explain that the claim that would go to

25  trial was a illegal-detention claim.  Yet, you recharacterized

Colloquy

1    this as a false-imprisonment claim and then based all of your

2    arguments off of that.  Why did you do that?

3             THE WITNESS:  Your Honor, in North Carolina, the

4    unlawfulness of the detention is kind of wrapped up into the

5    definition of false imprisonment.  They're kind of used

6    interchangeably, and there are cases to that effect.  Again,

7    my using the word detention in one place and imprisonment in

8    another -- detention is a form of imprisonment.  Any unlawful

9    form of restraint is a form of imprisonment.  That was my

10   thought process.

11            THE COURT:  How do you bring a -- how do you find a

12   North Carolina state law claim when the entire M&R on the

13   summary-judgment motion deals with federal claims, when all of

14   your briefing deals with federal claims, all of my opinion

15   deals with federal claims?  Why did you think there was a

16   state-law claim here?

17            THE WITNESS:  Again, Your Honor, and I understand it

18   does not appear that you believe me, but I can only testify

19   under oath that what I know to be true, which was at the time

20   that I filed this third -- excuse me, third motion which

21   was -- I'm trying to look at the dates, the difference between

22   the two -- more than a year after I filed the initial for Mr.

23   Paris, which is the second motion to dismiss and after a six-

24   month period of leave for issues related to cognitive

25   processing.  And if I am ever at some point able to explain

1    the other timeline that goes into that, I simply did not

2    recall that that issue had been resolved.  There's on reason

3    why I would have had I recalled it.  And it did not occur to

4    me to go back and reread something that I thought I recalled

5    correctly but did not.  I wouldn't -- it doesn't make sense

6    that I would say even if the Court finds, if the Court had

7    already found and I recollected that.

8        THE COURT:  Do you understand that there's a

9    difference between a claim for false imprisonment and a claim

10   for illegal detention?

11       THE WITNESS:  I understand that unlawful detention

12   and false imprisonment in cases have been used

13   interchangeably, and that unlawful detention is a form of

14   imprisonment.  And that was my thought process on

15   interchanging the two.  It was not to try to change the claim.

16       THE COURT:  Because your argument is that if any of

17   us are pulled over tonight by law enforcement, and we are

18   ordered out of a car at gunpoint by a law enforcement officer,

19   which is what Mr. Mayo alleged happened -- not the pulling

20   over but he's ordered out of a car at gunpoint.  If that

21   happens to any of us today, so long as the officer doesn't

22   arrest us, the Fourth Amendment has nothing to say about that.

23   That's your argument.

24       THE WITNESS:  Your Honor, my argument should not have

25   been limited to whether or not there's an arrest.  My point

 1    was there's not an arrest.  That's one way we get to a false

 2    imprisonment is whether or not there's a lawful arrest without

 3    probable cause.  But the other issue is whether or not it's

 4    lawful, and the unreasonableness of that lawfulness.

 5         THE COURT:  No.  You say in your memorandum, "In

 6    other words, an alleged federal claim of false imprisonment

 7    cannot stand without a claim for false arrest."

 8         THE WITNESS:  Your Honor had dismissed the false

 9    arrest, and my argument at that point was that without -- and

10    there's case law to that effect.  Your Honor had found there

11    wasn't an arrest, so I was trying to argue that without an

12    unlawful arrest we don't get to an unlawful

13    detention/imprisonment, either way you want to use the word.

14    But the bottom line is whether or not the

15    detention/imprisonment is, in fact, unlawful or unreasonable.

16         The point being, Your Honor, it still goes back to,

17    regardless of whether or not I didn't articulate properly

18    whether the different ways to get to an unlawful detention.

19    And I think I used the word unlawful detention in -- I don't

20    know if it was my motion for summary judgment or my second

21    motion for -- to dismiss.  I used the word detention at that

22    point.  And I think I -- and Your Honor made a point to say

23    that -- to quote me in saying that he appears to have alleged

24    an unlawful -- unreasonable search and false arrest and

25    unlawful detention.  I think I used the word detention there

1  too.

2       Also I'm arguing partially in the alternative because

3  I'm still under the impression that there's still an issue of

4  whether it's federal or state.  So if I made arguments about

5  federal in one point and state in the other it's because

6  they're in the alternative, and I have used the words assuming

7  arguendo.

8       And I tried to come back, again without realizing

9  that I misspoke altogether about whether or not Your Honor had

10 ruled on this, in the order that you issued between the 25th

11 and the 28th to explain that -- let me find it so that I'm not

12 going off memory.  I'm trying not to go off memory.

13      I explain that the prior motion was based on the

14 failure to designate the basis under 1983.  That was part of

15 the reason.  And that the current motion was based on the

16 premise of the Court's dismissal of the false-arrest claim.

17 Again, both of which did not take into account that Your Honor

18 had already ruled on that.

19      THE COURT:  Let's assume for the moment you're

20 correct that there was a state-law claim remaining.  Both

21 federal law in 1367 and numerous opinions from the Supreme

22 Court and Fourth Circuit Court of Appeals established that a

23 court can retain jurisdiction over state-law claims after

24 dismissing all federal claims.  So what -- and your brief did

25 not argue that the Court should not exercise discretion.  You

Colloquy

1    argued pointedly that there is no jurisdiction.  So what is

2    the legal basis for that argument, given that there is both

3    statutory, Supreme Court, and Fourth Circuit opinion that says

4    that the court can retain jurisdiction over state-law claims

5    after dismissing all federal claims?

6         THE WITNESS:  As I explained earlier, Your Honor,

7    part of that was based on my not recalling that you had

8    already ruled that it was a federal claim.  And it was also

9    based on my reading of Pate, where it can be federal or state.

10        THE COURT:  Okay, so a District Court of South

11   Carolina --

12        THE WITNESS:  It still gets back to jurisdiction.

13        THE COURT:  A District Court of South Carolina

14   opinion that's been cited to me by no one for anything is

15   legal authority when compared to Fourth Circuit opinion,

16   Supreme Court opinion, and a statute enacted by Congress and

17   signed by the President?

18        THE WITNESS:  Your Honor, where it -- again, that

19   case is about what the court should do or can do.  It is not

20   mandatory.  And again, part of the reason that I didn't use

21   the discretionary language is I did not recall you had already

22   denied that.

23        THE COURT:  But I'm talking about even if -- setting

24   aside the fact that you didn't recall that, and I don't think

25   I'm going to get a good answer or satisfactory answer to my

1    question.  Even if there was a state-law claim, even if you

2    were right about that, what is the basis that the Court lacks,

3    not that the Court can choose to dismiss it but the Court

4    lacks jurisdiction?

5         THE WITNESS:  The proper argument should have been,

6    as I tried to explain earlier, as just as I raised earlier,

7    and you said it was a blurb but 1367 gives you the

8    jurisdiction to have that discretion.  Pate doesn't say shall.

9    It says should.  And I was not clear when I said, again

10   thinking that there was no federal claim, that it was

11   something in your discretion.  Thinking there was no federal

12   claim, I'm thinking that it should not be.  Just because it

13   could have been federal, it should not have been maintained.

