UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No.: 5:22-CV-00289-M

| | |
|---|---|
| SEAN B. MAYO, | |
| Plaintiff, | **REPORT OF THE** |
| v. | **NORTH CAROLINA** |
| | **DEPARTMENT OF JUSTICE** |
| ROCKY MOUNT POLICE DEPT., *et al.* | |
| Defendants. | |

## INDEX

INTRODUCTION ........................................................................................................... 1

I.      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND. ...................... 4

    A.      Procedural History Leading to the Award of Sanctions Against
        NCDOJ. ...................................................................................................... 4

    B.      Organization and Work of the Public Safety Section Within the North
        Carolina Department of Justice. ................................................................. 7

        1.      Inception Through Mid-2024. ............................................................ 7

        2.      Mid-2024 Through January 1, 2025. ................................................ 12

        3.      January 1, 2025 Through Present. ..................................................... 13

II.     THE UNDERLYING CAUSES OF THE PUBLIC SAFETY SECTION'S ISSUES
     IDENTIFIED IN THE SANCTIONS ORDER. .................................................. 15

    A.      Workload, Resources & People. ............................................................... 17

    B.      Performance Management & Supervision Structure. ................................. 20

C.     Quality Control, Processes & Procedures. ...................................................... 20

D.     Culture, Accountability & Training. ............................................................. 21

III.    STEPS THE ATTORNEY GENERAL INTENDS TO TAKE TO ADDRESS THE PUBLIC SAFETY SECTION'S ISSUES. ............................................................ 22

A.     Outside Advisors for Quality Control and Programmatic Improvements. ............................................................................................. 24

1.     Management Review and Process Improvement. ................................. 25

2.     Legal and Substantive Expertise. ......................................................... 25

3.     Training and Professional Development. ............................................. 26

B.     Improved Management & Supervision. ....................................................... 26

1.     Measures Already Taken. ..................................................................... 26

2.     Additional Measures. ........................................................................... 29

C.     People, Resources and Workload Management. ......................................... 30

1.     Measures Already Taken. ..................................................................... 30

2.     Additional Measures. ........................................................................... 30

D.     Internal Quality Control, Process & Procedure Improvement. ................... 33

1.     Measures Already Taken. ..................................................................... 33

2.     Additional Measures. ........................................................................... 34

E.     Culture of Accountability & Training and Development. .......................... 35

1.     Measures Already Taken. ..................................................................... 35

2.     Additional Measures. ........................................................................... 37

IV.    LIMITATIONS AND RESERVATIONS OF RIGHTS. ....................................... 38

A.     Retrospective Nature of the Review. ........................................................... 38

B.  Incomplete Data Systems. .............................................................. 39

C.  Resource Constraints. ................................................................. 39

D.  Reservation of Rights. ................................................................ 39

E.  Additional Institutional Concern. ............................................ 40

CONCLUSION ............................................................................................. 41

CERTIFICATE OF SERVICE .................................................................... 43

CERTIFICATE OF MAILING ................................................................... 44

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No.: 5:22-CV-00289-M

| | |
|---|---|
| SEAN B. MAYO,<br><br>         Plaintiff,<br><br>v.<br><br>ROCKY MOUNT POLICE DEPT., *et al.*<br><br>         Defendants. | **REPORT OF THE<br>NORTH CAROLINA<br>DEPARTMENT OF JUSTICE** |

NOW COMES the North Carolina Department of Justice (NCDOJ or the Department), by and through the undersigned officials, and submits the following Report.

## <u>INTRODUCTION</u>

The North Carolina Department of Justice respectfully submits this Report in compliance with the directives set forth in the October 17, 2025 Sanctions Order issued by U.S. Magistrate Judge Robert T. Numbers, II. A certification by Attorney General Jeff Jackson, along with his transmittal letter to the Court, is attached. This Report arises from a series of actions by Department attorneys who are no longer with NCDOJ and reflects the Department's commitment to transparency, accountability, and meaningful improvements to its Public Safety Section (the "Section").

Since assuming office in January 2025 and prior to this Court's Order, Attorney General Jackson and his leadership team have taken significant steps to restructure, restaff,

and reform the Public Safety Section, building on the foundational blocks that were put in place in 2024 by the previous administration. These efforts are already yielding improvements in performance, morale, and accountability, even as the Section continues to face challenges inherent in high-volume federal litigation practice and longstanding resource constraints.

This Report outlines the underlying causes of the Section's historical deficiencies, details the corrective actions already taken, and presents a forward-looking plan to strengthen oversight, improve quality control, and foster a culture of professionalism and excellence. While some setbacks have occurred, the trajectory of the Section under current leadership is one of progress.

To that end, and to address the causes of the issues identified in the Sanctions Order, NCDOJ has launched a Growth & Improvement Plan (Plan) for the Public Safety Section that includes, among other measures:

- Utilization of Outside Experts:

  o The Department has engaged the services of former North Carolina Supreme Court Justice Barbara Jackson to provide advisory and mentoring services to attorneys in the Public Safety Section and to offer an additional level of review to ensure quality work product is submitted to this Court.

  o In addition, leadership has been in ongoing conversation with the National Association of Attorneys General (NAAG) and plans for them to provide confidential systemic review and consulting services to NCDOJ with the goal of evaluating and improving the performance of the Public Safety Section.

- Structural Reorganization: The Public Safety Section was transferred from the Criminal Bureau to the Civil Bureau and is now housed within the Litigation

2

Division, aligning it with other high-volume civil litigation units. The Section's staffing structure changed during that process as well. Additional staffing changes are underway.

- Leadership Overhaul: A new Section Head, Division Head, and Civil Bureau Chief have been selected, bringing decades of litigation and management experience to the Section's oversight.

- Caseload Management: Leadership is identifying an attorney caseload cap to avoid overwork and inadequate attention to cases, and overflow cases have been temporarily reassigned to outside counsel to stabilize workloads. The NCDOJ criminal appellate brief case rotation has been paused for the Section for a period of six months.

- Supervision & Quality Control: All dispositive motions are now reviewed by the Section Head, and monthly one-on-one case reviews with each attorney-paralegal team have been instituted. Attorneys must also get supervisory approval before submitting second or successive requests for extension of time from the court.

- Training & Professional Development: A mandatory monthly training series, CLE programs, and federal litigation courses have been implemented for attorneys and paralegals.

- Accountability Measures: A formal policy now requires immediate reporting of negative court citations, and performance management protocols are in the process of being strengthened in collaboration with NCDOJ Human Resources.

- Technology & Process Improvements: NCDOJ is advocating for funding for a modern case management system and is implementing manual centralized calendaring measures to reduce human error in the interim.

This new leadership team is committed to the Section's growth. At bottom, NCDOJ submits this Report not only to comply with the Court's directive, but also to reaffirm its institutional commitment of candor to our federal courts, to the rule of law, to the fair and effective administration of justice, and to the continuous improvement of its legal services to the people of North Carolina.

3

The Report begins with the overview of what brought us here: Section I briefly discusses the relevant factual and procedural background, including the events that led to the issuance of the Sanctions Order and the evolution of the Public Safety Section. Section II identifies the underlying causes of the issues within the Public Safety Section, as required by the Court. Section III outlines the corrective actions already taken and the additional steps the Attorney General intends to implement to address those issues. Finally, Section IV respectfully sets forth the Department's institutional reservations and limitations.