14        THE COURT:  Pate was a motion to remand in which the

15   plaintiff himself said I am not bringing federal claims.  In

16   that case, undoubtedly there's no subject-matter jurisdiction.

17   The plaintiff controls his complaint and the claims he brings.

18   So when a plaintiff says I'm not bringing any federal claims,

19   the court really has no choice but to kick the case back to

20   state court.

21        That's not at all what happened here.  I mean,

22   Pate -- your argument is so procedurally afield from where we

23   stand now, and so factually afield that that case has no

24   bearing whatsoever on this.

25        THE WITNESS:  Your Honor, I understand that it's not

Colloquy

1    on all fours.  My point was simply the can language because I

2    again believed that the federal issue had not been resolved,

3    and that there was no federal issue.  And that even if it was

4    an assuming arguendo, even if there was a federal claim, that

5    you should not -- and again, if I didn't make it clear that it

6    was should, which is what Pate says, maintain jurisdiction.

7         I at no point, and I think I mentioned describing the

8    case that it was honoring -- sent back on remand.  I was not

9    trying to insinuate that it was on all fours, and that this

10   involved a remand or that one didn't involve a remand.  That

11   was not the point of the comparison that I was making.

12        And I do not believe that a good-faith argument for a

13   law, if it is a law and whether or not another court has cited

14   it, and even if it is in another federal district court, which

15   is persuasive not mandatory, means that it's not a good-faith

16   argument.  As long as there's some law to support it, that was

17   the point of what I was trying to make.

18        But again, my point was marred by my inability to

19   recollect and not realizing that my recollection was not

20   accurate that you had not already ruled on something.  Again,

21   I would not have said if this Court rules that it's federal if

22   I had recalled that the Court had already ruled that it was

23   federal.

24        THE COURT:  I want to talk about the objection you

25   filed, which has since been withdrawn by Mr. Williams.  On

Colloquy

1    page -- this was filed -- I believe I filed my M&R on a

2    Friday.  Your objection was filed I believe on a Tuesday or a

3    Wednesday thereafter.  It was a few days later.  I'm sorry, I

4    filed my M&R on a Monday.  By Wednesday afternoon you'd filed

5    your objection.

6         On page 2 of your objection at the beginning of your

7    argument section you say, "Following this Court's dismissal of

8    a due-process claim stemming from the alleged unlawful search

9    and also a false-arrest claim, defendant Parris filed a

10   subsequent motion to dismiss for lack of subject-matter

11   jurisdiction over the remaining false-imprisonment claim."

12        Where is there a due-process claim anywhere in this

13   case?

14        THE WITNESS:  Your Honor articulated that he -- it

15   was my -- and at all times my understanding that he was

16   attempting to say that the unlawful search was a violation of

17   his constitutional rights.  I forgot exactly how he phrased

18   that but that's what I was referring to.  He never says

19   Fourteenth Amendment, due process, or any of that.  That was

20   me trying to make sense of what he had alleged.

21        THE COURT:  Are you saying that someone who's

22   bringing an unlawful search or seizure claim is bringing a

23   due-process claim?

24        THE WITNESS:  I'm saying that under color of law, if

25   in the federal court you bring a claim under 1983, under color

Colloquy

1    of state law -- if you bring a claim under 1983 that your

2    constitutional rights have been violated is where I was going

3    with that, Your Honor.

4         THE COURT:  But I guess my point is there is no due-

5    process claim in this case.  Mr. Mayo never under any --

6         THE WITNESS:  He never uses the word due process,

7    correct.

8         THE COURT:  Okay.  And you understand that's a

9    particular type of claim in Section 1983?

10        THE WITNESS:  Your Honor, despite the many things

11   that Your Honor has found that you disagree with my wording

12   on, and that hindsight is 20/20, I could say I should have

13   done differently or could have done differently, filing claims

14   or responding to claims under due process is not something

15   that is new to me.

16        I'm telling you that at the time that these two prior

17   motions were filed, there were other things going on with me.

18   And that if I misspoke yet again, that still speaks to my

19   issue of trying to make sure that I'm not violating anything

20   unethical.  Part of the reason, as Your Honor mentioned, I

21   responded quickly was I was trying not to miss a deadline.

22   This is how we got here the last time.

23        I responded quickly because I was trying not to miss

24   a deadline.  I'm so anxious about doing something wrong that I

25   try to do it quickly. And in trying to offset my medical

Colloquy

1    condition, the two don't always go together.

2        THE COURT:  I'll also note in that objection on page

3    3 in the first full paragraph on page 3, you say that I

4    ordered that you "[a]ppear and show cause why she," meaning

5    you "should not be held in contempt of court for moving a

6    second time for dismissal on the basis of subject-matter

7    jurisdiction."  Where did I order you to show cause and appear

8    why you should not be held in contempt of court?

9        THE WITNESS:  Why you should not be sanctioned, I

10   misspoke.

11       THE COURT:  And where did I say I was doing that

12   because you had moved for a second time for dismissal on the

13   basis of subject-matter jurisdiction?

14       THE WITNESS:  That was my interpretation of your

15   discussion that I had previously filed this, and that I

16   appeared to have filed another duplicative motion that Your

17   Honor believed was frivolous and had previously ruled was

18   frivolous.

19       THE COURT:  What need is there for interpretation

20   when I spell out in detail what the grounds are explicitly --

21   explicitly, because one of the requirements of doing this is I

22   tell you exactly why I think you violated Rule 11.  I say:

23       "After considering the timing of this motion and the

24   lack of a legal basis for its arguments, the Court has reason

25   to believe that Parris' attorney Sonya Calloway-Durham and the

Colloquy

1    North Carolina Department of Justice have violated Rule 11(b).

2    The legal contentions in this motion about the nature of

3    Mayo's remaining claims and the Court's lack of subject-matter

4    jurisdiction over it do not appear to be warranted by existing

5    law or based on nonfrivolous arguments for changing existing

6    law.  And the apparent lack of a legal basis for these

7    arguments suggest that they were presented to the Court to

8    harass Mayo and to unnecessarily delay the trial of this

9    matter.  Thus, Calloway-Durham and the North Carolina

10   Department of Justice must appear and show cause as to why

11   their conduct has not violated Rule 11(b)."

12          What need is there for interpretation there?

13          THE WITNESS:  I don't know there's need.  I was

14   trying to explain the -- the procedural history in what had

15   happened that led to the objection.  Whether or not it's

16   necessary, again, Your Honor, I don't know that that's --

17          THE COURT:  This is law.  This is a court of law.

18          THE WITNESS:  I understand.

19          THE COURT:  Words matter.  Words are the law when it

20   comes to statutes and court opinions.  Words really matter.

21   And what I keep hearing from you is I'm saying things wrong;

22   I'm misrepresenting things, I'm misstating things

23   inadvertently.  It really matters.  The nature of Mr. Mayo's

24   claim matters.  Whether it's a due-process claim, or a Fourth

25   Amendment claim matters.  Whether I ordered you to show up to

1   argue about contempt of court or rule 11 matters.  Whether I
2   did it because you filed a motion a second time or because
3   there was no basis for that motion matters.

4        THE WITNESS:  Your Honor, this is not -- it was not
5   an attempt on my part to suggest that it didn't matter.  I
6   don't know what I can say to get you to understand what my
7   intent was and that it was not an intent to be disingenuous.
8   And that's the bottom line.