## I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND.

### A.   Procedural History Leading to the Award of Sanctions Against NCDOJ.

The Court's Sanctions Order stems from a series of filings by former NCDOJ Public Safety Section attorney Sonya Calloway-Durham. She is no longer with the Department.

On September 23, 2024, Calloway-Durham filed a third motion to dismiss on behalf of defendant-Probation Officer Dennis Parris, reasserting arguments regarding the Court's subject matter jurisdiction that had already been rejected multiple times. [DE 121]  The motion was filed just before key pretrial deadlines, prompting the Court to stay proceedings to consider jurisdiction once again.

Critically, prior to filing the third motion to dismiss, Calloway-Durham had already been the subject of a prior Show Cause hearing in 2023 in this same case. At that time, former NCDOJ leadership appeared alongside her to address concerns about her conduct and to outline some remedial steps the Section had implemented, including weekly docketing meetings and a new requirement that the Section Head receive all electronic

4

filing notices. [DE 141 at 6] The Court declined to impose sanctions at that stage but expressly noted that it might do so in the future. [DE 141 at 6]

At the time Calloway-Durham filed her motion, the Public Safety Section was still under prior leadership. On January 1, 2025, Jeff Jackson assumed office as North Carolina Attorney General, and a new chain of command was installed to oversee the Section's work. Then, on March 31, 2025, the Court issued a Show Cause Order, citing the repetitive and frivolous nature of Calloway-Durham's motion and requiring both her and NCDOJ to explain why sanctions under Rule 11 of the Federal Rules of Civil Procedure should not be imposed. [DE 128]

Calloway-Durham filed an objection to the Show Cause Order without notifying her supervisors. Upon learning of the filing, the new leadership team carefully reviewed the case and promptly withdrew the objection. The Section Head of the Public Safety Section[1] entered an appearance in the case on April 9, 2025, replacing Calloway-Durham as counsel of record and informing the Court that the jurisdictional argument would not be pursued further. [DE 131, 132]

In preparing for the Show Cause hearing, NCDOJ's new leadership conducted a thorough review of the case file, including the Show Cause Order, Calloway-Durham's objection, and the relevant docket history. They also reviewed Rule 11's text, advisory notes, and leading case law, including the "exceptional circumstances" standard that

---

[1] See additional information about the Section's structure and chain of command on pages 12-14 of this Report.

5

governs a law firm's joint liability for an attorney's sanctionable conduct. Leadership recognized that, under the post-1993 amendments to Rule 11, a law firm is generally held jointly responsible for its attorney's violations unless it can demonstrate truly exceptional circumstances. Fed. R. Civ. P. 11(c)(1). Given the nature of the conduct and the timing of the motion, the Department concluded that rather than contesting sanctions, it would accept responsibility for Calloway-Durham's actions and instead focus on institutional improvement.

Accordingly, NCDOJ made a decision to withdraw the objection, substitute counsel, and focus its efforts on demonstrating to the Court that the issues were being taken seriously by the new leadership team and addressed through meaningful reform. At the April 15, 2025 hearing, NCDOJ representatives did not defend the merits of the motion to dismiss. Instead, they acknowledged the seriousness of the conduct and emphasized the structural and cultural changes already underway within the Public Safety Section to prevent recurrence.

Six months later, on October 17, 2025, the Court filed its Sanctions Order. [DE 141] It sanctioned Calloway-Durham under Rule 11 for filing a frivolous motion for the improper purpose of delaying trial. The Court also sanctioned NCDOJ jointly, citing its failure to adequately supervise Calloway-Durham and the Public Safety Section over several years. The Order referenced more than 15 incidents involving multiple attorneys between 2019 and 2024, nearly all of whom are no longer with the Department. As part of the sanction, the Court directed the Attorney General to submit a report identifying the

6

causes of the Section's deficiencies and outlining corrective measures. To fully understand the context of the Court's findings and the reforms now underway, it is necessary to examine the structure, function, and historical challenges of the Public Safety Section itself.

**B.      Organization and Work of the Public Safety Section Within the North Carolina Department of Justice.**

Through much of the Section's history cited in the Sanctions Order, this Section had been a part of the Criminal Bureau, which traditionally handled special prosecutions and criminal appeals of state court convictions. That changed in 2024, along with the structure of the Section, its leadership, and later the leadership of NCDOJ at large. The Public Safety Section is now housed within the Litigation Division of the Civil Bureau at NCDOJ, which defends state agencies and employees against civil lawsuits.

1.      Inception Through Mid-2024.

The Public Safety Section of NCDOJ was formed in approximately 2013. The Section currently represents the Department of Adult Correction (including prisons, probation, and parole) (DAC), Department of Public Safety (including Juvenile Justice, Alcohol Law Enforcement, and Office of Recovery & Resiliency) (DPS), the State Highway Patrol (SHP), the State Bureau of Investigations (SBI), and their employees and officials.

The Section litigates in federal and state courts, as well as in the North Carolina Office of Administrative Hearings. The Section's work focuses primarily on litigation and constitutional law, including 42 U.S.C. § 1983 litigation, providing defense to the law enforcement and correctional officers in constitutional and civil rights actions. The Section

7

also handles employment litigation for the state agencies it represents.

A large majority of the Section's work is prisoner lawsuits filed against DAC and its employees. The Section handles heavy volumes of lawsuits in the prisoner litigation context, with all the attendant discovery requests, motions to dismiss, motions for summary judgment and ultimately federal jury trials. Notably, the number of prisoner lawsuits has steadily increased over the years.[2] Moreover, during the last several years, prisoner litigation law has been evolving. Currently, it is more challenging to obtain a dismissal at the early dispositive motion stages. Additionally, if a dismissal is obtained, it is less likely that the dismissal will be affirmed on appeal.[3]

In 2017, the state legislature cut NCDOJ's budget by $10 million dollars. At the time, it was a 40 percent cut to the NCDOJ General Fund budget. Then-Attorney General Josh Stein predicted that public safety work done by NCDOJ attorneys would suffer because of this budget move by the legislature, warning that "[t]hese cuts would gut our Department and have damaging, long-term impacts on our state. Public safety would not be maintained at its current level. The taxpayer would be exposed to hundreds of millions of dollars in potential liability from lawsuits that we would not be able to defend

---

[2] Administrative Office of the U.S. Courts, *Caseload Statistics Data Tables*, Tables C/C-2, https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables (last accessed November 28, 2025) (compare statistics for prisoner lawsuits for "Civil Rights" and "Prison Conditions" in 2021-2022 to statistics for the same categories of lawsuits in 2024-2025. The numbers rose from 27,881 in 2020-2021 to 30,756 in 2024-2025).

[3] *See, e.g.*, *Perttu v. Richards*, 605 U.S. 460 (2025) (parties are entitled to a jury trial on exhaustion under the Prisoner Litigation Reform Act when the exhaustion issue is intertwined with the merits of the claim).

appropriately." Exhibit 1.