9        THE COURT:  I don't know what I can do to get you to
10  understand how off base these arguments are.

11       THE WITNESS:  They're off base based on what I'm
12  trying to explain to you.  And I don't think -- from my
13  perspective, whether Your Honor agreed that the case was on
14  all fours or on point that my argument was based on something
15  that was not -- even if it's persuasive authority, even if
16  it's factually different, not a basis for -- not a proper
17  basis for the motion.  If Your Honor didn't agree, you know,
18  you deny orders every day -- motions, excuse me.  It was not
19  to see myself in this situation.  Why would I do that?  Why
20  would I say if this Court does find if I recalled that you
21  had?  I wouldn't do that.

22       THE COURT:  I don't know that that's an excuse.  The
23  fact that you're saying you don't recall a prior order on this
24  is not -- does not absolve you of this, and it almost indicts
25  you of improper conduct or violating Rule 11.  Like it's not

1  an excuse to say I don't remember the prior orders.  It's not.

2  The orders are law.

3  　　　　　THE WITNESS:  The orders are law.  I'm not -- I'm not

4  disputing that.  I'm telling you what my intent was, and my

5  intent at the time I filed the motion, which is what's

6  relevant to Rule 11, is that I believed I had a meritorious

7  argument based on what I inaccurately recalled about your

8  prior order, part of which came out when I was not even

9  working at that time.

10  　　　　　When I came back, if I could ever explain the

11  timeline, I would like to explain what all else was going on

12  and how that impacted my ability to recall.  Hindsight is

13  20/20.  I'm not going to disagree that in a perfect world I

14  should have gone back and reread the order when I'm thinking

15  I -- but I'm thinking I properly recalled the order is the

16  problem.

17  　　　　　I wouldn't file something that I knew to be factually

18  or legally incorrect.  And even with different interpretations

19  of something legal that does not always mean that they're

20  without merit or that they're intended to do something

21  unethical with Rule 11.  I mean, I don't know how else I can

22  answer you.

23  　　　　　I understand that you don't -- apparently you don't

24  believe me, but I can only answer your question which is what

25  my intent was.  I'm answering under oath.  I'm putting myself

1    on the mercy of the Court based on a medical condition that,

2    quite frankly, I should not have on a public document.

3          THE COURT:  All right, I'll hear anything else you'd

4    like to share with me about this issue.

5          THE WITNESS:  Your Honor, if I may.  May it please

6    the Court if I didn't already ask earlier.  As Your Honor

7    indicated earlier, the first -- the last order in which Your

8    Honor did not find that I should be sanctioned or that DOJ

9    should be sanctioned, related to a period of time that I

10    unbeknownst to me was beginning to suffer from a chronic

11    medical condition.

12          During that time, Your Honor ordered me to do

13    something that I wanted to make sure the Court knew I had done

14    because there had been issues with Mr. Mayo asking for things

15    or saying he didn't get things.  And I wanted to make sure

16    Your Honor knew that I had done it.

17          I wear glasses.  I do recall the day that I got that

18    I was trying to make sure that I didn't miss a deadline with

19    everything else we had going.  And that I responded and did

20    exactly what you asked me to do.  There was no intent to do it

21    in a way that was other than what you asked me to do.

22          With my screen 140 percent, which is where I normally

23    keep it, I did not realize that I didn't scroll down.  Had I

24    printed it, I would have seen it.  It wasn't me trying to

25    disregard a court order, which Your Honor heard this, and you

Colloquy

1    ruled.  I'm making a point.

2          From there, a couple months later I filed the motion

3    to dismiss, the second motion to dismiss as it relates to Mr.

4    Parris.  The following month in June of 2023, I filed a motion

5    for summary judgment.  The following two months later --

6    actually it wasn't even two, a full two months, I went on

7    medical leave.  I was on medical leave for a period of six

8    months.

9          During my absence, in December of 2023, the Court

10   ruled on the motion to dismiss.  In January of 2024, in my

11   absence, the Court ruled on the motion for summary judgment.

12   In February of 2024, I returned from work (sic) and within

13   weeks of my return to work we lost a number of our attorneys

14   and were down to essentially four attorneys to do these type

15   of cases.

16         During that time, what cases that normally would not

17   have been assigned to me either because of the type of cases

18   they were and the number of cases, because we were down to so

19   few attorneys, impacted all of our -- well in particular my

20   ability to put forth the kind of work product that ordinarily

21   I would have provided to the Court.  Never mind I had just

22   come back from medical leave trying to do so.

23         In June of 2024, while this case was still pending, I

24   had issues that also exacerbated my medical condition related

25   to my own personal trial that was scheduled to have been in

Colloquy

1    June and then it was moved to July and then it was moved to

2    September.  At some point it was moved to October.

3           While it was still pending in October, on September

4    12th I filed this motion listing -- a motion to extend, excuse

5    me.  Listing a number of reasons including the timing of my

6    trial, which would have been a week before Mr. Mayo's trial;

7    the continued staffing shortage; and the suggestion that the

8    Court appoint a -- send the case to court-hosted mediation.

9           As far as the allegation that I filed these motions

10   to delay or to harass Mr. Mayo -- the reason I'm bringing this

11   up is to that.  That that was nothing about what I did was to

12   delay or harass.  It was to make sure that A, I could be

13   available and able to present a defense on behalf of Mr.

14   Parris and also because Mr. Mayo is pro se, to see if there

15   was something else that could be resolved with court-hosted

16   mediation.

17          At that time, there was no intention to file another

18   dispositive motion.  It was not something I had considered.  I

19   was still trying to prepare for trial because the Court had

20   not ordered whether or not the case should be stayed, is what

21   I asked not delayed.

22          THE COURT:  I'm sorry.  What are you talking about

23   here?

24          THE WITNESS:  I'm talking -- because Your Honor has

25   suggested that I filed this motion to delay the proceedings or

Colloquy

1    to harass Mr. Mayo, I'm trying to speak to that allegation.

2         THE COURT:  And your explanation is to why on the day

3    before motions in limine were due for trial you filed a motion

4    to dismiss for subject-matter jurisdiction?

5         THE WITNESS:  No.  I'm talking about I had previously

6    filed a motion to stay and the reasons for that.  That the

7    timeline is what was going on at that time.  There was nothing

8    done --

9         THE COURT:  When did you file that motion to stay?

10        THE WITNESS:  May -- excuse me, September 12th.

11        THE COURT:  September 12th of 2024?

12        THE WITNESS:  Yes, Your Honor.

13        THE COURT:  Docket entry 120, which was filed on

14   September 12th, 2024 you asked the Court to enter an order

15   extending the case management deadlines to a date in January

16   or February of 2025 for a trial by jury and dates prior for

17   all evidentiary motions, voir dire questions, jury

18   instructions, pre-trial orders, and pre-trial hearings or

19   postpone the matter pending scheduling of court-hosted

20   mediation.