By 2019, the Section was reduced to 11 attorney positions. At that time, most of the attorney positions in the Section were Attorney IIIs (intermediate level)[4]. Due to that structure and the limitations imposed by NCDOJ's budget, promotional opportunities within the Section were scarce. If an experienced attorney wanted to seek advancement, the attorney likely had to take a position in another section or leave NCDOJ. As a result, the Section experienced a high turnover rate, sometimes with numerous vacancies occurring at the same time. Throughout the years, the Section had periods of time when it was significantly understaffed in both attorneys and paralegals. For example, in May 2022, the Section was only 73% staffed (three vacancies). And in March 2024, the Section reached its bottom: it was only 45% staffed (six vacancies).

From approximately 2019 until 2022, there was little managerial oversight into attorneys' caseloads. Because of the staffing shortages and a high volume of cases filed by prisoners, the Section Head was frequently required to "put out fires" instead of concentrating on management tasks. Specifically, management was not able to keep track of the procedural status of each attorney's cases to ensure that proper arguments were being made or review a majority of the filings. If an attorney needed help or guidance on a particular case, they could ask for it; otherwise, each attorney was responsible for managing their own caseload. The one standardized exception to this practice was for federal trials –

---

[4] Attorney positions at NCDOJ are designated by experience level and attendant job responsibilities, beginning with the most junior Attorney I and continuing up to senior Attorney V.

9

if an attorney had a federal trial coming up, they were required to meet with the Section Head and Division management to discuss the trial issues, documents, witnesses, and settlement potential.

This was an especially difficult time because COVID-19 restrictions had most employees working from home, leading to little collaboration between the Section's attorneys and strained communication with paralegals. As in other job sectors, the pandemic also resulted in additional turnover and employee burnout.

In 2022-2023, as part of the early efforts to address performance issues following the return to in-person work, the former Section Head instituted weekly docket meetings for the entire Section to review upcoming deadlines. The meetings were supposed to ensure that everything that was on the calendar was timely completed, with an added bonus of increasing attorney collaboration and paralegal communication. Around the same time, the former Section Head added his email address to every attorney's CM/ECF accounts in an attempt to ensure that case events were calendared.

While this increased managerial oversight, the Section's staffing issues persisted, leading to heavy caseloads for the remaining attorneys. While recruitment and retention challenges were prevalent in North Carolina state agencies as a whole,[5] the Section

---

[5] The North Carolina Office of State Human Resources (OSHR) in its commissioned Total Compensation Study noted that in 2022, "The State of North Carolina has seen applications for its posted vacancies drop by 15%, while the number of posted job vacancies has increased by 35%." NC OSHR, *2022 Compensation and Benefits Report* at 19, https://oshr.nc.gov/documents/2022-compensation-and-benefits-report/open, (last accessed on November 21, 2025). That hiring problem was enhanced by the high turnover

experienced vacancy and turnover rates that were considerably higher than at state agencies at large. From 2022 through 2024, the Section experienced substantial problems with long-term attorney retention. For example, during this time, various attorneys left their positions within 17 months, 15 months, 9 months, and 5 months. At around the same time, three other Section's attorneys, including Calloway-Durham, went on various unplanned and extended periods of leave. [DE 141 at 18] As a result, at one point in 2024, there were only five attorneys, including the Section Head, handling all the prisoner lawsuits in North Carolina.

Thus, in the relevant time period and until mid-2024, the Section saw a perfect storm of increased volume of prisoner cases, a pandemic that changed the work environment, decreased budget due to legislative funding cuts, persistent staffing vacancies, and evolving law in an already complex area of constitutional law. Not all the Section's attorneys proved to be a good fit for this high-volume, fast-paced litigation work in federal courts, especially under the challenging conditions discussed. Mistakes, missteps and instances of misconduct cited by the Court in its Sanctions Order and in other court documents occurred. [DE 141 at 37-39]

But, even in the face of the severe staffing, turnover, and caseload issues, the Section persevered and continued to function, delivering successful outcomes to its clients in many cases it handled. Collection of the data is limited by NCDOJ's lack of funding resources to

---

and retention problem in state government: "In the 2022 calendar year, agencies had a voluntary turnover rate of 14.85%, a significant increase from 8.74% the previous year." *Id*. at 23.

pay for a high-quality case management database to accurately present the outcomes from those times to the Court. However, between 2020 and August 2024, the Section had at least 27 federal trials with only one loss (originally for $0 but changed to only $1). Exhibit 2. The hundreds of other federal cases were either dismissed through dispositive motions or appropriately settled to achieve both the right outcome and financial savings for the Section's clients.

        2.       Mid-2024 Through January 1, 2025.

Faced with the challenges described above, between April and September 2024, the Section underwent significant structural changes in an attempt to improve its operations.

First, as of April 22, 2024, the Public Safety Section was transferred from the Criminal Bureau to the Civil Bureau. This allowed for the Section to be housed in the Litigation Division where other high-volume civil litigation sections reside. It also allowed for the Section's attorneys to interact with and be led by experienced civil litigators in the other Litigation Division sections.

Second, an outside law firm was hired by DAC in June 2024 to handle approximately 70 prisoner litigation cases, helping reduce the caseload for the remaining NCDOJ attorneys during the time the Section was undergoing a structural transformation described below.

Third, in an attempt to address the difficulty in recruiting experienced attorneys, in the late part of 2024, the Section was fundamentally restructured. Some of the vacant mid-level positions were reallocated to form six junior Attorney I positions. This resulted in

12

the Section's current staffing structure:

- one Section Head (currently 15 years' experience);

- five Attorney IV's (currently between 8-28 years' experience with one vacancy that has been posted for hiring);

- one Attorney III (currently 8 years' experience);

- three Attorney II's (currently between 3-6 years' experience);

- three Attorney I's (currently between 1-2 years' experience); and

- six Paralegals (with one vacancy).

Fourth, the former Section Head left for other employment, allowing for a change in the Section's direct line of leadership and bringing fresh energy to implement the reforms.

Fifth, the system of attorney-paralegal assignments changed, allowing attorneys to consistently work and build a professional relationship with one assigned paralegal, as opposed to the pool of multiple paralegals.

Sixth, on October 8, 2024, the new Section Head conducted a day-long onsite mandatory civil litigation training that focused on a full range of topics relevant to Section's civil litigation practice.

3. January 1, 2025 Through Present.

After taking office, Attorney General Jackson intentionally named leadership with significant experience in complex civil litigation and personnel management to oversee the Section. The Section Head reports to the Senior Deputy Attorney General in charge of the Litigation Division. The current Senior Deputy serving as the Head of the Litigation

13

Division was appointed on February 17, 2025, and is a 20-year veteran of NCDOJ with practice expertise spreading over several divisions. She is a Certified Public Manager with significant civil litigation roots in North Carolina state and federal courts and considerable management experience within both NCDOJ and in the United Nations system.

The Senior Deputy reports to the NCDOJ Civil Bureau Chief. The current Civil Bureau Chief has more than 30 years of experience as a practicing attorney in North Carolina. She has enjoyed a 30-year long career with NCDOJ, with many years of management experience at the Section and Division levels. The Civil Bureau Chief was appointed to that position under the new administration at NCDOJ on January 14, 2025.