21        THE WITNESS:  Correct.

22        THE COURT:  That's not -- it's not a motion to stay.

23        THE WITNESS:  Well --

24        THE CLERK:  But go ahead.

25        THE WITNESS:  I filed the motion to extend for good

Colloquy

1  reasons that had nothing to do with trying to delay or harass,

2  delay the matter unreasonably or to harass Mr. Mayo.  In fact,

3  I thought and still think that court-hosted mediation would be

4  helpful for Mr. Mayo.

5       While I was preparing because the Court had not ruled

6  on the motion, I was still preparing for trial in this matter.

7  While doing so, I happened upon the Pate matter and felt,

8  again without recalling that you had already ruled on the

9  federal issue, that there was a meritorious argument on

10  summary -- on subject-matter jurisdiction.  I filed that while

11  I was preparing not to avoid preparing.

12       When Your Honor ordered on the 25th that I have three

13  days to respond on how the two motions were different, that

14  was my focus -- the two motions.  I responded in a timely

15  manner on the 28th.  Again, I'm not going to suggest that at

16  any point everything I said couldn't have been said

17  differently or in a better way or that it properly conveyed my

18  intent.  Within less than two weeks of filing that, by

19  November 8th, I was back out on medical leave.

20       So the point I'm trying to make is that hindsight is

21  20/20.  My intent is what should be relevant, whether Your

22  Honor agrees or disagrees with my interpretation but my

23  intent.

24       THE COURT:  But it would be helpful if you knew what

25  the standard was because your intent is a subjective standard.

Colloquy

1    And that's only relevant if a subjective standard applies

2    here.

3          THE WITNESS:  Rule 11, my understanding is the intent

4    of the lawyer at the time of the filing is what's relevant.

5          THE COURT:  Well, I mean, it'd be helpful if you knew

6    the standard the Fourth Circuit applied.

7          THE WITNESS:  I understand, Your Honor, and I don't

8    want to misspeak as to excusable neglect or good cause.  I've

9    read them both, and now I can't remember the exact language

10   that the court used is what I'm afraid to regurgitate and get

11   incorrect.

12         At the time that I filed the motion, I had no intent

13   to harass the plaintiff or to use the response as a delay

14   tactic.  At the time I responded to the Court's text order as

15   well, that I said that might have been factually or legally

16   incorrect was the product I believe of excusable neglect based

17   in pertinent part on my inaccurate recollection of a prior

18   order that Your Honor had already found there was no -- that

19   there was no state claim, that it was all federal.

20         The natural consequence in this case of the years of

21   litigation in this case, the various moving parts, the

22   unconventional moving parts in this case where you had an

23   answer that was due after the motion for summary judgment, my

24   two absences for a period of time during all of that --

25         THE COURT:  I'm sorry.  What do you mean there was an

Colloquy

1   answer due after the motion for summary judgment?

2        THE WITNESS:  My understanding in my absence is that

3   another attorney who was handling the case in my absence filed

4   an answer, given that Your Honor had denied the motion to

5   dismiss and no answer had been filed.

6        THE COURT:  All right --

7        THE WITNESS:  I was not the party who filed that.

8   I'm just speaking to the timeline.  That given the many moving

9   parts in this case, the number of years this case has been

10  going on, my absence during substantial periods of time while

11  this case has been pending, my medical issues that impact what

12  I believe was my inaccurate recollection.

13       Had I recalled -- not been able to recall in my mind

14  what you ordered, the logical thing to do would have been let

15  me go back and read that.  I'm not sure what he said.  I

16  thought I recalled accurately.  Not that Your Honor knows me

17  well enough to know but I have always had a very good memory.

18  And not being able to have that same memory has been very

19  difficult for me.

20       And if I'm -- if I don't recall, I'll go back and

21  look.  But the problem that eventually began happening is that

22  I didn't recall and didn't know I didn't recall.  It's hard to

23  say what you should have done when you didn't know that you

24  were recalling something inaccurately.

25       My argument again is that at the time that these

Colloquy

1    motions -- the third motion and then the response to the text

2    order were filed was that I was not operating at my optimal

3    level, which is what precipitated the additional family

4    medical leave.  That the days -- it was within days of that

5    second filing and within a month of that second -- of that

6    third filing, excuse me, that I ended up going out on medical

7    leave.

8         That it was not until Your Honor issued the show

9    cause that I figured out what I did not recall that you had

10   already ruled on the issue.  I was quite frankly confused

11   because I didn't understand what I had done wrong because, in

12   my mind, you had not ruled on it.

13        THE COURT:  In anywhere in your objection do you

14   mention the fact that you did not recall --

15        THE WITNESS:  I did not want to put that in a court

16   order, Your Honor.  I did not.  It was -- quite frankly, it's

17   embarrassing to not have the memory that I've always had.  And

18   again, I'm thinking that I have a legitimate argument on

19   whether or not there is a federal claim.

20        At the time that I filed the text order, I believed

21   that there was an argument with merit regarded to -- related

22   to Pate based on again my not recalling accurately that you

23   had already ruled on the federal issue.  That at the time I

24   responded to the text order I was focused on the order portion

25   of it, which was to explain the difference in the two motions.

Colloquy

1    That was my focus, especially when, by the time I saw the

2    motion, it was due that same day, the 28th -- the order,

3    excuse me.  So this is what I'm talking about.  I misspeak.  I

4    meant order if I said -- motion -- I said order.

5         My intent was just to summarize.  It was not to go

6    through the whole litany of assuming arguendo and discretion.

7    I was limited in the number of pages, and I was limited in

8    getting it done that same day.  Not because I was rushing to

9    get it done in a way that I didn't miss a deadline necessarily

10   but because it was due the day that I saw the order.

11        My language again in the prior 9/23/24 motion speaks

12   to my mistake when I say in the event the Court does not find

13   federal jurisdiction, which makes no sense if I recalled that

14   Your Honor had already found that.  I don't know how many ways

15   I can explain that Your Honor finds it unbelievable, but I'm

16   testifying under oath that that was the case.

17        I continued preparing for trial even after that.

18   That until the Court, in fact, found that my motion to extend

19   was moot, I continued -- I continued preparing for trial in

20   that case.  It had nothing to do with me trying to use a delay

21   tactic.

22        My interpretation had not changed between 9/23 when I

23   filed the motion and 10/28 when I attempted to explain the

24   differences between the two motions.

25        Your Honor, I hear what you're saying.  I understand

Colloquy

1    that -- I'm sorry, Your Honor.  Would you be offended if I

2    take my jacket off?

3            THE COURT:  That's fine.

4            THE WITNESS:  Okay.  I'm sorry.  I can't breathe.  I

5    understand that Your Honor does not agree with my assessment,

6    that you believe it's unfathomable, and that's my word.  I

7    can't recall your word that you used.  But all I can tell you

8    is that it is a true statement that I did not recall

9    something, that I did not know I was incorrectly recalling,

10   that I've always been able to rely on my memory, that it would

11   not -- that had it occurred to me that I might be off or that

12   I wasn't sure, I would have gone back and verified.  I didn't

13   think I needed to, and it was off base, and I apologize to the

14   Court for that impression.

15           But you know, Your Honor has gone through a litany of

16   well, you said due process, you said show cause, you said --

17   you know, a number of things that I agree but I don't think in

18   this case under the stress that it has caused and considering

19   that stress affects the very problem that I'm dealing with

20   that it should not overshadow my years of practicing not only

21   before this Court but before various courts where this is not

22   my track record.  And I think that should mean something.  I

23   would not intentionally say something to the Court in a public

24   document under oath essentially under Rule 11 that I knew to

25   be incorrect.