In addition, the Chief Deputy Attorney General, who oversees all civil and criminal litigation for the Department, has specific experience in the work of the Section. Prior to joining NCDOJ, she was General Counsel for the Department of Public Safety, the primary client for the Section. As a result, she was intimately familiar with the challenges facing the Section and, on day one, began focusing on strategies for improving their work product. In so doing, she brought to bear 15 years of experience in complex civil litigation and federal prosecution before this Court.

In addition to leadership changes, the new Section Head worked on changing the culture of the Section by bringing the team together in a meaningful way, improving the office space, and sending regular Section-wide emails announcing important legal updates and systematized case assignments.

In June 2025, the Section Head also started requiring the Section's attorneys to

14

discuss with the Section Head the arguments being made in dispositive motions. This step was taken to ensure that all appropriate legal arguments are made to avoid unnecessary trials and to provide a level of quality control to guide against any improper arguments. Additional measures aimed at improving the Section's work and addressing the Court's concerns were taken in 2025 and are detailed on pages 22-38 of this Report. These changes have seen positive results. With the exception of two vacancies which are under additional restructuring considerations, the Section's vacant positions have been promptly filled.

In 2025, the Section completed five federal jury trials, winning four of them and the sole loss resulting in only $2 of damages. Exhibit 2. Additionally, in 2025, the Section has won dispositive motions in approximately 55 cases. Approximately 10 other cases were settled, avoiding the burden of further proceedings on the court. Another North Carolina federal judge recently complimented two of the Section's attorneys for their performance at a final pretrial conference and their apparent readiness for trial. Tr. of Final Pretrial Conf., *Torres v. Coffey*, No. 1:21-CV-68-MR at 24:8–10, 24:23 (W.D.N.C. Oct. 31, 2025). One of the Section's primary clients, DAC—which supplies the Section with the bulk of its federal work—has also noted strong positive growth trends and improvements in the Section since its reorganization, particularly in this calendar year. Exhibit 3.

## II. THE UNDERLYING CAUSES OF THE PUBLIC SAFETY SECTION'S ISSUES IDENTIFIED IN THE SANCTIONS ORDER.

The Court directed the Attorney General to prepare and file "a report that outlines the underlying causes of the Public Safety Section's issues." [DE 141 at p. 42] In response, and following best public management practices, the new leadership conducted a cause-

and-effect analysis. The information reviewed included relevant documents, systems, HR materials, case examples cited by the Court, and interviews with Section leadership covering the period from July 2020 to the present.

The analysis identified several root causes, which are summarized in the following cause-and-effect diagram and discussed in detail in the narrative sections that follow. These causes are grouped into four primary categories.



### A. Workload, Resources & People.

**Budget**. Insufficient funding of NCDOJ by the North Carolina General Assembly hindered hiring appropriate staff for the Section, as well as retention and promotional opportunities for high-performing attorneys, paralegal and administrative staff. As explained earlier in the Report, under the previous administration, NCDOJ faced a $10 million dollar budget cut. Exhibit 1. NCDOJ continued to request funding from the General Assembly to enable the agency to restore cut positions, retain and promote its top talent and to revert other cost saving measures. Yet, heading into this year, the overall budget shortfall continued to amount to $3 million dollars per year. Exhibit 4.

The Public Safety Section continues operations today not because of adequate funding from the General Assembly, but because of NCDOJ leadership's proactive collaboration with client agencies to secure necessary resources. The Section's ability to represent law enforcement and correctional officers in numerous civil lawsuits is sustained through direct funding support from those agencies, despite their own critical budget constraints.

**Workload**. The volume of federal cases, particularly cases filed by inmates, caused the Section's attorneys frequently to have a heavy caseload in the range of 40-60 cases. In fact, the former Section Head carried a caseload of approximately 120 cases at one point. The problem would become exacerbated at the times when the Section experienced vacancies.

**People**. In previous years, the Section suffered from a number of underperforming

17

litigators and paralegal staff. A small number of former NCDOJ attorneys were responsible for the vast majority of the issues cited by the Court on pages 37-39 of the Sanctions Order. Those individuals are no longer with the Department. Of the two remaining incidents involving current NCDOJ attorneys, the first involved typographical and formatting errors in a pleading prepared by a legally blind attorney. *Parks v. Poole*, No. 1:20-CV-898, 2022 U.S. Dist. LEXIS 179771 (M.D.N.C. Sept. 30, 2022). That attorney's filings are now supported by assistive technology or reviewed by a paralegal to reduce such errors. The second case involved an unsuccessful, though arguably novel, legal argument regarding waiver of attorney-client privilege in access-to-court claims. *Hale v. Wilson Cty.*, No. 5:19-CV-550-BO, 2022 U.S. Dist. LEXIS 159814 (E.D.N.C. Sept. 2, 2022).

**High Staff Turnover and Low Pay**.  Statewide pay lag has made it difficult for NCDOJ to compete with the private sector.  According to NC OSHR reporting, state employee salaries trail the market by approximately 11.6% over the past decade.[6] This pay gap has significantly impacted NCDOJ's ability to attract and retain qualified attorneys and staff, particularly in the Public Safety Section. The problem worsened during and after the pandemic, contributing to a severe staffing crisis between 2020 and 2024. Given the lower compensation compared to private firms, in-house counsel roles, and local government positions, many attorneys left for better-paying jobs, lighter caseloads and more advancement opportunities.  This high turnover disrupted continuity in case handling,

---

[6] NC OSHR, *2024 Compensation and Benefits Report* at 30, https://oshr.nc.gov/2024%20Compensation%20and%20Benefits%20Report/open (last accessed November 25, 2025)

strained remaining staff, and led to the loss of institutional knowledge critical to managing complex federal litigation efficiently and effectively.

Notably, this is not an issue unique to North Carolina or NCDOJ. State offices that provide legal representation to correctional facilities and officers routinely face challenges with attorney recruitment and retention. As part of its root-cause analysis, the Department discussed these issues with colleagues at various states' Offices of Attorney General, as well as with NAAG. They repeatedly confirmed the difficulty in staffing these cases due to their high volume, complex nature, and low compensation.

**No High-Quality Case Management System.** Despite repeated efforts, NCDOJ lacks the resources for a modern, centralized case management and calendaring system. The need for such a system has been highlighted by Section attorneys and managers for years. Although NCDOJ has consistently requested funding from the General Assembly for a case management system—including its most recent request—those efforts have not been successful. In support of its request, NCDOJ emphasized that the absence of such a system "hinders our ability to efficiently serve our clients and fulfill our legal obligations." Exhibit 4.

Modern legal case management systems streamline daily operations, reduce administrative burdens, and minimize human error through automated calendaring and workflow tools. In contrast, NCDOJ must rely on manual tracking through spreadsheets, paper calendars, and Outlook entries—methods that are labor-intensive, error-prone, and inefficient.

B.   **Performance Management & Supervision Structure.**

**Overburdened Supervisory Structure.**  Due to chronic understaffing and budget constraints, the Section Head and other supervisors were required to carry full litigation caseloads—at times exceeding 120 cases. This dual role left little time for consistent supervision, mentorship, or quality control. Aside from weekly "Monday meetings," which were largely procedural and ineffective, there were no regular supervisory check-ins or structured oversight of the Section's federal litigation workflow. As a result, case progress, calendaring consistency, and work-product quality were not adequately monitored.