Colloquy

1        THE COURT:  Because I know the standard that applies

2    here, I know one of the things I need to consider if I find

3    you violated Rule 11 and I decide to impose sanctions, I need

4    to assess your training in the law.  So can you give me a

5    brief overview of where you went to law school and your

6    professional career up to today?

7        THE WITNESS:  I went to law school at North Carolina

8    Central from 1992 to 1995.  I graduated in three years.  I

9    took the bar, passed the bar the first time.  I began

10   practicing with a small law firm in Durham for seven years,

11   where I did personal injury and criminal law.  From there --

12   well, not seven years.  That was -- I worked for them for - -

13   while I was in law school and as soon as I became licensed.

14       I then began being a solo practitioner.  And during

15   that time, I was the -- had a contract with the State to

16   represent the guardian ad litem program in Durham, which I did

17   for two of those seven years.  I also did general practice,

18   which included anything from small claims to superior court

19   criminal trials, personal injury litigation, which was

20   district and superior court, just various and sundry torts.

21       From there, I went to the attorney general's office

22   in January of 2022, where I represented the Department of

23   Labor for ten years.  Primarily doing OSHA cases on behalf of

24   the Department of Labor.  And also doing some personnel work,

25   which was my first case in federal court, which we won on

Colloquy

1    summary judgment in the Fourth Circuit.  I also did some other

2    personnel work at that point.

3            From there, part of what I did for the office was

4    focused on child-sex crimes because I had a background in

5    juvenile law and also the guardian ad litem, where I -- my

6    focus on criminal appeals with the AG's office was child-sex

7    crimes.

8            From there, I began working for the Capitol

9    Litigation Section where I handled post-conviction cases in

10   federal court, where I also focused on direct appeals

11   involving first-degree murder.  From there in January of

12   2018 -- February, sorry, of 2018 due to staffing shortages, I

13   was asked to come over to the Public Safety Section, and I

14   began handling cases both in state and federal court regarding

15   the Parole Commission and post-release supervision and

16   community supervision.

17           During that same time, there were four murders that

18   occurred at one of the prisons that precipitated -- that -- I

19   can't think of words, that evolved into an OSHA case that

20   lasted for two years.  And I represented the Department at

21   that time with public safety against the Department of Labor,

22   where we reached a favorable resolution after two years on

23   behalf of the Department of Public Safety.

24           All while part of the reason that I was brought over

25   was to assist with satellite-based monitoring appeals, which I

Colloquy

1   knew nothing about at the time.  I think I'd had one of those

2   cases.  We already had a contrary opinion that came out per

3   curium in the North Carolina Supreme Court on North Carolina's

4   unreasonableness of the statute.

5           From there, I had an uphill battle from 2018 until I

6   believe it was -- I don't know if it was 2020 or 2021, when I

7   went to -- I continued to appeal up to the Supreme Court of

8   North Carolina and was meritorious on what -- in addition to

9   the General Assembly change in the law, changed the ability

10  for notwithstanding the U.S. Supreme Court decision but the

11  ability of people who were found that need satellite-based

12  monitoring to then be able to appeal the issue.

13          In the meantime, I was still doing first-degree

14  murder appeals.  I was still helping out with prisoner cases

15  from time to time but mostly was dealing with prisoner cases

16  involving again the Parole Commission, community supervision,

17  and post-release supervision.

18          When I returned from FML, which is how I ended up on

19  Mayo's case, community supervision -- by the time I returned

20  from FML in February, again, all of that kind of changed

21  because we were so short-staffed that I began doing run-of-

22  the-mill prisoner cases.  I was still handling first-degree

23  murder appeals, which during that time I had a case that was

24  very pivotal on juvenile sentencing in North Carolina and

25  Miller v. Alabama and North Carolina's interpretation of that.

Colloquy

 1          I'm not disagreeing that I said things that might not

 2    have been well said or that I misspoke, but the intent was not

 3    to misspeak.  It was to respond in a timely manner to the best

 4    of my ability, which unfortunately was impacted by my medical

 5    condition which affects my cognitive processing.

 6          THE COURT:  Thank you.

 7          Mr. Williams, I don't know if you're just here along

 8    for the ride or if you have something to add substantively to

 9    the issues we're dealing with today?

10          MR. WILLIAMS:  Thank you, Your Honor.  May it please

11    the Court.  Your Honor, if I may just talk a little bit about

12    the evolution of the Public Safety Section.  To start, I will

13    say that I joined here -- I left big law, joined DOJ in

14    December of 2019.  And I started out more or less as a line

15    attorney, worked my way up to an Attorney IV, which is a

16    complex-case attorney.  And then I'm now the section head of

17    the Public Safety Section.

18          And so I can tell you that during that almost six

19    years there have been massive changes.  There has been an

20    evolution.  I can tell you that the section that I walked into

21    in 2019 is not the section that it is now.  And some of those

22    changes I think are important to highlight here because I

23    think Your Honor has gone through in great detail in its

24    previous show-cause orders the problems with the Public Safety

25    Section.

Colloquy

1        I think number one this issue is a little bit

2    different than a lot of those other issues.  Number two, I can

3    tell you we have put in steps to prevent those problems going

4    forward.  And I would like to highlight just a few of those.

5    I'm not going to go through all of them.

6        But we have increased the number of attorneys.  When

7    I started in 2019 it was approximately eight or ten attorneys.

8    We're now up to thirteen attorneys.  Of those attorneys, when

9    I first got here, almost everybody was an Attorney III.  We

10   now have I believe it's four or five Attorney IV, so we're

11   getting more experienced attorneys that are handling these

12   cases.

13       Then when I first started, every paralegal was

14   assigned to every attorney.  And I think that that created

15   part of the problem that we previously had because number one,

16   it did not allow for any kind of synergy between the attorney

17   and the paralegal.  Number two, that meant that every

18   paralegal was getting every single notification of electronic

19   filing for every single case in our section.  And it did not

20   allow them to focus on only their cases.

21       And so I made that recommendation in April of 2024

22   that we change that.  And we did, and so now, we're operating

23   on more of a law firm model where we have one paralegal that

24   is assigned to a junior attorney and a senior attorney.  And

25   they're working more or less as a team.  So it allows them to

Colloquy

1    focus on only their cases instead of all the cases.

2          Docket meetings, in early 2023 my predecessor Jamie

3    Trachtman started doing docket meetings.  I know Your Honor

4    talked about that earlier.  When we started doing those, it

5    was hey, this is what's on the docket coming up.  I felt like

6    that only addressed half the problem because you've got to

7    make sure that something's on the docket before you can ensure

8    that it's done.

9          And so we slightly tweaked that when I became section

10   head in August to where now the attorney is meeting with the

11   paralegal once a week, every week, the same day of the week.

12   And the reason for that is there are not many, if any, rules

13   within the Federal Civil Rules or the local rules that are

14   less than five business days or seven calendar days.

15         And so if you're meeting every week with your

16   paralegal and going through your cases, and number one, the

17   first half of that meeting is supposed to be what was filed

18   the week before, and is it on the calendar?  If it's not let's

19   get it on the calendar right now.