**Limited Work Product Quality Control.**  No standardized system of substantive review of motions to dismiss and for summary judgment was in place to control the quality and consistency of the briefing in the Section.  While supervisors conducted trial strategy reviews prior to a given case going to trial, the quality of the briefs filed with the courts depended largely on the skill set of individual attorneys.

**Performance Management was Limited.**  The Section lacked a consistent and well-applied system for evaluating employee performance, providing feedback, or addressing underperformance. As noted in the Sanctions Order, repeated errors by some attorneys went uncorrected for extended periods.

C.   **Quality Control, Processes & Procedures.**

**Unstandardized Case Assignment.** The Section lacked a consistent case assignment policy. Over time, assignments varied significantly, and high-performing attorneys were sometimes overburdened with a large number of complex cases. No formal

limits were placed on the number of cases an attorney or the Section Head could be assigned, leading to uneven workloads and burnout.

**Inadequate Calendaring Controls.** To address missed deadlines, the Section implemented weekly "Monday meetings" to review docketing. However, these meetings failed to resolve underlying issues with miscalendared or overlooked deadlines and did not provide a reliable system for tracking time-sensitive tasks.

**Inconsistent Deadline Tracking.** Deadline tracking relied on manual systems maintained by attorney-paralegal teams, including spreadsheets, paper calendars, and Outlook entries. This approach was error-prone. Attempts to mitigate risk - such as copying the Section Head on all court notices - were ineffective due to the sheer volume of filings and lack of automation or manual backup systems.

### D. Culture, Accountability & Training.

**Professional Culture and Commitment to the Courts.** In response to the Court's concern about a "persistent disregard for the authority of the federal courts and the rule of law[,]" [DE 141 at 1], NCDOJ reviewed the Section's culture and attitudes toward federal litigation. No evidence suggested intentional disregard for judicial authority or rules. On the contrary, most attorneys and supervisors expressed pride in their federal practice and viewed their work as meaningful and professionally important. With few exceptions, the issues identified in the Sanctions Order were not rooted in a culture of disrespect.

**Inadequate Onboarding for New Attorneys.** New attorneys received only limited onboarding—typically a few handouts, brief review of early filings, and solid but informal

guidance from an experienced paralegal. These measures were insufficient to prepare attorneys for the demands of high-volume federal litigation.

**Lack of Ongoing Federal Practice Training.** The Department did not require regular training or updates on developments in federal civil litigation. This lack of continuing education contributed to inconsistent legal work and missed opportunities to improve practice standards.

**No Mandatory Supervisory Training.** New supervisors received minimal training on transitioning from litigation to management. Outside of basic HR requirements, there was no structured, mandatory program to support leadership development. This gap contributed to ongoing challenges in managing performance and maintaining accountability in a high-pressure environment.

## III. STEPS THE ATTORNEY GENERAL INTENDS TO TAKE TO ADDRESS THE PUBLIC SAFETY SECTION'S ISSUES.

The Court directed the Attorney General to discuss in this Report the steps that will be taken to address the underlying causes of the Public Safety Section's issues. In compliance with the Sanctions Order, NCDOJ developed a Growth & Improvement Plan for its Public Safety Section to address the identified issues and the likely causes that have contributed to these issues. The Plan contains the steps designed to remedy these causes within the finite budget and personnel resources available to NCDOJ within the next year. Those steps are organized by category of the causes they seek to address.

In addition to working on these steps and any needed adjustments identified through

22

the implementation period of this Plan and proposed by Justice Jackson or NAAG, NCDOJ intends to continue advocating for additional resources and funding for its Public Safety Section to the North Carolina General Assembly and the Section's state agency clients. NCDOJ leadership is also mindful that the entry of the Sanctions Order itself may inadvertently result in additional obstacles to recruitment and retention within the Section. This presents a genuine concern, as these obstacles could slow the momentum of the reforms outlined in this Plan and impact long-term progress.

The work continues. NCDOJ will evaluate and make improvements, where issues are identified. NCDOJ implements this Plan with an expectation to improve operations of the Section. However, the adjustments to the steps outlined in this document may become necessary, if the Public Safety Section exhibits additional repeated failings or patterns of professional misconduct of the type outlined in the Sanctions Order. [DE 141 at 39]



The following are the steps NCDOJ intends to take to address the issues identified

23

by the Court.

## A. Outside Advisors for Quality Control and Programmatic Improvements.

**External Monitoring by Former Justice Barbara Jackson.** To further strengthen oversight and ensure the successful implementation of the Growth & Improvement Plan, NCDOJ is engaging former North Carolina Supreme Court Justice Barbara Jackson as an external advisor. Justice Jackson has thirty-five years of experience practicing law, including fourteen years in the Court of Appeals and Supreme Court of North Carolina. Beginning in December of this year, Justice Jackson will provide independent review and guidance on the Section's progress and compliance with the Plan. Her responsibilities will include:

- Assisting the Section Head in reviewing filings by attorneys identified as "at-risk," as well as other significant briefs prepared by the Section;

- Participating in regular meetings with the Chief Deputy Attorney General, the Head of the Litigation Division, and the Chief of the Civil Bureau to provide updates on her observations and recommendations;

- Offering strategic input on legal quality, ethical compliance, and performance management within the Section; and

- Participating in trial preparation panels with Section Head and Division Head.

Justice Jackson's distinguished judicial experience and deep understanding of North Carolina law will provide valuable insight with respect to the Department's reform efforts.

**NCDOJ Partnership with the National Association of Attorneys General**. Further, as part of a broader commitment to public service excellence and structural reform,

24

NCDOJ has been in ongoing conversation with NAAG to assist the Department by providing an outside confidential review of the Public Safety Section and proposing additional improvements for the Section's operations.

NAAG is uniquely positioned to support this effort by leveraging its national network of Attorney General offices, its institutional knowledge of best practices in public sector legal work, and its non-partisan consulting and training capabilities. NAAG's support with respect to this matter will focus on three critical areas: management review, subject matter expertise, and professional development.

    1.    Management Review and Process Improvement.

NAAG's consulting services are designed to help Attorney General offices evaluate and improve internal operations. For the Public Safety Section of NCDOJ, it is expected that NAAG will provide:

- **Organizational and Process Audits**: A consulting team will assess the Section's structure, workflow, and case management systems to identify inefficiencies or inconsistencies that may have contributed to the issues cited by the Court;

- **Best Practices Benchmarking**: NAAG will compare the Section's policies, staffing, and operations with those of other high-performing AG offices to identify opportunities for improvement; and

- **Strategic Planning Support**: NAAG will assist NCDOJ leadership in enhancing its proposed Growth & Improvement Plan to implement reforms and track progress over time.

    2.    Legal and Substantive Expertise.

NAAG provides access to a national network of legal experts and resources to help

25

address the substantive legal issues raised in the Sanctions Order:

- **Subject-Matter Expertise**: NAAG can connect NCDOJ attorneys with experts in public safety litigation, constitutional law, and other relevant areas.

- **Policy and Process Development**: NAAG will assist in drafting or revising internal processes, legal guidance and policy manuals to ensure compliance with judicial expectations and national standards.

    3.      Training and Professional Development.

NAAG's training programs are central to building a culture of accountability and excellence:

- **Customized In-Office Training**: NAAG faculty will deliver targeted training sessions on topics such as federal litigation management and standards.