20         The second half of that meeting is supposed to be

21   what's coming up this week, and what do I need help with?

22   What do you need to be doing?  And so we have implemented

23   that.

24         The other thing is we have implemented some other

25   policies.  Before -- even before this issue recently I've had

Colloquy

1    to take over a number of cases.  And I've realized that some

2    of the arguments that were made -- we missed out on arguments

3    that were made.  There were cases that were going to trial

4    that arguably could have been dismissed or something like

5    that.  And so I recognized the need.

6         And so one of the things that we have implemented is

7    that all the attorneys in the section are going to come and

8    meet with me, and we're going to talk about the case, and

9    we're going to talk about the dispositive motion that you want

10   to file before you file it so that the arguments are -- so

11   that there's somebody else looking over their shoulder to make

12   sure the arguments are good, solid arguments.

13        The other thing that I've been trying to do is be

14   more deliberate in case assignments.  Making sure that the

15   proper case is going to the proper attorney.  I feel like that

16   due to staffing levels that might have been an issue in the

17   past, but now we're almost fully staffed.  We have twelve out

18   of thirteen positions staffed.  There's only one left.  It's

19   currently posted.  We're trying to get it hired.

20        The other thing I would mention is training.  Since I

21   came on board, we have been doing more section-wide training.

22   I started off saying I want everybody to go through a day-long

23   training in civil procedure.  And specifically civil procedure

24   things that you're going to see in this section that are

25   specific to this section.  Because this section does operate a

Colloquy

1    little bit differently in the civil procedure world than some

2    other cases that come before the Court.  And so there are some

3    nuances, and I wanted to highlight those nuances.

4         And so we are going -- I put everybody through that

5    regardless of whether they were a brand-new attorney or a

6    twenty-year veteran.  Everybody went through the same full-day

7    training.  Then that happened in -- it was supposed to happen

8    in September but due to my own absence because my wife had our

9    firstborn child, I had to back it up a month.  So that

10   happened in October.

11        Then in January we had our second training, and that

12   was on OAH procedures because there are a number of our

13   attorneys that have to practice in OAH for personnel matters.

14        Then in April we went through -- earlier this month

15   we went through scheduling orders.  We talked about how

16   they're created, how they're modified, those types of things

17   to make sure that the attorneys are aware of these things.

18   I'm trying to go forward -- I'm hoping to do these monthly, at

19   least quarterly but I'm hoping to do them monthly.

20        We have also seen an evolution in how we

21   substantively deal with these cases.  When I first started,

22   nobody was filing a motion to dismiss.  You filed your answer,

23   you go through discovery, you file your motion for summary

24   judgment.  I came out and said why are we doing all this time-

25   consuming discovery on a case that should be dismissed for

Colloquy

1   statute of limitations, or failure to exhaust, or whatever it

2   may be. And we started implementing doing those motions to

3   dismiss. And so we are substantively changing to where we are

4   becoming more efficient in our time and what we're doing.

5         I've also proposed some process changes to DAC so

6   that we can more -- we can handle these cases in a more

7   streamlined fashion. And I have grand -- a grand idea. I

8   don't know if it will make it to all the levels I would love

9   to make it, but I think that we can -- there are levels that

10   we can achieve. And that we are already achieving.

11         Part of the process is we're going to start

12   standardizing the documents that DAC provides to us at the

13   outset, so that we have fewer motions for extensions of time

14   on your answers, so that we can get these defensive state-

15   employees analyses done quicker.

16         Another thing that we've done since I've been here is

17   we've moved from a paper filing system to an electronic filing

18   system. That is now cloud based, and so you can access it --

19   I can access it from my phone. It makes it way more

20   accessible.

21         Your Honor, we've also just tried to change the

22   culture of the section. Even going down to the aesthetics of

23   the walls, getting rid of old files, we're trying to change

24   the culture of the section to where we maintain staffing

25   levels instead of losing staff every three months.

1          And so I could tell you that having been there for

2    the last five-and-a-half years there has been quite the

3    evolution of this section.  And it is not what it used to be.

4    It is not rinse and repeat.  There's brand-new leadership

5    involved.  Most of the attorneys that were there two years ago

6    are no longer there.  We have a whole new crop of attorneys,

7    and they're good attorneys.

8          And so I think that there has been quite the

9    evolution of the section.  And I am really looking forward to

10   seeing where this section can go.  The ultimate goal is for it

11   to be a well-oiled machine that will efficiently resolve cases

12   and that will produce good litigators.  And that's my goal.

13   That's what I want to see this section to be.

14         So Your Honor, I am here because I substituted in,

15   number one, for Mr. Parris, but I'm also here on behalf of

16   DOJ.  And just to show Your Honor what has changed, and so

17   Your Honor, we would respectfully request that sanctions not

18   be imposed.  Thank you.

19         THE COURT:  Thank you.  I take it you don't have a

20   policy on what to do when a judge issues a show-cause order

21   involving sanctions against an attorney?

22         MR. WILLIAMS:  Your Honor, that was -- I was not

23   aware of a policy that was in place before this happened.

24   There is now a policy in place that if an attorney's work is

25   questioned, criticized, a show-cause order is entered,

Colloquy

1    anything along those lines, that the first thing they have to
2    do is alert their section head before they file anything else.
3    And so that policy was not in place before.  It is in place
4    now.

5         THE COURT:  When was that policy put in place?

6         MR. WILLIAMS:  I believe either last -- I believe it
7    was last week.

8         THE COURT:  Because when I was in private practice,
9    if you got such an order, you had to go tell the firm's
10   general counsel and not do anything because oftentimes when
11   attorneys get show-cause orders, they get angry at the judge
12   and file ill-conceived, poorly reasoned responses that do
13   nothing to help the attorney or the client's position.  And
14   instead, kind of dig the hole even deeper, so I think that's a
15   wise policy to have in place.

16        MR. WILLIAMS:  Yes, Your Honor.  And I agree, and
17   that's why it's been implemented, and we're going to make sure
18   that it gets enforced going forward.

19        THE COURT:  All right.  Ms. Vysotskaya de Brito, I'm
20   happy to hear from you on behalf of NCDOJ.

21        MS. VYSOTSKAYA DE BRITO:  I will go as a tail end to
22   what Mr. Williams has already said about the changes that he
23   has tried to implement in the section before the arrival of
24   the new leadership.  The leadership at the Department of
25   Justice has changed between obviously the beginning of this

Colloquy

1    year.  We have a new attorney general.  The section has now

2    transitioned as we mentioned before from criminal division to

3    the civil bureau.  So I -- Ms. Chambers became our civil

4    bureau chief, so that's a difference too, and that was at the

5    beginning of the year.

6        I became -- I was a section head that services the

7    State Agency's Section at the Department of Justice.  I became

8    a litigation division head, returning to the division where I

9    spent fifteen years before.

10        We have a completely new leadership at the

11   Department.  The leadership that I think I heard Your Honor's

12   words about being aghast, frustrated, finding some of the

13   things we heard incredible.  Unfortunately, we have not

14   discovered this third motion to dismiss back last year.  It

15   came to our attention on April 3rd, after unfortunately the

16   objection has been filed in this case.