- **Leadership Development**: Specialized training for supervisors and managers will focus on performance management, accountability, and communication to ensure reforms are implemented consistently and sustainably across the Section.

NCDOJ's partnership with NAAG reflects the Department's broader commitment to accountability and improvement of its Public Safety Section's work. The following are additional specific steps NCDOJ intends to take to address the identified issues.

    **B.**      **Improved Management & Supervision.**

    1.      Measures Already Taken.

**Monthly Supervisory Meetings**. In November 2025, the Section Head began a series of recurrent one-on-one meetings between him and each attorney-paralegal team. These one-on-one meetings are designed to review the status of all active cases with the goal of spotting and troubleshooting any emerging issues and deficiencies in active cases.

These meetings will continue and recur on a monthly basis. Section-wide Monday docket review meetings that proved to be inefficient for its sought goals were discontinued.

**Weekly Attorney-Paralegal Meetings.** NCDOJ leadership recently mandated weekly attorney-paralegal team meetings for each attorney-paralegal team. During these weekly attorney-paralegal meetings, there are two things the attorney is required to discuss with the paralegal: (1) what was filed/served during the previous week to ensure any related deadlines are calendared; and (2) what needs to be filed/served in the upcoming week and whether anything is needed for it. These meetings are designed to ensure that deadlines are calendared, everyone is aware of upcoming deadlines, and attorneys and paralegals discuss the needs of each case.

**Structural Changes to Attorney-Paralegal Team Assignments.** Over the last year, the Section Head has instituted additional structural changes. After completing the hiring of the new junior attorneys at the end of 2024, new paralegal assignments were made. The idea for these assignments was to assign one paralegal to two attorneys – a senior attorney (Attorney III or IV) and a junior attorney (Attorney I or II). This is designed to mimic the partner-associate law firm model, wherein the junior attorney has a built-in senior attorney to answer questions, help with strategy, and assist with more complex litigation tasks (e.g. trials or appeals). The model also allows for junior attorneys to help the senior attorneys with their more complex cases and learn from their experience.

**Quarterly Litigation Division Section Head Meetings.** In the spring of 2025, prior to this Court's order, the Head of the Litigation Division commenced a series of

standing meetings for Section Heads in the Litigation Division. The goals of these meetings are to break down management silos for litigating sections, provide appropriate management peer support and facilitate information sharing about NCDOJ best management practices, emerging litigation and management issues and practical know-how among the Division's leadership. These Litigation Division Section Head meetings are scheduled on a recurrent quarterly basis in-person and will continue in the next calendar year. When possible, the Civil Bureau Chief will attend these meetings to ensure additional level of oversight.

**Division-Level Monthly Meetings.** In March 2025, the Head of the Litigation Division initiated a series of standing one-on-one, in-person monthly meetings with the Section Heads. The monthly meetings provide a regular opportunity for the Division's individual Section Heads to check in with the Division Head, update the Division Head on any emerging pattern or issue that needs to be addressed or escalated through the leadership chain of command. The first meeting with the Head of Public Safety Section was held on March 3, 2025. The Division Head additionally exercises an open-door policy and is frequently in touch with the Section Heads, in person or virtually, for routine management issues.

**Supervisory Training.** On June 11-12, 2025, the Public Safety Section Head completed an in-person specialized training, Core Leadership Competencies for First-Line & Mid-Level Managers, conducted by NAAG. The training encompassed management topics relevant to the supervision issues discussed in this Report, including but not limited

to the role of the manager; setting goals, roles, and accountabilities in the working AG unit; manager communication; and necessary conversations.

2. Additional Measures.

**New Approval Protocol for the Section.** NCDOJ leadership is implementing a new Supervisory Approval Protocol for the Section in 2026. The Protocol will require the following:

- All Attorneys: The Section Head and/or Justice Jackson must review all dispositive motions, responses to motions to compel and responses to any negative court order (including Show Cause); and

- At-Risk Attorneys: Any attorney on a Performance Improvement Plan, with a written warning or subject to a judicial sanction must have all substantive court filings reviewed by the Section Head or Justice Jackson.

This additional layer of review should improve the quality and consistency of the Public Safety Section work product. It should also quickly identify attorneys who need additional training, assistance, or oversight.

**Supervisor Case Cap.** To improve the ability of the Section Head to adequately manage and supervise the Section, NCDOJ leadership is implementing a cap on the number of cases that the Supervisor will actively handle as an attorney of record for the next calendar year. The need and efficacy of this cap will be continually evaluated and reassessed at the end of 2026.

**Additional Management Training.** Additional management and supervisory training opportunities will be actively explored for the Section Head of the Public Safety Section. The goal is to have the Section Head complete another appropriate management

29

and supervisory course within the next year. Additionally, NCDOJ is holding an in-person NAAG-administered specialized management training for new supervisors in January 2026.

### C. People, Resources and Workload Management.

#### 1. Measures Already Taken.

**Manual Audit of the Section's Caseload.** To assess the Section's current caseload in the absence of a high-quality automated case management software, a manual audit of the current attorney caseload began on November 4, 2025. The manual audit involved a series of 2-3 hours-long one-on-one in-person meetings of the Section Head with each attorney-paralegal team. That process has now been completed. That process has now been completed. It was determined that the current caseload in the Section averages less than 30 cases per attorney. This lower caseload increases the likelihood that attorneys and staff can adequately respond to case deadlines.

#### 2. Additional Measures.

**Budget Restoration & Case Management System Advocacy.** NCDOJ will continue advocating to the North Carolina General Assembly for restoration of its budget and additional resources where necessary. NCDOJ will also continue advocating to the North Carolina General Assembly for funding for a modern case management system through annual recurring costs with a nonrecurring one-time allotment.

**Continued Client Outreach for Position Funding.** Because NCDOJ has been unsuccessful in its efforts to restore its budget at the General Assembly level since 2017,

30

NCDOJ relies on its state agency clients to fund the majority of the Section's positions. NCDOJ is currently actively working on its outreach to the Section's client agencies to negotiate funding for either additional positions for attorneys and staff and/or for promotional opportunities for high-performing attorneys within the Section to slow down the high attorney turnover rate. Specifically, NCDOJ leadership is in negotiations with DAC about funding for a Manager-Paralegal position for the Section. The Manager-Paralegal would lead the paralegal team and supervise the Section's docketing and calendaring needs, following the example of a paralegal team leader in the high-volume Tort Claims Section of the Litigation Division.

**Attorney Case Cap.** To address the high caseload, leadership will install a cap on the number of cases assigned to the Section's attorneys. NAAG will assist with the evaluation of the appropriate cap based on best practice benchmarks in Attorneys General offices across the United States. The need and efficacy of this cap will be monitored on a continuous basis and then reassessed at the end of 2026.

**Attorney-Supervisor Communication.** Section attorneys will be required to immediately report to the Section Head if the volume of work within the established cap triggers a performance/work quality issue. The Section Head will discuss the issue with the attorney, identify solutions or escalate the situation as needed up the chain of command.