17        As soon as we discovered that the objection has been

18   filed, we -- Mr. Williams, myself, my leadership evaluated the

19   case file.  And determined that the best course of action was

20   to withdraw the objection.  We considered whether or not join

21   attorney or substitute the team determined the best course of

22   action would be substitute the team.  But at the same time, we

23   wanted to make it clear to the Court that we were not going to

24   rely on the motion challenging the Court's subject-matter

25   jurisdiction.  That was based on our evaluation of the file.

Colloquy

1    And I think we put it in our either notice of appearance --

2    rather notice of substitution or our withdrawal of objection

3    document.

4        And the other thing that we wanted to make clear to

5    the Court, we understand that this process has already been

6    delayed.  We indicated that we will prepare for the trial, and

7    we'll be ready to proceed with this trial expeditiously.  Mr.

8    Williams assures me that he could be ready to try the case as

9    soon as the summer.  I understand it's not now, but he has

10   trial obligations in several other cases.

11       So that's what we have done in once we discovered

12   this issue.  I also wanted to talk a little bit more about the

13   section-wide and department-wide changes that we implemented.

14   One of them, Mr. Williams has already talked about.

15       We have always had expectations of our attorneys that

16   if something like a Rule 11 violation, show-cause order,

17   admonition, or anything negative, discovery violation order

18   would come to the attorney's lap that the first place to go

19   that the attorney would have is a leader, the section head or

20   another leader.

21       We realized we needed something in the right -- and

22   that has happened to my knowledge in most of the cases where

23   something like that has occurred in the past.  But we realized

24   we needed to do better and more, so we put it down in an

25   immediate email to our attorneys across my division,

Colloquy

1    litigation division.  And now it's a written directive that

2    applies across the civil bureau where litigation division

3    resides.

4         We did that change.  We have -- so the training was

5    already in place that -- the schedule of training was in place

6    that Mr. Williams was talking about.  But having realized what

7    happened in this case, we thought that the appropriate thing

8    to cover with our attorneys would be case scheduling orders or

9    case management orders in federal court.

10        And given that one of the Court's concerns was delay

11   that has occurred in this case, and some of the close trial

12   deadlines or near deadlines that were missed, so the session

13   that we held on Monday, very short after we discovered this

14   problem was covering that topic.  And we held that session.

15   We held that training.  We will continue with the theme of

16   educating our younger attorneys on federal practices and

17   procedures.

18        One other practice that Mr. Williams talked about and

19   it's important is ideally at some point, when we are

20   completely full up to staffing, when we bring that one

21   attorney who is still missing, Mr. Williams could transition

22   to more of management responsibilities rather than being a

23   line attorney.  He unfortunately does have still some case

24   load going.  And we will be in a position where dispositive --

25   where the briefs that support dispositive motions would be

Colloquy

1    reviewed.  This is what I had in special litigation section

2    where I was an attorney, and that's what I had in services to

3    state agencies.  That was a requirement that the briefs are

4    reviewed before they're filed.  We hope to transition soon to

5    that practice with Public Safety as well as soon a we are

6    full, up to full staffing.

7         But those meetings that Mr. Williams has discussed,

8    which are before you file a dispositive motion discuss with

9    your section head the grounds that support your dispositive

10   motion is already in place.  So this was implemented again as

11   soon as we discovered that this has happened.

12        And the problems that were happening with DOJ before

13   they were related in many cases, as far as I understand

14   reviewing historical records, they related to delays a lot of

15   them or maybe not following the rules exactly to the point.

16   This is slightly different, but we thought the discussions of

17   dispositive motions would help.

18        And trial meetings is another practice that we

19   implemented, which is myself and Mr. Williams meet with each

20   of the attorneys before -- about a month before the trial in

21   order to discuss the trial strategies, hoping to assist with

22   producing a better quality product to the Court.

23        We understand we failed.  But we ask the Court to

24   consider the circumstances which we were not aware.  Once we

25   found out, we tried to correct it the best we can.  And we

Colloquy

1    implemented additional measures to try to improve the product

2    that's coming from that section.  We ask the Court to consider

3    those circumstances in making its decision whether or not to

4    award the sanctions against the Department.

5         THE COURT:  Well, a couple things.  I appreciate

6    all -- sharing everything that's been taking place to try to

7    improve what's going on.  If anyone goes back to read my

8    opinion in Human Rights Defense Center v. Hoekstra, that's

9    5:21-CV-469, an opinion I issued April 7th, 2023.  It contains

10   multiple pages just providing a litany of errors by the Public

11   Safety Section over the course of years, from Murphy to Manio

12   (ph.) effectively.  I mean, East, Middle, Western District,

13   judges across those courts all chastising, criticizing the

14   Public Safety Section for errors.

15        And I've been through multiple rounds of this over

16   the course of years.  I've probably -- more than five years

17   dealing with these issues.  I have attorneys who don't follow

18   my orders.  I have attorneys who miss deadlines.  I have

19   attorneys who are disrespectful of the Court's settlement

20   conferences and the Court -- I had one attorney in here make a

21   scene leaving the courtroom after I chastised him in front of

22   a full courtroom.  He doesn't work -- at least I don't believe

23   he works for you all anymore.  I had to call him back and

24   dress him down in front of a full courtroom because he was so

25   disrespectful.

Colloquy

1        And I just said in my last hearing in this case I'm
2    running out of patience.  And I'm running out of options.
3    I've tried to be incremental.  Over the course of time, I've
4    tried to be incremental in how I deal with this understanding
5    you all have a hard job.  You have a lot of cases.  I think
6    because of apparently North Carolina politics there are issues
7    involving funding and staffing and all of that.  And so I've
8    tried to be incremental.  But the bottom line is the Court
9    expects better, and the people of North Carolina deserve
10   better.

11        There are ninety-four federal district courts in this
12   country.  Out of those federal courts, according to the
13   weighted case load averages, we have the second busiest court
14   in the country.  We have 2,500 if not more Camp LeJeune water
15   contamination cases which need to be tried by the four
16   district judges who sit in this court.  We have an amazing
17   amount of work to do.

18        And we handle it all, according to statistics, pretty
19   well.  We are solidly performing in terms of case disposition
20   time.  But when things like this happen, when deadlines are
21   missed, when the Court has to take up motions that should
22   never -- have no business being filed, it impacts the
23   administration of justice.  It impacts this Court's ability to
24   deliver justice to the citizens of the Eastern District.

25        And that is what is so disconcerting and upsetting to

Colloquy

1    me about this situation.  No other law firm in the state has

2    these issues.  I don't deal with -- from big to small, I

3    don't -- from Womble -- if Womble's the biggest one, I don't

4    know, down to a solo shop of a few people.  We don't have

5    these problems in this volume.  It befuddles me.  I don't -- I

6    really don't know what to do.

7            I'll hear from you in a moment.

8            I also note the rule requires me that unless

9    exceptional circumstances are present, to impose sanctions on

10   the law firm that employs the offending attorney, assuming I

11   find sanctions against -- that Ms. Calloway-Durham violated

12   Rule 11.  So I certainly appreciate the changes you've put

13   into place.  I don't know -- I'll have to mull on it and

14   certainly happy to hear anything else, but I have to -- I'm

15   not sure whether exceptional circumstances have been

16   established here.