**Update Public Safety Issue Bank.** To support consistency in legal arguments, NCDOJ will update and maintain an Issue Bank for the Public Safety Section. This resource will serve as a reference repository for commonly encountered legal issues and

31

sample briefing. However, attorneys will be expected to treat the Issue Bank as a starting point only. Each attorney will remain responsible for conducting independent legal research, tailoring arguments to the facts of the case, and ensuring the accuracy and appropriateness of all filings.

**Update Onboarding Materials for New Hires.** The Section Head will update and streamline onboarding training to improve performance and prepare new attorneys for federal practice. Justice Jackson will also provide direct coaching and work product review for new attorneys in order to reduce errors.

**Trial Director Licenses for the Section.** Trial Director is legal software that helps organize, manage, and present evidence in a courtroom. It aims to create visual presentations using a variety of digital media like documents, videos, and images, and offers features for annotating, highlighting, and synchronizing evidence. To improve the quality of the trial work by the Section, NCDOJ plans to train and give the Public Safety Section attorneys and staff access to Trial Director. This will enable the Public Safety attorneys to deliver a more professional and efficient trial presentation.

**Explore the Use of Everlaw for the Section**. Everlaw is a cloud-based solution that automates the discovery process, among other tasks, resulting in labor savings for the team. It enables teams to upload, review, and produce documents to streamline discovery. If the client agency approves the Everlaw funding in certain more complex cases, NCDOJ will be implementing Everlaw training sessions for the Section's attorneys and paralegal staff, leveraging the Everlaw expertise of an NCDOJ senior paralegal.

32

**Pause the Section's Criminal Rotation Work.** NCDOJ does not have adequate staffing in its Appellate and Post Conviction Section to handle all of the criminal appeals for the state. As a result, all attorneys in the Department, outside of a few limited exceptions, are required to write criminal appellate briefs on a rotational basis. In addition to accomplishing a critically important task for the State, this assignment contributes to the development of NCDOJ attorneys' appellate skills.

Attorneys in the Public Safety Section are currently required to participate in this criminal brief rotation with some limitations. However, in recognition of the need to focus on Public Safety cases, NCDOJ will pause its criminal brief assignments for the Section's attorneys for a period of six months starting January 1, 2026. The efficacy of the criminal brief rotation for the Section will be evaluated in July 2026.

### D. Internal Quality Control, Process & Procedure Improvement.

1. Measures Already Taken.

**Implement a Mandatory Negative Court Citations Report Policy.** Across the Litigation Division, including the Public Safety Section, attorneys are now required to immediately report any motion to compel, negative sanction, contempt, missed deadline or admonishment order to their respective section heads, who will escalate to the Division Head as needed.

**Solicitor General Collaboration for Public Safety Section Appeals.** In the late summer of 2025, the Solicitor General, Litigation Division Head, and Public Safety Section Head implemented new protocols for the Section's appeals to streamline the appeals

33

process, improve the quality of the Section's appellate product and determine whether Solicitor General's assistance will be beneficial for any particular appeal. The initial consultation about the direction of any given appeal takes place around the time when the Fourth Circuit issues its formal briefing order, if any, in a case. That collaboration yielded a positive result already. In October 2025, the Department handled oral arguments in the Fourth Circuit for three appeals stemming from the work of the Public Safety Section.

        2.     Additional Measures.

**Successive Motions for Extension Discouraged.** Successive motions for extension of time within the Section are now discouraged. Any second or successive motion for extension of time will need to be approved by the Section Head and be accompanied by a good faith basis acceptable to the Section Head. This change will reduce delays in and burdens on court schedules.

**Public Safety Section Paralegal-Manager Position.** Particularly in the absence of a high-quality case management system, an additional system of manual case management checks-and-balances is needed. As mentioned above, NCDOJ is in discussions with DAC to create a paralegal-manager position. That individual will provide an additional layer of supervision of the paralegal staff and will serve as a master of the Section's federal calendaring system. The paralegal-manager will report to the Section and Division Head.

**Establishment of a Centralized Calendaring System.** This system would remove the burden of initial calendaring from individual, overworked attorneys. Implementation

of such a centralized calendaring system would be managed by paralegals under the lead of the paralegal-manager. This team would be responsible for receiving all court e-filings in addition to the attorneys of record, calendaring all deadlines, and sending standard escalating reminders to attorneys and the Section Head.

**Dispositive Briefing Checklist.** Prior to filing any dispositive motion, the assigned attorney must complete a Dispositive Motions Checklist and submit it to the Section Head along with the draft motion for review and approval. The Section Head must retain a copy of each completed checklist for a period of one year from the date of filing.

**NCDOJ HR & Management Collaboration**. A senior NCDOJ HR staff member will be assigned to work with the Section and Division Head to assist with the Section's HR goals. The NCDOJ HR liaison assigned to the Section is to collaborate with OSHR to ensure that these proposed personnel policies and practices in response to the Sanctions Order align and are consistent with best state HR practices. If any HR exceptions are appropriate, NCDOJ HR and the Division Head will consult OSHR on an as needed basis.

**DAC-NCDOJ Collaboration to Streamline Access to the Prisoner Records.** NCDOJ and DAC are working together to establish a streamlined data-sharing process in order to expedite review and disclosure of discovery in civil cases. By communicating early and leveraging DAC's new shared document platform, NCDOJ attorneys and paralegals will have faster access to client case files.

    E.    **Culture of Accountability & Training and Development.**

        1.    Measures Already Taken.

**Mandatory Monthly Section-Specific Onsite Training Series.** Under Attorney General Jackson, NCDOJ has begun mandatory training for Section attorneys. Starting in April 2025, these trainings have been occurring on a regular basis on topics including:

- Scheduling Orders (April 2025);

- Dispositive Motions (May 2025);

- Written Discovery (June 2025);

- The Prison Litigation Reform Act (PLRA) (July 2025);

- Hearing/Trial Preparation (August 2025);

- Settlement Valuation (September 2025);

- Citations (October 2025);

- Mediations (November 2025);

- Growth & Improvement Plan (November 17, 2025); and

- Westlaw Fundamentals Research (November 2025).

**NCDOJ In-person Continuing Legal Education (CLE).** Additionally, in 2025 NCDOJ re-instituted its in-person two-day CLE program. The CLE program this year featured a federal practice segment focused on dispositive motions practice, scheduling orders, discovery, and professionalism in North Carolina federal courts.

**Public Safety Section's Paralegal Training.** Strengthening competence and professionalism of the paralegal staff should aid the goal of meeting the federal court deadlines, appropriate document preparation and other paraprofessional tasks in the Section. On July 15, 2025, the Section's paralegals were required to attend a day-long

36

onsite, lecture-based course conducted by NAAG. The course included training on litigation specific topics such as drafting effective discovery responses and requests, e-discovery, and preparation and use of trial exhibits. All paralegals attended the training. NCDOJ contemplates additional hands-on and course-based training for the Section's paralegal and administrative staff.

2. Additional Measures.

**Mandatory Two-Part Federal Training for Attorneys.** NCDOJ leadership has now mandated training by the Practicing law Institute (PLI) consisting of a two-part series of 1-day trainings for all Section attorneys focused on two relevant practice areas: (1) federal civil litigation practice updates; and (2) defense of section 1983 cases. The training requirement was automated in the state online management tool to require all existing positions and any new attorney joining the Section to be assigned this mandatory training series for completion. The first mandatory module is scheduled to be completed by the Section's attorneys on or before December 31, 2025, and the second training is to be completed on or before March 31, 2026.