17           I take no joy in today's proceedings.  I don't enjoy

18   this part of the job.  I don't enjoy being in these situations

19   with attorneys where I'm dealing with -- where I'm having to

20   be critical of attorneys because I know the practice of law is

21   hard.  But at a certain point, the Court has no other option.

22   And those are some of my concerns here.

23           But Ms. Chambers, happy to hear anything that you'd

24   like to add.

25           MS. CHAMBERS:  Thank you, Your Honor.  First, I would

Colloquy

1    like to apologize for your time.  As you said, I know that

2    you're extremely busy, and this is not how you would like to

3    be using your time.

4            I'd also like to say that I have spent almost my

5    whole career at the Department of Justice, and this is very

6    painful to hear.  This is not how we at the Department of

7    Justice want to be viewed, and we are, as they've explained --

8    have tried to take some measures.  And I want to back up just

9    a little bit.

10           One thing that didn't get mentioned.  Before I became

11   in this role that I'm currently in, the Public Safety Section

12   for years had been in what we call our Criminal Bureau or our

13   Criminal Practice Group.  And the middle of last year that

14   moved to the Civil Bureau or the Civil Practice Group.

15           And I think that hopefully you have seen less of the

16   issues that you've been talking about since then because the

17   practice of this group is a civil nature, and now it is in the

18   Litigation Division under Olga, who is a supreme litigator.

19   Mr. Williams is an excellent litigator and federal

20   practitioner.  And Olga moved into her current role I believe

21   in February of this year and has already committed a lot of

22   time to working with this section and sharing her expertise.

23           I moved into this current role that I'm in that's

24   over all the civil practice within the Department of Justice

25   the end of January.  And what they have talked about that has

Colloquy

1    been instituted in some of the Public Safety Section and the

2    Litigation Division I have done across all Civil Bureau with

3    the Civil Practice Groups.  And in one of my regular

4    management meetings this morning we talked about it with our

5    senior managers.

6            So we apologize for your frustration.  We apologize

7    for your time.  We are committed.  I'm very committed and take

8    this very seriously in this new role that I am in.  And I will

9    continue to work with Olga, Mr. Williams, and others in the

10   Public Safety Section to make our office proud, make you

11   proud, make the citizens proud because that is what we care

12   about.

13           And to the extent that you can find circumstances

14   that -- Mr. Williams moved into his management position just

15   the middle of last year.  So to the extent that you can see

16   the new leadership that has come into this all since some of

17   these early filings since the first part of this case, if you

18   can take that and understand that we are all in new places

19   with firm commitment and that once it became known -- I think

20   you saw the actions taken specific to this case.  And under

21   those circumstances, we would ask that you not sanction the

22   Department of Justice but understanding you have your

23   objective standards that you have to apply.  Thank you, Your

24   Honor.

25           THE COURT:  Thank you.

Colloquy

1          MS. CALLOWAY-DURHAM:  Your Honor, may I please?

2          THE COURT:  Yes.

3          MS. CALLOWAY-DURHAM:  I don't know that it will make

4     a difference.  But there were two things that I just wanted to

5     clarify.  One of which was I don't want to do anything that

6     brings negative light to the client that was -- to Mr. Parris

7     or to the Agency.  That was never my intent.

8          I asked to be substituted out in this matter.  And

9     also that I filed -- even though Alex made indication that we

10    weren't filing motions to dismiss, I filed motions to dismiss

11    in numerous cases.  Again, I don't think this one case is --

12    and these last filings are examples of the kind of work that I

13    do and who I am as an attorney.  Thirty-one years I'm hoping

14    means something.

15         THE COURT:  For any of the management or NCDOJ reps,

16    does anyone know the committees of the General Assembly that

17    provide oversight to Department of Justice?

18         MS. CHAMBERS:  Your Honor, it's Governmental Ops.

19         THE COURT:  Is that both House and Senate?

20         MS. CHAMBERS:  I believe so.

21         THE COURT:  To your knowledge is this on the Attorney

22    General's radar?

23         MS. CHAMBERS:  I have shared this with my superior,

24    Laura Howard and I plan to update her as soon as we get back.

25    I do not have firsthand knowledge that the Attorney General

Colloquy

1    knows but I have been talking to Ms. Howard.

2          THE COURT:  Ms. Howard is certainly aware of this

3    Court's expectations for its attorneys.  She spent many years

4    here.

5          MS. CHAMBERS:  Yes, Your Honor.

6          THE COURT:  Litigating cases, so --

7          MS. CHAMBERS:  We are very fortunate she joined also

8    with the new administration, and she is holding us all to a

9    high bar, and we appreciate that and want to follow her

10   example.

11         THE COURT:  Well, again, I'm going to -- as I always

12   endeavor to do, I'm going to follow what the law requires

13   here, what the Fourth Circuit requires me to do here in

14   resolving these motions based on the standards they have set

15   out.  I will issue an order as soon as practicable on this.

16         Again, I appreciate everything that Mr. Williams and

17   the rest have said about the changes that are going on.  I

18   hope that bears itself out in terms of having vastly fewer

19   issues in the federal courts here.  It simply cannot continue

20   to be problems at this level.

21         At least as far as this judge is concerned, this will

22   continue in an incremental manner, but the increments are

23   going to become more punitive at this point because we've

24   tried the cajoling and the begging and the pleading and the

25   forgiveness and the grace.  We've tried that.  We still have

Colloquy

1  issues, and so now we're talking potentially punitive

2  measures.

3         And as I indicated last time, and I've considered it

4  here, whether an appropriate response here is to either have

5  NCDOJ put together a written policy or plan to solve these

6  problems and have someone monitor it, or to appoint an

7  independent third-party to come in and effectively audit your

8  operations and provide a report to the Court about what's

9  going on.  I'm that serious about this.

10        MS. CHAMBERS:  I understand.

11        THE COURT:  And I understand that to have someone

12  from the outside come in and go through your operations is a

13  very serious thing, particularly for a state government entity

14  and all that.  But again, I want to impress on you just how

15  frustrated I am, how important I think this is that the

16  problem get solved, and how serious I am about making sure

17  this issue gets addressed if NCDOJ is unable to do it on its

18  own.

19        MS. CHAMBERS:  Yes, Your Honor.

20        THE COURT:  All right.  Thank you.  We'll be in

21  recess, everyone.

22        THE COURT OFFICER:  All rise.  Court is now in

23  recess.

24               (Court is adjourned)

25                    * * * * *

1                    CERTIFICATE OF TRANSCRIBER

2

3          I, Tamara Bentzur, court-approved transcriber, in and

4   for the United States District Court for the Eastern District

5   of North Carolina, do hereby certify that pursuant to Section

6   753, Title 28, United States Code, that the foregoing is a

7   true and correct transcript from the official electronic sound

8   recording of the proceedings held in the above-entitled matter

9   and that the transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12                    Dated this 21st day of April, 2025.

13

14

                      /s/ Tamara Bentzur
15   _____

16   TAMARA BENTZUR, CET-824

17   COURT-APPROVED TRANSCRIBER

18

19

20

21

22

23

24

25