**Proposed Meetings with North Carolina Federal Judiciary.** The steps proposed in this Report seek to address causes and minimize reoccurrences of the issues identified in the Sanctions Order. Unfortunately, there always remains the possibility of human error. In an attempt to spot and troubleshoot any reemerging problems or new emerging issues, NCDOJ intends to seek opportunities to engage in a dialogue with the federal judiciary about the Section's performance for, at least, the duration of the next calendar year

37

accompanying the implementation of the Growth & Improvement Plan. NCDOJ recognizes the federal judiciary's existing work obligations and heavy workload and will accommodate any schedule or model of in-chamber meetings or other modes of rapport that will be amenable to the Court.

NCDOJ expects that the combination of all the steps outlined in this Report will optimize and improve the performance of the Public Safety Section.

## IV. LIMITATIONS AND RESERVATIONS OF RIGHTS.

While this Report reflects a thorough and good-faith effort by the current leadership of the Department to identify, analyze, and address the issues raised by the Court, and implement appropriate solutions, several limitations should be acknowledged:

### A. Retrospective Nature of the Review.

The majority of the conduct cited in the Court's Sanctions Order occurred prior to the current administration's tenure. As such, the leadership team preparing this Report did not have direct involvement in the events or decisions that led to the sanctions. The analysis is therefore based on:

- Review of case files and docket entries;

- Interviews with current and former staff; and

- Available HR and administrative records.

This retrospective review, while diligent, is inherently limited by the availability and completeness of documentation and institutional memory.

**B. Incomplete Data Systems.**

As mentioned throughout, NCDOJ currently lacks a comprehensive, centralized case management system capable of generating detailed performance metrics or historical litigation outcomes. As a result:

- Quantitative data on case outcomes, attorney performance, and filing timelines is limited; and

- The Report relies in part on survey/human accounts evidence and manual file, systems and information review.

Efforts are underway to seek funding to modernize NCDOJ data systems, but this limitation affects the precision of historical analysis.

**C. Resource Constraints.**

As discussed throughout the Report, the Section and NCDOJ at large continues to operate under significant budgetary and staffing limitations. Those issues limit the ability of NCDOJ to cut down on high rates of turnover of staff and to promote and retain its high performing attorneys in the Section. While reforms are being implemented using available NCDOJ resources and support of the Section's agency clients, their full impact may be constrained without additional support from the General Assembly. Indeed, NCDOJ could face unforeseen additional budget constraints that could further endanger the good faith efforts at improvement. NCDOJ is committed to making improvements where possible and finding creative solutions to the challenges identified in this Report.

**D. Reservation of Rights.**

This Report is submitted in good faith and in full compliance with the Court's

Sanctions Order. While the Department is not itself a party to this litigation, it understands that its attorneys have a duty and obligation to abide by all Court rules and ethical responsibilities. However, the Department must respectfully reserve the right to object to any future sanctions that extend beyond the scope of the current Sanctions Order or that would unduly interfere with the internal operations of a sovereign state agency and the elected Attorney General. Further, the Department reserves all rights under the Constitutions of the United States and the State of North Carolina.

The Department also acknowledges the Court's stated intent to retain jurisdiction without any time limit to ensure compliance. To the extent that this refers to the timely submission of this Report and trial in this matter, NCDOJ does not object. However, it reserves the right to challenge any future assertion of jurisdiction over NCDOJ as a non-party beyond the scope of Rule 11 or the current proceedings.

### E.    Additional Institutional Concern.

While the Department fully accepts the seriousness of the conduct underlying the Sanctions Order and remains committed to reform, it respectfully notes a concern that the Order may be utilized by opposing counsel in future litigation to chill routine litigation practice. Opposing counsel have already cited it in unrelated matters to suggest improper conduct where none exists. *See* Notice of Position re Mot. for Extension of Time*, McLean v. Lechner*, No. 5:25-ct-03199-M (E.D.N.C. Nov. 4, 2025), DE 10. There is a real risk that routine litigation activity—minor scrivener's errors, novel but nonfrivolous arguments, or reasonable extension of time requests—could be unfairly equated with past misconduct.

40

This could burden the court with frivolous complaints, chill effective advocacy, and hinder the Section's ability to represent its clients in high-volume federal litigation. The Department raises this concern now, as the Court may be asked in future cases to apply a sanction where one would not normally lie.

## **CONCLUSION**

The Public Safety Section is undergoing substantial structural, cultural, and operational changes. This deep process is gradual and takes time. With new leadership, new personnel, and a comprehensive Growth & Improvement Plan now underway, the Section is on a path toward greater accountability and professionalism. Though challenges remain, the Department is committed to continuous improvement and to restoring the confidence of the federal judiciary and the public it serves. NCDOJ will continue to implement and monitor the reforms outlined in this Report with diligence and make any appropriate changes along the way.

Respectfully submitted, this the 1st day of December, 2025.

JEFF JACKSON
Attorney General[7]


/s/ Alex R. Williams
Alex R. Williams
Special Deputy Attorney General
Section Head

---

[7] This report was additionally reviewed and approved for filing by Kelly Chambers, Civil Bureau Chief, N.C. State Bar No. 19857, Email: kchambers@ncdoj.gov and Laura S. Howard, Chief Deputy Attorney General, N.C. State Bar No. 38485, Email: lhoward@ncdoj.gov.

41

N.C. State Bar No. 41679
Email: awilliams@ncdoj.gov

/s/ Olga E. Vysotskaya de Brito
Olga E. Vysotskaya de Brito
Senior Deputy Attorney General
Division Head
N.C. State Bar No. 31846
Email: ovysotskaya@ncdoj.gov


N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
Phone: (919) 716-6900
Fax: (919) 716-6763

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of

Court using the CM/ECF system, and that I will cause the foregoing document to be served

on all non-CM/ECF participant(s) by U.S. Mail, postage prepaid, addressed as follows:

Sean B. Mayo
PO Box 2922
Rocky Mount, NC 27802
Pro Se Plaintiff

This the 1st day of December, 2025.

/s/ Olga E Vysotskaya de Brito
Olga E. Vysotskaya de Brito
Senior Deputy Attorney General
N.C. Department of Justice

## CERTIFICATE OF MAILING
## TO CHIEF UNITED STATES DISTRICT JUDGES

The undersigned hereby certifies that on this day a copy of the foregoing Report was sent via the United States Mail, postage prepaid and certified, to the Chief United States District Judges in each of North Carolina's federal judicial districts, addressed as follows:

Chief United States District Judge Richard E. Myers, II
United States District Court for the Eastern District of North Carolina
2 Princess Street
Wilmington, NC 28401


Chief/Senior United States District Judge Catherine C. Eagles
United States District Court for the Middle District of North Carolina
324 W. Market Street
Greensboro, NC 27401-2544


Chief United States District Judge Martin K. Reidinger
United States District Court for the Western District of North Carolina
200 U.S. Courthouse Building
100 Otis Street
Asheville, NC 28801

Respectfully submitted this the 1st day of December, 2025.


/s/ Olga E. Vysotskaya de Brito
Olga E. Vysotskaya de Brito
Senior Deputy Attorney General

44